**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GAIL A. GRIFFIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:24-cv-00248-TRM-MJD** |
| | ) | |
| **MILLENNIA HOUSING** | ) | **JURY DEMANDED** |
| **MANAGEMENT, LTD.** | ) | |
| **and MILLENNIA HOUSING** | ) | |
| **DEVELOPMENT, LTD.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Defendants Millennia Housing Management, Ltd. and Millennia Housing Development, Ltd. ("Defendants" or "Millennia") submit this Memorandum in Support of their Motion for Summary Judgment.

## <u>INTRODUCTION</u>

Millennia is a property management company based in Cleveland Ohio and currently employs about 800 employees, managing approximately 20,000 affordable and market rate apartment units in 26 states. (Moore Decl. ¶ 3[1]). Millennia's core mission is "to provide the highest quality of standards in the management of affordable and market rate rental housing." (Moore Decl. ¶ 4). Plaintiff is a former employee of Millennia, whose employment was terminated after a significant, and documented, decline in performance.

---

[1] The Declaration of Debra Moore is attached hereto as Exhibit 1.

Plaintiff alleges she was discriminated against because of her age in violation of the Age Discrimination Employment Act ("ADEA") 29 U.S.C. §623, *et seq.* and the Tennessee Human Rights Act ("THRA") T.C.A. §4-21-401(a), *et seq.* As further discussed below, each of these claims are entirely without merit and are subject to dismissal.

The undisputed record shows that Millennia repeatedly promoted Plaintiff over the course of her tenure – from Property Manager to Senior Property Manager, to Regional Manager, and ultimately to Regional Property Director - based on her prior success. But beginning in 2022, Plaintiff's performance declined sharply, particularly with respect to the Jacksonville portfolio for which she had recently taken responsibilities. Objective metrics, compliance audits, HUD-related inspections, and internal financial reviews revealed persistent account receivables problems whereby she did not collect rents from residents, missed occupancy targets, severe regulatory compliance deficiencies, and unacceptable operational conditions at multiple sites under her supervision. These issues were documented in a 2022 performance evaluation, corroborated by multiple managers and executives, and memorialized in a detailed Performance Improvement Plan that Plaintiff acknowledged receiving.

Despite repeated opportunities to improve, the problems worsened. Within weeks of the PIP, Millennia uncovered even more serious compliance failures - including missing resident files, undeposited rent checks, and an inability to locate any unit inspections for an entire year - problems that jeopardized HUD compliance and risked significant penalties. These discoveries, combined with ongoing staff complaints and continued operational breakdowns, led Millennia to terminate Plaintiff's employment.

Against this backdrop, Plaintiff cannot demonstrate that her termination was because of her age. The same executives who promoted her into senior leadership positions made the decision

to end her employment. Millennia continues to employ multiple Regional Managers and Regional Directors over the age of 50, including individuals in the same role Plaintiff once held. The only alleged "age-related" remarks Plaintiff alleges are (1) CEO Frank Sinito's statement about turning the company over to the "younger generation" - referring explicitly to his adult children, not to Millennia's workforce; (2) James Zapf (age 59), who was not part of any decision-making process and was employed by Millennia for approximately ninety (90) days; (3) Debra Moore (age 62) who made a comment about making sure staff was trained because Plaintiff and Moore might be thinking about retiring. Under binding Sixth Circuit precedent, stray remarks unrelated to the decisional process are insufficient to create a triable issue of age bias.

Because Plaintiff cannot establish a *prima facie* case of age discrimination, much less show that Millennia's well-documented, legitimate reasons for her termination were pretext for age bias, her age discrimination claims fail as a matter of law. Under the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177–178 (2009), a plaintiff bringing a claim under the ADEA bears the burden of proving, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action—not merely a motivating factor. Plaintiff cannot come close to satisfying this burden. Accordingly, summary judgment should be granted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Millennia is based in Cleveland Ohio and currently employes approximately over 800 employees, managing approximately 20,000 affordable and market rate apartment units in 27 states. (Moore Decl. ¶ 3).

2. Millennia's core mission is "to provide the highest quality of standards in the management of affordable and market rate rental housing." (Moore Decl. ¶ 4; Plf. Dep., Ex. 1[2]).

---

[2] Relevant portions of Plaintiff's Deposition ("Plf. Dep.), and all relevant exhibits, are attached hereto as Exhibit 2.

3

3.  Millennia is an equal employment opportunity employer and maintains an "Open Door Policy" that encourages employees to raise concerns or provide feedback directly to management. (Plf. Dep. 64:1-6; Plf. Dep., Ex. 1).

4.  Millennia provides "equal employment opportunities to all employees and applicants for employment without regard to race, color, religion, sex (including pregnancy, lactation, childbirth or related medical conditions), gender identity, sexual orientation, national origin, ancestry, age (40 and over), physical or mental disability, genetic information (including testing and characteristics), military service or veteran status, citizenship status, or any other classification protected by applicable local, state, and federal law." (Plf. Dep. 65:20-66:4; Plf. Dep., Ex. 1).

5.  Millennia "does not tolerate harassment, discrimination, or retaliation of any kind, including but not limited to, these protected classes." (Plf. Dep. 68:1-4; Plf. Dep., Ex. 1).

6.  Plaintiff was aware of Millennia's equal employment opportunity and non-discrimination policy. (Plf. Dep. 61:12-23, 66:2-4).

7.  Plaintiff was also aware of Millennia's Open Door Policy during her employment. (Plf. Dep. 64:4-6).

8.  During her employment, Plaintiff received a copy of the employment handbook and attended an in-person training in which the company's non-discrimination policy was discussed. (Plf. Dep. 61:12-23, 66:2-4).

9.  Millennia's Employee handbook was readily available via the intranet and a physical copy was kept at the property where Plaintiff worked. (Plf. Dep. 61:24–62:7).

10.  Plaintiff began her employment with Millennia on August 19, 2016, as a Property Manager at the Overlook Apartments in Chattanooga. (Plf. Dep. 22:2–4, 42:22–43:9, 71:9–12).

4

11.     As a property manager, Plaintiff was responsible for managing occupancy, handling rent collections, addressing resident concerns and ensuring compliance with government regulations. (Plf. Dep. 22:2–4, 42:22–43:9, 71:9–12).

12.     In October 2017, Plaintiff was promoted to Senior Property Manager. (Plf. Dep. 75:6–19).

13.     In October 2018, Plaintiff was promoted to Regional Manager. (Plf. Dep. 75:6–19).

14.     As a Regional Manager, Plaintiff was responsible for overseeing the following properties: Overlook (Chattanooga), Morning Side (Knoxville), Summit Towers (Knoxville), Maple Oaks (Kingsport), Cherokee Hills (Hazard, Kentucky) Watauga Square (Johnson City), and Charles Seivers (Clinton). (Plf. Dep. 59:23-60:5, 83:12-14).

15.     In September 2021, Plaintiff was promoted to Regional Property Director.  (Plf. Dep. 97:20-22).

16.     As a Regional Property Director, Plaintiff received responsibility for an additional six properties, including four properties in the Jacksonville, Florida market.  (Plf. Dep. 93:10-13).

17.     The Jacksonville properties required a significant amount of attention. (Plf. Dep. 93:10-24).

18.     While Plaintiff's performance was strong as a Property Manager, Senior Property Manager, and as a Regional Manager—evidenced by promotions and positive performance reviews—her performance began to significantly decline in 2022 and 2023. (Weckerly Dep. 10:21–25[3]; Sinito Dep. 28:6–10[4]).  Specifically, Plaintiff's performance relating to the Jacksonville properties became extremely concerning.  (Sinito Dep. 31:13-15; Weckerly Decl. ¶ 4[5]).

---

[3] Relevant portions of Alan Weckerly's Deposition are attached hereto as Exhibit 3.
[4] Relevant portions of Frank Sinito's Deposition are attached hereto as Exhibit 4.
[5] The Declaration of Alan Weckerly is attached hereto as Exhibit 5.

5

19.     In fact, as early as July 27, 2022, Millennia's CEO, Frank Sinito, recommended that Millennia place Plaintiff on a Performance Improvement Plan ("PIP") based on her not properly conducting quarterly inspections for her properties and based on a review of two of the Jacksonville properties' (Valencia and Callaway) financials. (Moore Decl. ¶ 5). Plaintiff was not placed on a PIP at that time. (Moore Decl. ¶ 5).

20.     On November 28, 2022, Payroll Manager Philip Krakowiak sent an email to Moore stating, "Just making sure Gail is okay. She has been consistently going up in errors over the last few weeks. It's never been this bad, so just making sure. I'm going to start estimating to correct and approve." (Moore Decl. ¶ 5; Moore Dep. 7:5[6]).

21.     Along those lines, in 2022, Plaintiff's portfolio had the highest amount of payroll within the entire company, including overtime pay. (Weckerly Decl. ¶ 5).

22.     For Regional Managers, performance evaluations are typically completed by direct supervisors and assess items including financial performance, leadership, and professional conduct. (Moore Dep. 11:23–12:14). Alan Weckerly completed Plaintiff's performance evaluation for the year of 2022. (Weckerly Decl. ¶ 5).

23.     In the 2022 Performance Evaluation, Weckerly gave Plaintiff a "Needs Improvement" in the following categories: (1) Financial Performance – Controllable Net Operating Income – Location/Area; (2) Financial Performance – Individual Contribution; (3) REAC – Individual Contribution – Real Estate Assessment Center Inspection; (4) MOR – Location/Area – File Audits and Management Occupancy Reviews; (5) MOR – Individual Contribution – File Audits and Management Occupancy Reviews; (6) Unit Turn and Inspections. (Weckerly Decl. ¶ 8).

---

[6] Relevant portions of Debra Moore's Deposition are attached hereto as Exhibit 6.

6

24. The Overall Rating on the 2022 performance evaluation was a 2.75, which indicated "Needs Improvement." (Moore Dep. 28:13–15). Weckerly left a comment stating, "Gail had a tough year with the portfolio under her supervision." (Weckerly Decl. ¶ 9).

25. When performance concerns are identified, such as those outlined in Plaintiff's 2022 Performance Evaluation, Millennia frequently uses a Performance Improvement Plan ("PIP") to provide employees an opportunity to address deficiencies and remain employed. (Moore Dep. 19:11–20:23).

26. Plaintiff's performance issues were regularly discussed by Millennia's leadership team, including Alan Weckerly, Frank Sinito, compliance representatives, and members of the finance team. (Moore Dep. at 18:1-15).

27. Due to her continued performance issues, on May 2, 2023, Moore met in-person with Plaintiff, and Weckerly participated via Zoom. At the meeting, Plaintiff was presented with two options: accept a demotion and a PIP or accept a severance package. (Moore Dep. 48:5–14; Plf. Dep. 262:10-18, 10:17-20). Retirement was never discussed during this meeting. (Moore Dep. 48:8–19).

28. Plaintiff accepted the PIP and the demotion to Regional Manager. (Moore Dep. 53:3–18).

29. The PIP outlined the following "Areas of Concern":

a. Receivables / Financials – Plaintiff's properties had substantial receivables issues, including over $11,000 in undeposited rent checks, persistent high AR balances well above affordable housing standards, and properties that did not meet financial obligations in 2022 and 2023 despite repeated discussions and directives.

7

b. Occupancy – Plaintiff consistently failed to achieve company-mandated 98% occupancy across Tennessee properties (except one), with no effective corrective actions implemented despite clear targets and deadlines.

c. Recertifications (Past Due) – Plaintiff allowed 125 HUD and Tax Credit recertifications to become past due, jeopardizing regulatory compliance, and failed to ensure timely completion despite written directives and extended deadlines.

d. Morningside Gardens and Summit Towers – Plaintiff did not maintain acceptable security, cleanliness, or inspection standards at these properties, resulting in HUD oversight, mandated 100%-unit inspections, and additional reporting obligations for these two properties.

e. Leadership/Decision Making – Plaintiff made staffing and promotion decisions contrary to company policy and without required approvals, rehired or promoted employees with known performance or conduct issues, failed to report serious incidents, and mishandled employee relations matters in ways that exposed the company to legal risk.

f. Payroll Matters/Overtime – Plaintiff managed a portfolio with the highest payroll costs in the company in 2022, without implementing necessary controls to reduce unsustainable expenses.

(Moore Decl. ¶ 7).

30. For each Area of Concern, the PIP also outlined the specific items for an Action Plan. (Moore Decl. ¶ 8).

31. Two days after Plaintiff received the PIP and agreed to the demotion (removing the Jacksonville properties from her authority), on May 4, 2023, Vice President of Operations Dawn Meyers sent an email to Sinito, Alan Weckerly and Moore regarding Jacksonville properties. (Moore Decl. ¶ 9).

8

32.     Meyers' email states that there are "very serious compliance, [Enterprise Income Verification] and file concerns that exist to some extent at all 4 Jacksonville sites." (Moore Decl. ¶ 10).

33.     Meyers' email included statements including that:

a.      "We had been assured by Gail and Willie that ALL of the REAC repairs were complete. This was found not to be true….The physical portion of this review is believed to be the demise and likely the reason we may not get satisfactory at the Weldon." (Moore Decl. ¶ 11(a)).

b.      "Valencia had 62 Move ins from 1/1/2022 through 3/21/23. At least half of the files could not be located." (Moore Decl. ¶ 11(b)).

c.      "…Mary Ellen advised Dawn of the piles and boxes of paperwork that she would begin by sorting piles of papers into searchable piles. So, the missing files could be re-created." (Moore Decl. ¶ 11(c)).

d.      "Dawn advised Gail of this extreme concern that last week in March. Gail did not agree with our concerns." (Moore Decl. ¶ 11(d)).

e.      "While fishing through paperwork a box of what appeared to be undeposited money orders and checks was found by the new PM. Efforts switched at that time to process the checks and verify what was deposited and not. The property gained 11g in revenue from those efforts." (Moore Decl. ¶ 11(e)).

f.      "Unable to locate ANY unit inspections from 2022. Gail had been using a 3rd party, USING every year, but we could not locate the binder for 2022. We have 2021 and 2023. Nothing for 2022. Gail was asked by Pearl the location of 2022 as that is part of the MOR—no response from Gail." (Moore Decl. ¶ 11(f)).

34.     Meyers' email also included pictures of the resident files at these properties. (Moore Decl. ¶ 12)).  The resident files were in complete disarray, creating a severe and unacceptable risk to HUD compliance. (*Id.*).  This condition not only undermined Millennia's ability to meet mandatory recordkeeping standards, but also exposes the property to serious findings, penalties, or other enforcement actions in the event of a HUD investigation. (*Id.*).  If a review were conducted – including a Management and Occupancy Review (MOR) - it is highly likely that the disorganized state of the files would result in significant deficiencies, jeopardizing Millennia's compliance status and potentially impacting funding or even program participation. (*Id.*).

35.     In response to Meyers' email, on May 6, 2023, Sinito emailed Moore and Weckerly and stated, "Based on the attached and following our meeting, we need to consider her not working out her PIP and offering a PM [property manager] position or just asking her to resign."  (Moore Decl. ¶ 13).

36.     Between May 21 and June 5, Plaintiff was offered the option to sign a severance agreement or accept another demotion, which was to the Property Manager position.  (Plf. Dep. 218-19.)  Plaintiff chose the Property Manager position, which would be effective June 24, 2023. ( Plf. Dep. 218-20).

37.     Before the demotion became effective, in addition to the previously identified performance deficiencies, Plaintiff's recently assigned supervisor, Alexandra Thompson, reported even more ongoing performance issues and staff complaints. (Moore Dep. 54:7–16).  Specifically, Thompson reported the following:

a.     Multiple property managers within Plaintiff's portfolio reported that they did not feel supported by her and that her leadership style was ineffective for the needs of the properties, particularly in East Tennessee.

b.     Morningside Gardens and Summit Towers - two properties under Plaintiff's oversight - were experiencing serious operational deficiencies, including security problems, homelessness within the buildings, and failure of a HUD REAC inspection, placing the company at risk of losing management control.

c.     Property managers, including at Maple Oak, reported that Plaintiff instructed them not to record resident move-outs in the system so that HUD rent payments would continue, resulting in inaccurate records and required repayments to HUD.

d.     Plaintiff routinely delegated critical financial and operational tasks, such as ledger corrections, to a Senior Property Manager (Sabrina Noble) rather than ensuring property managers performed their own duties in compliance with company policy.

e.     When meeting with regional leadership at Overlook, Plaintiff openly expressed distrust and extreme dislike for her supervisor, spoke negatively about the company in front of staff, and resisted her reassignment despite documented performance concerns.

(Moore Decl. ¶ 14).

38.     As a result of the continued performance issues, including what had been reported by Meyers and by Thompson, Plaintiff was terminated on June 22, 2025, before her demotion to Property Manager was officially effective. (Moore Dep. 53:19–23).

39.     The decision to terminate Plaintiff was based on a number of performance issues, including declining financial performance at her properties, failure to maintain budgeted occupancy, and persistent receivables issues. (Sinito Dep. 28:11–21; 38:18–23).

11

40.     Moore was planning to conduct the termination meeting with Plaintiff on June 22, 2023. (Moore Decl. ¶ 15). However, on that day, Moore received a text from Alexandra Thompson stating "…And now I'm pissed.  I almost just did it myself." "She asked me if I've seen Django. I told her yes and she said 'Steven from that movie is Debra Moore.'  She said I don't know if that's your cousin or whatever but that's how I feel."  (*Id.*).

41.     Moore had not seen the movie Django Unchained, so she searched it on Google. Moore (who is African-American) discovered that Steven from the movie is described as a "house slave."  (Moore Decl. ¶ 16).

42.     Moore responded to Thompson stating, "Of course I never saw Django so I had to Google it.  I am pissed."  (Moore Decl. ¶ 17).

43.     As a result of how Moore was feeling, Moore asked Michael Pico to conduct the termination meeting.  (Moore Decl. ¶ 18; Pico Dep. 25:23-26:16[7]).

44.     In advance of the termination meeting, Moore sent talking points to Michael Pico. (Moore Dep. 49:25–50:5; Pico Dep. 9:19–21).

45.     Pico also made notes for himself to use as a script during the termination meeting. (Pico Dep. 35:14-15, 36:12-24, 38:5).  Pico's script stated the following, which he provided during the meeting:

Hi Gail,

Nice to see you again, and I wanted an opportunity to talk to you, I think you are alone, correct? I also realize it sounds like it has been a bumpy several months, as I am aware that you were provided with a Performance Improvement Plan on May 2, 2023, covering many operational topics, which I did had a chance to review in detail. As well as I reviewed your rebuttal to it that you submitted on May 5.

I realize that this has been a tough time for you in so many ways. A couple of weeks ago, when it became clear to the organization that you would have not been successful ultimately in

---

[7] Relevant portions of Michael Pico's Deposition, and all relevant exhibits, are attached hereto as Exhibit 7.

executing the components of the plan and did not see the progress on several line item, you were offered a severance plan or the demotion a couple weeks ago.

The organization continued to explore options on this and upon deeper and further review of the performance of the properties, both financially and physically, and the feedback from staff and other business partners, the organization has made the tough determination to re-offer you the severance plan again and separate employment effective today. For what it is worth, I am so sorry to have to share this news with you.

We are offering you a severance agreement which I will review for you in a couple minutes. This agreement will be at your pay rate of $90,000. I have just emailed and sent Alexandra a copy of it for you and will email it to you as well.

(Pico Dep. 35:14-15, 36:12-24, 38:5; Pico Dep., Ex. 1).

46.    CEO Frank Sinito made comments about eventually turning the company over to the "younger generation," but these comments referred specifically to his adult children, who hold various roles within the company. (Sinito Dep. 17:13–21).

47.    Plaintiff testified that she "loves" Frank Sinito and reached out to him, after her separation, when she heard he was in the Chattanooga area. (Griffin Dep. 274:19-275:6, 276:14-18).

48.    At the time of Plaintiff's termination, June 22, 2023, there were 23 regional managers and directors. Their ages were as follows: 44, 64, 50, 60, 56, 43, 55, 52, 46, 42, 46, 55, 61, 44, 46, 48, 41, 60, 54, 54, 25, 24, 47. (Moore Decl. ¶ 19).

49.    Alexandra Thompson, Plaintiff's supervisor, was 39 years old at the time of Plaintiff's termination. (Moore Dep. 45:2-22).

## LEGAL STANDARD

Summary judgment is appropriate for Millennia because there is no genuine issue of material fact (*i.e.*, those "facts that might affect the outcome of the suit under the governing law"), and those undisputed material facts compel judgment for Millennia as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this case, no genuine

issue of fact exists because no reasonable jury could return a verdict for Plaintiff, even after the Court views the facts and draws reasonable inferences in a light most favorable to Plaintiff, as it is required to do. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Millennia has met its "initial burden to show a lack of evidence to support [Plaintiff's] case." *Id.* At this point, the burden shifts to Plaintiff, who must convince the Court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat a motion for summary judgment, *id.,* and Plaintiff cannot even offer that level of evidence. Moreover, conclusory or speculative testimony cannot defeat a motion for summary judgment. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888–89 (1990). Again, even viewing the facts in this case in the light most favorable to Plaintiff, her claims cannot survive summary judgment.

## LAW AND ARGUMENT

I.     **PLAINTIFF'S AGE DISCRIMINATION CLAIM SHOULD BE DISMISSED AS A MATTER OF LAW.**

"[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020). One impermissible reason to terminate an employee is because of the employee's age, which violates the ADEA (29 U.S.C. § 621, *et seq.*) and the THRA (Tenn. Code Ann. 4-21-101, *et seq.*). The same analysis applies to Plaintiff's claims under the ADEA and THRA. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006). Under both laws, Plaintiff must prove "by a preponderance of the evidence (which may be direct or circumstantial) that age was the '**but-for**' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (emphasis added). If Plaintiff fails to establish a case through direct evidence, her case is analyzed by the *McDonnell Douglas* burden-shifting analysis. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th

Cir. 2005). Plaintiff fails to establish a case through either direct or circumstantial evidence, and therefore, her age discrimination claims fail as a matter of law.

### A. Plaintiff Does Not Present Direct Evidence of Age Discrimination

Direct evidence of discrimination is unambiguous evidence that proves the existence of discriminatory animus without requiring any inferences. *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009). "It is the rare situation when direct evidence of discrimination is readily available…." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). "'Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criterion." *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006).

"Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination." *Geiger v. Tower Auto.*, 579 F.3d 614, 620-21 (6th Cir. 2009). "[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden… of demonstrating animus." *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998).

In determining whether certain statements represent direct evidence of age discrimination, courts consider: (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making [termination] process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination. *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002). *See also Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (analyzing comments in a race discrimination case and noting to be direct evidence of racial animus, the comments must "have some connection to the decision to terminate" the employee and that they must "specifically mention" the employee). The Sixth Circuit has held that a gap of two months between alleged comment and termination is sufficiently

proximate. *Brewer v. New Era, Inc.*, 564 F. App'x 834, 841 (6th Cir. 2014).

Plaintiff relies primarily on comments allegedly made by CEO Frank Sinito to support her age discrimination claim. This theory fails for multiple reasons.

First, Plaintiff offers no evidence that any comment by Sinito—if made—were intended to discriminate based on age. While Sinito may have remarked about eventually "turning the company over to the younger generation," these comments referred specifically to his adult children, who now hold roles within the company. (SOF ¶ 45). Moreover, even if the comments were made, Plaintiff was not adversely affected by them. Plaintiff testified that she "loves" Frank Sinito and reached out to him after her separation when she learned he was in Chattanooga. (SOF ¶ 46).

Plaintiff also testified that comments about retirement were made by Debra Moore (once in 2019) and James Zapf (who was terminated before Plaintiff). However, it is well settled that questions concerning retirement plans alone do not constitute direct evidence of age discrimination. *See, e.g., Lefevers v. GAF Fiber class Corp.*, 667 F.3d 721, 724 (6th Cir. 2012); *see also Scott v. Potter,* 182 F. App'x 521, 526 (6th Cir. 2006) (noting that to conclude that the remark "[w]hy don't you just retire and make everyone happy" was direct evidence of age discrimination would require an inference to be drawn, because "[the words] 'retire' and 'age' are not synonyms"). In fact, questions about retirement plans do not constitute *any* evidence of age discrimination. *MacDonald v. United Parcel Serv.,* 430 Fed. Appx. 453, 460 (6th Cir. 2011) ("inquiries into retirement plans do not generally constitute evidence of discrimination.").

In summary, comments such as these, that "require a factfinder to draw further inferences" to support a finding of discrimination do not constitute direct evidence of discrimination. *Krupnick*

*v. ARCADIS of U.S., Inc.*, S.D. Ohio No. 2:12-CV-273 (2014) (quoting *Dougherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008)).

In short, Plaintiff has presented no direct evidence of age discrimination.

**B.    Plaintiff Fails to Establish Her Claim Through Circumstantial Evidence**

Under the *McDonnell Douglas* burden-shifting framework, Plaintiff bears the burden of establishing a *prima facie* case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdline*, 450 U.S. 248, 252-53 (1981). If Plaintiff makes a *prima facie* showing, Millennia must offer a legitimate, non-discriminatory reason for the adverse employment action. *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007). If Millennia presents a legitimate, non-discriminatory reason for its actions, Plaintiff must demonstrate a genuine issue of material fact as to whether Millennia's proffered reason is a pretext for discrimination to defeat summary judgment. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). Despite these shifting burdens, at all times, Plaintiff bears the ultimate burden of persuasion that Millennia's alleged conduct was the product of **intentional** age discrimination. *See St. Mary's Honor Society v. Hicks*, 509 U.S. 502, 510-12 (1993).

**i.   Plaintiff cannot establish a *prima facie* case for age discrimination.**

To demonstrate a *prima facie* case for age discrimination under the ADEA, Plaintiff must show (1) she is at least forty years of age, and therefore a member of a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008).

In order to show that a plaintiff is qualified, "[She] must prove that he was performing his job at a level which met his employer's legitimate expectations." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 372 (6th Cir. 1999). Plaintiff cannot establish the third prong of a *prima facie* age discrimination claim because the record clearly shows that she was not meeting Millennia's

17

legitimate performance expectations at the time of her termination. For this reason, her age discrimination claim must fail.

As early as July 27, 2022, Millennia CEO Frank Sinito recommended placing Plaintiff on a Performance Improvement Plan ("PIP") due to her failure to properly conduct quarterly inspections and issues identified in the financials of two Jacksonville properties (Valencia and Callaway). (SOF ¶ 19). Similarly, in November 2022, Payroll Manager Philip Krakowiak emailed Moore noting that Plaintiff "has been consistently going up in errors over the last few weeks" and that corrective steps would need to be taken. (SOF ¶ 20). During this same period, Plaintiff's portfolio recorded the highest payroll in the entire company, further highlighting management concerns. (SOF ¶ 21).

Plaintiff's 2022 Performance Evaluation corroborates her declining performance. Alan Weckerly rated her as "Needs Improvement" in multiple critical areas, including: financial performance (both controllable net operating income and individual contribution), REAC inspections, Management and Occupancy Reviews (both location/area and individual contributions), and unit turns and inspections. (SOF ¶ 23). The overall rating of 2.75 reinforced that Plaintiff's performance fell below company standards, and Weckerly noted that "Gail had a tough year with the portfolio under her supervision." (SOF ¶ 24).

In May 2023, Plaintiff was formally placed on a PIP and offered a demotion to Property Manager, which she accepted. (SOF ¶ 27). Two days after receiving the PIP, Vice President of Operations Dawn Meyers reported serious deficiencies at the Jacksonville properties, including incomplete REAC repairs, missing resident files, undeposited rent checks, and missing 2022 unit inspections. (SOF ¶¶ 31-33). Meyers emphasized that these issues created substantial compliance risks and threatened Millennia's ability to meet HUD standards. (SOF ¶ 34).

18

In addition to Meyers' observations, Plaintiff's direct supervisor, Alexandra Thompson, documented ongoing leadership and performance problems, including ineffective oversight of multiple properties, security and operational deficiencies, mishandling of staff and financial processes, and failure to ensure regulatory compliance. (SOF ¶ 36).

Given the severity and persistence of these performance issues, it is clear that Plaintiff was not meeting Millennia's legitimate expectations. Accordingly, Plaintiff was not qualified for the position. As a result, Plaintiff cannot establish that she was qualified for her position and her *prima facie* claim fails, and her age discrimination claim should be dismissed.

### ii. Millennia had a legitimate, nondiscriminatory reason for the separation of Plaintiff's employment.

Even if a *prima facie* case existed, which it does not, Plaintiff's ADEA and THRA claims should be dismissed because Millennia has articulated a legitimate, non-discriminatory reason for its decision to terminate Plaintiff's employment—her substantial performance issues. Millennia has thereby satisfied its obligation under the second prong of the burden shifting analysis. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (explaining that "the employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons"). "Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008).

### 1. Plaintiff's performance had measurably declined.

For years, Plaintiff performed well as a Property Manager, Senior Property Manager, and Regional Manager, earning multiple promotions. But beginning in 2022, her performance declined significantly—most notably in her management of the Jacksonville properties. (SOF ¶ 18). These issues were not minor: in July 2022, Millennia's CEO recommended placing Plaintiff on a

19

Performance Improvement Plan ("PIP") due to missed quarterly inspections and troubling financial results at Plaintiff's properties. (SOF ¶ 19). By late 2022, her supervisor was receiving reports of rising payroll errors, and her portfolio carried the highest payroll costs in the company. (SOF ¶¶ 20-21).

### 2.     Objective evaluations confirmed the deficiencies.

Plaintiff's 2022 performance evaluation rated her as "Needs Improvement" in six separate performance categories, including controllable net operating income, REAC inspections, MOR audits, and unit turn inspections. (SOF ¶ 23). Her overall rating of 2.75 reflected these systemic issues and included the comment that she "had a tough year with the portfolio under her supervision." (SOF ¶ 24).

### 3.     Millennia followed its progressive performance process.

Consistent with its normal practices, Millennia offered Plaintiff the opportunity to remain employed under a PIP. (SOF ¶ 25). On May 2, 2023, she was presented with two options: accept a demotion and PIP or accept a severance package. (SOF ¶ 27). She chose the PIP and demotion, effective June 24, 2023. (SOF ¶ 28). The PIP identified concrete "Areas of Concern," including:

- Over $11,000 in undeposited rent checks and persistently high accounts receivable balances;

- Chronic failure to meet 98% occupancy targets;

- 125 past-due HUD and Tax Credit recertifications jeopardizing regulatory compliance;

- Unacceptable physical conditions at Morningside Gardens and Summit Towers, triggering HUD oversight;

- Unauthorized staffing decisions and failure to report serious incidents; and

- The highest payroll costs in the company without corrective action.

(SOF ¶ 29).

### 4. Additional compliance failures emerged immediately after the PIP.

Just two days later, Millennia's Vice President of Operations reported "very serious" compliance and file management failures at all four Jacksonville sites. (SOF ¶ 31). These included: incomplete REAC repairs despite prior assurances; missing tenant files for at least half of recent move-ins; piles of unsorted paperwork; a box of undeposited checks and money orders totaling $11,000; and no unit inspections on record for 2022. (SOF ¶¶ 32-33). Photographs confirmed the disarray, posing a substantial HUD compliance risk. (SOF ¶ 34).

### 5. Leadership complaints and operational breakdowns reinforced the decision.

Plaintiff's direct supervisor, Alexandra Thompson, reported that property managers in Plaintiff's portfolio did not feel supported; key properties suffered from serious operational deficiencies, including security problems and homelessness; Plaintiff directed inaccurate HUD reporting; and she delegated core duties to subordinates contrary to policy. (SOF ¶ 36).

### 6. Same-decisionmaker inference negates discriminatory motive.

Importantly, the very individuals who made the decision to terminate Plaintiff—CEO Frank Sinito, Senior Vice President Alan Weckerly, and Vice President of Human Resources Debra Moore—were the same people who had promoted her to higher levels of responsibility, including her 2021 promotion to Regional Property Director. This "same-actor inference" is well recognized in the Sixth Circuit and supports the conclusion that the decisionmakers did not suddenly develop age-based animus toward Plaintiff. *See Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464–65 (6th Cir. 1995) (same actor who hires or promotes and later discharges employee

creates strong inference against discrimination); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) (en banc) (same).

### 7. Termination was the product of cumulative, documented deficiencies—not age bias.

On June 22, 2023, after reviewing the ongoing performance, compliance, and leadership issues, Millennia decided to terminate Plaintiff's employment before her demotion took effect. (SOF ¶ 37). The decisionmakers cited her declining financial performance, failure to maintain occupancy, and persistent receivables issues as the basis for termination. (*Id.*).

The Sixth Circuit has consistently held that declining performance documented over time and corroborated by multiple sources constitutes a legitimate, non-discriminatory reason for termination. *Hawkins v. Ctr. for Spinal Surgery*, 34 F. Supp. 3d 822, 842 (M.D. Tenn. 2014). Because Millennia's decision rested on well-documented, business-related performance concerns—many of which directly implicated HUD compliance and financial integrity—Plaintiff cannot meet her burden under *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–178 (2009) to prove that age was the "but-for" cause of her termination. Summary judgment is warranted.

### iii. Plaintiff cannot show pretext.

There is no "affirmative evidence" that Millennia's reason for terminating Plaintiff was pretext for intentional age discrimination. *See Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 856 (6th Cir. 2002). To do so, Plaintiff would need to show "1) that the proffered reason had no basis in fact, 2) that the proffered reason did not actually motivate the actions, or 3) that the proffered reason was insufficient to motivate the actions." *Hopkins v. Elec. Data Sys.*, 196 F.3d 655, 662 (6th Cir. 1999). Plaintiff bears the burden of producing "sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir.

22

2011). Here, Plaintiff cannot make any of these showings.

First, there is no evidence that Plaintiff's discharge was not based in fact. In order to meet this factor, Plaintiff "must allege more than a dispute over the facts upon which his discharge was based. [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). Plaintiff acknowledges that she was placed on a Performance Improvement Plan ("PIP"). (SOF ¶ 28). The PIP clearly outlined specific performance deficiencies and areas of concern regarding her management of the properties, including financial oversight, regulatory compliance, and operational leadership. (SOF ¶ 29). Plaintiff has offered no evidence contradicting Millennia's documented concerns about her performance, relying instead on her subjective belief that these issues were fabricated. Such unsupported assertions cannot overcome the objective, documented record of her performance deficiencies.

Second, to establish the proffered reason did not actually motivate the action, a plaintiff must "attack [] the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant.'" *Travers v. Cellco P'ship*, 579 F. App'x 409, 417 (6th Cir. 2014). Plaintiff points to alleged comments made by Sinito and one comment made by Moore in 2019. Accordingly, Plaintiff's argument runs into the same problems discussed above in the direct evidence section. Alleged discriminatory remarks "unrelated to the decision to dismiss [plaintiff] from her employment… do not constitute evidence of discrimination" for purposes of establishing pretext. *Blizzard v. Marion Tech. College*, 698 F.3d 275, 287 (6th Cir. 2012) *citing Geiger*, 579 F.3d at 621 ("Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy

23

the plaintiff's burden… of demonstrating animus" (*quoting Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)). As explained above, the comments were not unambiguously ageist, were not directed specifically at Plaintiff, and were not made in connection with Plaintiff's termination decision. Plaintiff has no proof that age-related animus was the "but for" reason for her termination, rather than evaluations of her poor performance.

Third, there is no evidence that Plaintiff's performance issues were insufficient to warrant termination. To show that an employer's reason for subjecting an employee to an adverse action was insufficient to motivate that action requires Plaintiff to come forward with "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated the discharge of the plaintiff." *Lawroski v. Nationwide Mut. Ins. Co.*, 570 F. App'x 589, 594-95 (6th Cir. 2014). While a comparator need not be like the plaintiff "in every single aspect of their employment," they must be alike in "all relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Relevant considerations include whether the comparator employee (1) "dealt with the same supervisor," (2) was "subject to the same standards," and whether they (3) "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 352. No such evidence exists here. Plaintiff does not name any other employees who engaged in the same performance shortcomings and were not terminated. Therefore, with no comparators who engaged in substantially identical conduct and were not terminated, Plaintiff is incapable of showing the explanation proffered by Millennia is pretext.

Fourth, even crediting Plaintiff's version of events, the alleged age-related remarks are isolated, infrequent, and too remote in time to establish discriminatory animus. Plaintiff claims

24

Sinito referenced retirement on four occasions over the course of her lengthy tenure and that Moore made a similar comment in 2019. Plaintiff further alleges that former Millennia employee Zapf once remarked, "you need to think about retiring at your age." But Zapf left the company before Plaintiff's termination and played no role in the decision to end her employment. Stray comments by non-decisionmakers, or isolated remarks by decisionmakers years before an adverse action, are legally insufficient to show discriminatory intent under Sixth Circuit precedent. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025–26 (6th Cir. 1993) (comments made a year prior to discharge were too remote to establish bias); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550–51 (6th Cir. 2004) (stray remarks unrelated to the decisional process insufficient).

The record shows the decision to terminate Plaintiff was driven by objective, well-documented performance failures – not her age. Her 2022 performance evaluation, prepared months before the termination, rated her "Needs Improvement" in multiple categories, including controllable net operating income, REAC inspections, MOR audits, and unit turn inspections. (SOF ¶ 23). Reports from Thompson and Meyers documented additional operational deficiencies, including HUD compliance risks, missing tenant files, uncorrected REAC findings, and mishandled receivables. (SOF ¶¶ 31-34, 36). The PIP detailed six specific "Areas of Concern" with measurable performance expectations, yet within days of its issuance, further compliance failures came to light.

Finally, Plaintiff cannot meet her burden under *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–178 (2009) to prove that age was the "but-for" cause of her termination. In the face of contemporaneous, multi-source documentation of performance decline, the Sixth Circuit has made clear that disagreement with an employer's evaluation of an employee's performance does not create an issue of fact absent evidence that the stated reasons had no basis in fact or were

insufficient to motivate the decision. *See Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 888–89 (6th Cir. 2020); *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006). Plaintiff offers no such evidence here. Plaintiff's age discrimination claims under the ADEA and THRA fail and should be dismissed as a matter of law.

<u>**CONCLUSION**</u>

Plaintiff's ADEA and THRA claims fail as a matter of law. Accordingly, Millennia respectfully requests the Court Grant its Motion for Summary Judgment and enter an Order dismissing all of Plaintiff's claims with prejudice.

Respectfully submitted,

<u>s/Russell W. Jackson</u>
Russell W. Jackson* TN BPR No. 27322
(*Admitted *Pro Hac Vice*)
Mark E. Stamelos TN BPR No. 021021
**FORDHARRISON LLP**
1715 Aaron Brenner Drive, Suite 200
Memphis, TN 38120
Telephone: (901) 291-1500
Facsimile: (901) 291-1501
Email: rjackson@fordharrison.com
          mstamelos@fordharrison.com

**ATTORNEYS FOR DEFENDANTS**

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2025, a true and correct copy of the foregoing has been

served via the Court's CM/ECF System upon:

> Harry F. Burnette
> Burnette, Dobson & Pinchak
> 711 Cherry Street
> Chattanooga, TN 37402
> Email:  hbunette@bdplawfirm.com

> ***ATTORNEY FOR PLAINTIFF***


<u>/s/Russell W. Jackson</u>