# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| GAIL A. GRIFFIN, | * | |
| | * | |
| Plaintiff, | * | NO.: NO. 1:24-CV-00248-TRM-SKL |
| | * | |
| | * | JURY DEMAND |
| v. | * | |
| | * | |
| MILLENNIA HOUSING | * | |
| MANAGEMENT, LTD. and MILLENNIA | * | |
| HOUSING DEVELOPMENT, LTD.,, | * | |
| | * | |
| Defendants. | | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Introduction

Plaintiff Gail Griffin devoted nearly seven years to Millennia Housing Management, rising steadily from Property Manager to Regional Manager and eventually Regional Property Director. In each role, she earned greater responsibility: first managing individual sites, then supervising multiple properties as a Regional Manager, and ultimately overseeing entire multi-state portfolios as a Regional Property Director. Millennia entrusted her with its most troubled properties because of her proven ability to improve collections, compliance, and staff performance.

Shortly after her promotion to Regional Director, she began to experience an uptick of age-related comments about the need for the "next generation of leadership" and inquiries relating to her retirement. In 2023, Griffin's long career was abruptly derailed. She was placed on a flawed

1

Performance Improvement Plan, pressured repeatedly to retire and accept a severance agreement, demoted, replaced by a 39-year-old and ultimately terminated all within a two-month period.

Defendants now claim Griffin was discharged solely for poor performance. The record will show otherwise. The evidence demonstrates that Griffin had consistently strong reviews (despite her final review being scored incorrectly over multiple categories) and top scores in leadership and customer service, was praised for her performance even during the PIP, and was replaced under circumstances that point squarely to age bias.

In opposition of Defendant's Motion for Summary Judgment, Plaintiff relies upon the Depositions of : Plaintiff Gail Griffin (Joint Appendix JA–2), Frank Sinito (Joint Appendix JA–4), Debra Moore (Joint Appendix JA–6), Alan Weckerly (Joint Appendix JA–3), Michael Pico (Joint Appendix JA–7), and the Declarations of: Kristi Adams (Joint Appendix JA–8). For the reasons set forth herein, Plaintiff respectfully requests that this Court deny Defendants Motion for Summary Judgment.

**Statement regarding the Joint Appendix**

Counsel for Plaintiff did not see the effort by defense counsel regarding the establishment of a Joint Appendix as the email was after 5:00 on the evening Defendant filed its Motion for Summary Judgment. In an effort to create an appropriate joint appendix, counsel for Plaintiff has consecutively numbered Defendants' submissions and appended additional submissions pursuant to Judicial Preferences 5.H.

## II. Statement of Facts

### A. Griffin's Long Tenure and Advancement

Gail Griffin began her employment with Millennia in 2016 as a Property Manager for one of Defendant's properties in Chattanooga Tennessee. Her performance quickly earned recognition. In 2017, she was promoted to Senior Property Manager successfully managing multiple affordable housing communities, and in 2018 she advanced to Regional Manager, overseeing a portfolio of properties in Tennessee and Kentucky. Griffin consistently received strong reviews and praise. (Weckerly Dep. 10:4-10, JA–3). Plaintiff's success as a property manager and Regional Property Manager was not by accident, as she had more than twenty-five years of experience in the affordable housing industry and possessed certifications as a Tax Credit Specialist (TCS) and a Certified Occupancy Specialist (COS) through the IRS and HUD. (Griffin Dep. 147:12–148:7, JA–2). Griffin consistently received strong reviews and praise. Senior Vice President Alan Weckerly stated, she "was doing something right to be able to be promoted that quickly" from Property Manager to Regional Manager in roughly two years. (Weckerly Dep. 10:4-10, JA–3).

In September 2021, Griffin was again promoted by Millennia, this time to Regional Property Director ("RPD"), a position with broader responsibilities, an increase in salary and bonus opportunities where she was tasked with managing entire portfolios across multiple states. Historically underperforming properties in Florida were added to her portfolio. Duties included developing recovery plans for troubled assets, supervising multiple Regional Managers, resident relations, and ensuring HUD compliance while reporting directly to senior executives. (Griffin Dep. 99:9–100; 114:9-12; 131:6-10, JA–2).

Her work produced concrete results: for example, at The Weldon in Florida, Griffin successfully appealed a REAC result, moving the site from a one-year to a two-year inspection cycle. (Griffin Dep. 141:1–7., JA–2)

Griffins performance review for 2021 performed by Vice President Alan Weckerly, revealed that "Overall Gail does very well", specifically scoring her performance in the following categories: Financial 4 out of 5 "very good"; MOR 5 out of 5 Excellent; REAC 4 out of 5 Very Good; Unit Turn 3 out of 5 Acceptable; Customer Service 5 out of 5 Excellent; Communication 4 out of 5 Very Good; Job Knowledge/ Skills 4 out of 5 Very Good; Problem Solving 4 out of 5 Very Good; Teamwork 5 out of 5 Excellent.  (Weckerly Dep. 12-17, JA–3)

Griffin's performance review for 2022 may not have ever been delivered to Griffin (Weckerly Dec. ¶7, JA–5) Weckerly rated Griffin's performance in the following categories: Financial 2 out of 5 "Needs Improvement"; MOR 2 out of 5 "Needs Improvement"; REAC 2 out of 5 "Needs Improvement"; Unit Turn 2 out of 5 "Needs Improvement"; Customer Service 5 out of 5 Excellent; Communication 5 out of 5 Excellent; Job Knowledge/ Skills 5 out of 5 Excellent; Teamwork 5 out of 5 Excellent.  (Weckerly Dec. Ex 2, JA–5) Weckerly has now acknowledged that the objective categories were improperly scored and Griffin should have received a 5 out of 5 "Excellent" in the REAC and MOR categories. (Weckerly Dep. 25:10-21, JA–3)

**B. Age Statements, Retirement Pressure and Fulfillment of Succession Strategy**

Beginning in 2021, Griffin began to experience an uptick in the frequency of comments regarding her age, retirement, and the need for the younger generation of leadership. Sinito had previously discussed this with Griffin back in 2019 when he first told her that they "need to be looking at letting the younger generation take over" and that she should "retire or think about retiring," to which she responded, "I ain't retiring." (Griffin Dep 258:19-24, JA-2) .  In the fall of

2021, following Griffin's promotion to Regional Director Sinito again said, "At your age, you need to retire soon," repeating the same "younger generation" theme. (Griffin Dep. 259-261, JA–2)

The retirement pressure did not come only from Sinito. During the late-2022 to early-2023 period, Griffin's then-supervisor, James Zapf, repeatedly pressed her about retirement—"Aren't you tired of this? Don't you want to go ahead and retire?"—to which she answered, "I'm not retiring. That's not what I want to do," and, later, "Look, I ain't finna retire. So leave me alone." (Griffin Dep. 142:21-143:8, JA–2). Griffin testified this came up about four times, including in person at Calloway Cove and once in Cleveland. (Griffin Dep. 142:19-23, JA–2)

During the same discussions with then supervisor and Regional VP Zapf, Griffin was told that she no longer had responsibility for the Valencia Way, The Weldon and Calloway Cove in Jacksonville so that she could focus on the Tennessee properties, with the exception of Calloway Cove that had a REAC scheduled. (Adams Dec. ¶18, JA-8).

In hindsight, by the beginning of 2023, Millennia's succession strategy was becoming more evident. On a February 2023 hand-off trip to Jacksonville, Sinito told Griffin, "You've done a great job. This is nothing on you… it's time to pass the baton," as properties were being transitioned to a new (younger) regional manager; Griffin's responsibilities were redirected back to Tennessee. (Griffin Dep. 118: 15–119:13, JA–2)

When asked directly during his deposition whether he had "passed the baton to the younger generation," Sinito answered "Yes." (Sinito Dep. 18:7–9., JA–4). Current President/COO Michael Pico also confirmed he and Sinito had "many conversations on succession planning." (Pico Dep. 20:12-17, JA–7). The succession strategy was not limited to only the Sinito children. Shortly thereafter—and discussed supra with respect to the PIP chronology and Griffins eventual demotion and subsequent termination. —Alexandra Thompson, age 39, replaced Griffin as Regional

Property Director over Griffin's former portfolio in Tennessee despite the fact that Griffin's portfolio was doing better than Thompson.

On May the 2nd HR director Debra Moore requested Ms. Griffin into a meeting, Moore was present in person and Alan Weckerly participated remotely. (Griffin Dep. 154:1–7, JA–2). Moore handed Griffin a Performance Improvement Plan (PIP). Griffin was in shock at the surprise PIP. Among other inaccuracies in the PIP, not only did the PIP erroneously assign blame to Griffin for problems with the Jacksonville properties (which were officially removed from her control by the CEO and owner Sinito, but her former supervisor, James Zapf, had instructed her that he personally would handle those properties and she was to focus on the Tennessee properties. (Adams Decl. ¶¶7–11, JA–8) Additionally, the requirements of the PIP, were inconsistent with numerous company policies. (Response to PIP, JA–10) . For example, the PIP required Griffin to inspect properties 100% quarterly while company policy provided that the target was 25% quarterly for a total of 100% per year. (Adams Decl. ¶¶7–11, JA–8)

When Moore presented Griffin with the PIP, she offered Griffin the option to retire and accept severance instead or continuing to work. Griffin responded that she wanted "to work, I don't want to retire, I love my job" (Griffin Dep. 235:22, JA–2).

Following the official PIP, Griffin was informed that her salary was going to be reduced despite CEO and owner Sinito's assurance to Griffin that when she shifted her focus to the TN properties, her salary and title would not change. (Adams Decl. ¶¶7–11, JA–8)

Griffin provided a detailed response to the PIP identifying many of the inaccuracies and misapplication of blame. (Adams Decl. ¶¶7–11, JA–8).

Undaunted, Griffin continued to work, as she always had, and within one month, the director of asset management BJ Everson (a "numbers guy") (Weckerly Dep. 27:16-17, JA–3) at

6

corporate who was tasked with objectively evaluating Griffins progress, described "an amazing amount of progress since the prior update in early May, great efforts by you and your team!". Sinito, Moore and Weckerly were all copied on this email. He additionally identified areas where the company needed to assign additional resources and assets and pledged support for that implementation. (Amazing Progress Email, JA-9)

Of course, Griffin continued to work and proceed just as the "amazing" email described her efforts from the previous month, despite her reduction in pay.

Inexplicitly and despite her objectively amazing performance, within a week or so, Moore called Griffin and again offered her the opportunity to retire and accept a severance agreement or take a further demotion to Property Manager of the Overlook in Chattanooga, which would also come with a decrease in salary. (Weckerly Dep. 39:20-23, JA-3, Moore Dep. 51:21-22, JA–6). Moore formalized the offer to Griffin on June 15, 2023, with an effective start date to be June 24, 2023. (Griffin Dep. 220:8-24, JA–2). The offer of this position was somewhat puzzling, because there was no vacancy for a property manager at the Overlook (Adams Dec. ¶18, JA-8). Accepting this position would be returning to where Griffin began with the company back in 2016, something Millenia did not think Griffin would do[1]. (Griffin Dep. 235:8-22, JA–2). Regardless, Griffin was forced to accept the demotion because she loved her job, wanted to work, and after all she could manage the Overlook with her "eyes closed." (Griffin Dep. 235:22, JA–2). Griffin signed the acceptance offer on June 16, 2023, and her demotion was to take effect on June 24, 2023.

On June 22, 2023, just two days before she was scheduled to begin her demoted role as property manager; Griffin for the first time, met her replacement as Regional Director, 39-year-old Alexandra Thompson. During this meeting, Alexandra informed Griffin that Millennia was

---

[1] One Hour before Griffin's employment was terminated and on the first day Griffin met Alexandra Thompson, Alexandra tells Griffin "they were very shocked that you didn't take the offer [to retire]" (Griffin Dep. 235:8-22)

shocked that Griffin didn't take the severance offer and retire[2] rather than the demotion. (Griffin Dep. 235:8-22, JA–2).

Shortly after meeting Alexandra, Griffin was called into a meeting with the now COO Michael Pico and terminated, of course again with an offer of severance (which would have released all claims for age discrimination). Devastated, Griffin again refused the offer of severance, inquired about her accrued PTO, turned in her phone and laptop and left the company and job she so dearly loved. (Griffin Dep. 235:2–236:22, JA–2).

## III. Law & Argument

The *McDonnell Douglas* framework has recently drawn criticism from the Supreme Court. In June of this year, Justice Thomas (joined by Justice Gorsuch) in a concurring opinion wrote that " [i]n my view, requiring a plaintiff to satisfy the *McDonnell Douglas* framework—as this Court has described it—requires a plaintiff to prove too much at summary judgment." Furthermore, Thomas states "that the *McDonnell Douglas* framework is incompatible with the summary-judgment standard set forth in Federal Rule of Civil Procedure 56." Ames v. Ohio Dep't of Youth Servs., 605 U.S. 303, 322–23 (2025).

## A. Direct Evidence of Age Discrimination

Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."

---

[2] It was the first time I ever met Alexandra. First time she had been at the property. And I was showing her how to do some things, and she had talked to me about how that the company actually thought that I was going to accept their offer versus keep working. They wanted me to go ahead and stop working and stuff. And she -- she said, "I -- I haven't talked to anybody or anything like that." She said, "It's just -- I just know that they -- they were very shocked that you didn't take the offer," and stuff. And I said, "Okay." You know, "I want to work." You know, that's who I am. I like -- I like my job, and I can do The Overlook with my eyes closed."
Griffin Dep. 235:8-22

Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) Quoting *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) Citing *Teamsters v. United States,* 431 U.S. 324, 358, n. 44, 97 S.Ct. 1843, 1866, n. 44, 52 L.Ed.2d 396 (1977).

Here, senior decision makers repeatedly made comments about Plaintiff's age and need to retire, made comments about the need for the younger generation of leadership. Many of these comments coincided with offers of severance, placement on a PIP or demotions.

- CEO Frank Sinito admitted "Yes" when asked, "Have you, in fact, passed the baton to the younger generation?" (Sinito Dep. 18:7–9, JA–4).

- HR head Debra Moore repeatedly told Griffin, "At your age, it is time to retire… we all work for Mr. Sinito, and it is time to go," shortly before the termination (Adams Decl. ¶¶14–17, JA–8).

The current case contains many age-related admissions that reflect age bias. As is usually the case in discrimination litigation, the Defendants' witnesses deny they made biased statements. The owner and CEO of the Defendant corporation is Frank T. Sinito. Plaintiff provides many instances in which Mr. Sinito directed his age-bias toward Plaintiff.

Plaintiff lists the following:

- In 2022 and 2023, Mr. Sinito approached Plaintiff and asked her when she was going to retire. Though he continued to praise her work, he told her that at her age she needed to retire soon. He stated that he was going to retire in the future, and the younger generation would be taking over. He said she should strongly consider retirement. Plaintiff told him that she loved her job and did not have plans to retire.

9

- Mr. Sinito explained that he was going to retire and things would be different  When he retired, the younger generation would be taking over.

- "At your age you will need to retire soon."

- Several times over the years Sinito has said Plaintiff should "strongly consider retirement."

In addition to Mr. Sinito's retirement remarks, Plaintiff has had many encounters with corporate leaders who made comments about her retiring.  For example, Debra Moore told Plaintiff several times that at her age she needed to retire.  James Zapf, Regional Vice President, asked me, "When are you going to retire?"  This question was posed by him many times, and each time Plaintiff responded that she did not want to retire.  Plaintiff said that she wanted to keep working.

As to some of the statements, Frank Sinito admits he made some of the statements but denies other parts of the statements.

At the time of his Deposition, he lists the following people and their ages:

| | | |
|---|---|---|
| Angelica Sinito | Daughter | Age 29 |
| Frank Sinito, Jr. | Son | Age 27 |
| Thomas Sinito | Son | Age 26 |

When asked has his company ever been accused of age discrimination, he says that he does not recall.  (Sinito Dep. 16:12-18, JA-4).  When asked if he recalls stating it is time to turn things over to the younger generation. (Sinito Dep.; JA–9).  Mr. Sinito answered, "I may have."  (Sinito Dep. 17:13-17, JA–9).  As to the number of times he said that it was time to turn it over to the younger generation, he says, "Not many." (Sinito Dep. 17:18-21, JA–4).  He does not recall those to whom he made the statement. (Sinito Dep. 17:22-25, JA–4).  Mr. Sinito denies making the Plaintiff retirement statements.

10

The so-called evaluation of Plaintiff shows on its face that it is a sham. First, page one shows client was working for Ms. Thompson at the time of the evaluation. The evaluation was to have been completed by March 31, 2023. Plaintiff never met Thompson until the day Plaintiff was fired! Plaintiff was fired on June 23, 2023. In his declaration, Mr. Weckerly said he did not know if the evaluation had ever been shown to Plaintiff! (Weckerly Declaration Paragraph 7, JA–5).

The Declaration of Kristi Adams provides strong proof necessary to deny Defendant's Motion for Summary Judgment. For example, Ms. Adams knew Plaintiff was an excellent employee. (Adams Declaration Paragraphs 1, 2, 3, and 4, JA–8).

She states Plaintiff was not in charge of Florida properties when problems developed since the Defendant's Vice President Zapf was in charge. Mr. Zapf told employees that Ms. Griffin was no longer to answer their questions nor provide directions. (Adams Declaration Paragraphs 6, 7, 8, 9, and 10, JA–8).

Ms. Moore, the Human Resources Director, made many age-bias statements including some a short time before Plaintiff's termination. (Adams Declaration Paragraphs 12, 13, 14, 15, 16, 17, 18, 19, and 20, JA–8). Ms. Moore declared that Tennessee employees did not like Plaintiff, but Paragraph 21 of Ms. Adams' Declaration shows that if this occurred at all, it did not occur until after Plaintiff's termination. (Adams Dec. ¶21, JA-8). It shows after the fact the Defendants were looking for a non-age excuse.

These remarks/pressures come from the decisionmakers, are temporally linked to the action, and address the very decision at issue.

11

**B. Pretext — Governing Standard (Reeves / Wexler)**

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), is the starting point. In *Sanderson Plumbing*, the Supreme Court held that if a plaintiff makes out a *prima facie* case of discrimination and presents evidence from which a jury can conclude that the defendant's explanation for the adverse employment action is false, *i.e.*, a pretextual reason, the jury may, but is not required to, return a verdict for the plaintiff. There the jury had returned a verdict for the plaintiff. The Court of Appeals reversed. Although the plaintiff had presented evidence of pretext, he still had not presented evidence that the reason for termination was age discrimination. The Supreme Court reversed the Court of Appeals. The presentation of a *prima facie* case, coupled with proof that the employer's reason for the adverse employment action is false, *i.e.,* it is not the real reason, can support a finding of discrimination. The Court reasoned that the employer is in the best position to know the real reason for its actions. If the jury believes that the stated reason given for the adverse action is false, it can conclude that the employer is concealing or attempting to conceal the real reason for the adverse employment action. That the employer is "dissembling" about the true reason for the action is strong evidence of guilt. Thus, the Court squarely rejected the "pretext-plus" theory which would require a plaintiff to not only disprove the employer's explanation for the adverse employment action but also present other evidence connecting that adverse action to the plaintiff's age (or, presumably sex). In rejecting the "pretext-plus" theory, the Court wrote:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See *id.,* at 517, 113 S.Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the

12

factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); see also *Wilson v. United States,* 162 U.S. 613, 620–621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev. 1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves v. Sanderson Plumbing Products., Inc.,* 530 U.S. 133, 147–48, 120 S. Ct. 2097, 2108–09, 147 L. Ed. 2d 105 (2000).

Next, there is the landmark *en banc* decision of the Sixth Circuit in *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003). This decision came within only several years of *Sanderson Plumbing, supra,* and covered a wide range of employment law issues, specifically pretext and how it could be demonstrated. First, the court set forth the oft-recited methods of demonstrating pretext:

> White's maintains that the primary reason for demoting Wexler was that the store was experiencing low revenue. Although a rational trier of fact might believe this explanation, there is sufficient contrary evidence to support the conclusion that this reason was a pretext designed to hide discrimination. A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000).

*Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003).

The Sixth Circuit then went further and addressed the question of whether the employer's supposedly non-discriminatory reason for the adverse employment action was reasonable. A jury

13

is permitted to evaluate the reasonableness of the employer's decision to determine whether the asserted reason was really what motivated the adverse employment decision:

> Several of our sister circuits have similarly concluded that the reasonableness of a business decision is critical in determining whether the proffered judgment was the employer's actual motivation. *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1294 (D.C.Cir.1998) (*en banc*) ("If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.") (footnote omitted); *Ryther v. KARE 11,* 108 F.3d 832, 840 (8th Cir.1997) (holding that the factfinder was allowed to consider whether the survey that the employer relied upon as the basis for its decision to fire the plaintiff "was actually a sound—as opposed to pretextual—basis upon which to make employment decisions"); *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988) ("Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness."); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext ....").

*Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 577 (6th Cir. 2003).

The plaintiff in *Wexler* had been demoted from his store manager position, supposedly because of declining sales. Yet there was evidence that the sales had declined because of a lack of corporate-directed advertising. In other words, that sales were declining was not the fault of Wexler. The jury should therefore be entitled to decide whether declining sales really was the employer's reason for the demotion or, on the other hand, was this nothing more than an effort to conceal the real reason, *e.g.*, age. In other words, the jury could choose to disbelieve the employer's claim that it knowingly took an adverse action that was unreasonable.

Wexler is still the law in the Sixth Circuit and has even been extended to employee selection cases in 2023. *See Levine v. DeJoy,* 64 F.4th 789 (6th Cir 2023).

Therefore, under *Reeves v. Sanderson Plumbing*, a plaintiff's prima facie case coupled with proof that the employer's stated reason is false permits the inference of unlawful discrimination. *Wexler* explains three pathways to pretext (no basis in fact, did not actually motivate, and insufficient to warrant) and authorizes juries to consider the reasonableness of the decision as probative of motive. *Levine* confirms that empirically verifiable qualifications and objective performance matter: when the record shows a plainly better-qualified employee was discarded in favor of a less-qualified alternative, a jury may infer pretext. Applied here, Millennia's explanations fail on all three Wexler routes, especially when viewed against Ms. Griffin's undisputed qualifications and record of results.

A jury must evaluate whether Millennia's proffered reasons for its actions: have no basis in fact, did not actually motivate or was insufficient to motivate its decisions to demote and ultimately terminate Griffin.

## 1. No Basis in Fact

Defendants' principal criticisms are not grounded in the record. The "undeposited checks/collections" issue at Valencia Way is misattributed to Ms. Griffin for the period after the Jacksonville portfolio was reassigned to Zapf in early 2023. Ms. Griffin testified that supervisor James Zapf directed that Jacksonville operations would be handled by Mr. Zapf and Pearl Gray and that Jacksonville staff were no longer to take direction from her; only approximately $2,936 in undeposited items predated the hand-off. (Griffin Dep. 114:5–8, 115:1–6, JA-2; Response to PIP, Bates M84–87, JA-10; Adams Decl. ¶¶7–11., JA–8) Millennia leadership acknowledged that Griffin was expected to follow Zapf's direction. (Weckerly Dep. 26:12-13, JA–3).

Nor does the record support the PIP's requirement of "100% quarterly unit inspections." Company practice called for 25% quarterly and 100% annually; expecting 100% of roughly 1,100

units to be inspected in a two-month window was not consistent with policy or operational reality, as Ms. Griffin explained in her response to the PIP on May 5, 2023. (Response to PIP, Bates M84–87., JA–10) To the extent Defendants point to later-discovered Jacksonville issues, those events occurred after responsibility had been reassigned to Mr. Zapf and Ms. Gray, and later to Onix Sosa; attributing those conditions to Ms. Griffin lacks any factual basis. (Griffin Dep. 114:5–8; 115:1–6; 119:1–3, JA-2; Adams Decl. ¶¶7–11., JA–8)

**Defendant's Performance Evaluations of Griffin Were Internally Inconsistent and Improperly Scored.**

Defendant relies heavily on Griffin's purportedly "poor evaluations" as a justification for the PIP and her termination. But the record shows that those evaluations were not only inconsistent with her actual property performance, they were scored in violation of Defendant's own policies. Debra Moore, Millennia's Senior Vice President, admitted in her deposition that the scoring rules required a rating of "5 – Excellent" whenever a property achieved a REAC score of 60 or higher. Moore further conceded that when a property scored below 59, the rules mandated a rating of "1 – Unacceptable." (Moore Dep. 30:1–9, JA–6). Despite this clear policy, Griffin was given an arbitrary score of "2," which Moore acknowledged was inconsistent: "the reviewer didn't follow the instructions." (Moore Dep. 33:6-8; 35:18-21, JA–6)[3].

Moore also confirmed that where a Management and Occupancy Review ("MOR") falls within the acceptable range, Griffin's score should have been a "5 – Excellent." Yet Griffin's scores were downgraded regardless of MOR outcomes. Moore agreed that if scored properly,

---

[3] The complete discussion of how the performance review was improperly scored encompasses deposition pages 28-36. HUD reports shown to Millinia's senior leadership during their depositions confirmed that none of the Griffin's properties were below the threshold to receive a 5 had the performance evaluation been scored correctly. See (Weckerly Dep.44-52, JA-3).

16

Griffin's overall evaluation "would have gone up." (Moore Dep. 35:4–22, JA–6). When Weckerly reviewed the MOR and REAC scores from the HUD database, he confirmed that none of the scores within Griffin's portfolio of properties were below the threshold for achieving a 5 on the performance review metric. (Weckerly Dep. 52:16-20, JA–3).

This testimony establishes that the very performance metrics Defendant now claims justified Griffin's demotion and termination were internally flawed, misapplied, and not reflective of her actual results.

The Sixth Circuit has made it clear that when performance metrics are inconsistent, manipulated, or applied contrary to policy, they cannot support summary judgment. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (employer's reliance on flawed evaluations may itself be evidence of pretext); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (jury question where evaluations conflicted with objective performance evidence).

### 2. Did Not Actually Motivate

The timing and the company's own communications permit a jury to find that the stated performance concerns did not actually motivate the demotion and termination. Four days after issuing the PIP—and one day after Ms. Griffin submitted her written rebuttal—CEO Frank Sinito instructed leadership to "consider her not working out her PIP and offering a PM position or just asking her to resign," signaling predetermination while the PIP was barely underway. (Sinito email, May 6, 2023; JA-1). Retirement and severance pressure attended each step: Debra Moore offered severance at the May 2 PIP meeting, and again at the demotion meeting, Michael Pico re-offered severance at the separation meeting. (Griffin Dep. 221:21-222:6, JA-2; Moore Dep.

48:12–19, JA–6).   Ms. Griffin, for her part, repeatedly stated that she loved her job and did not want to retire. (Griffin Dep. 235:15–22, JA–2).

The supposed "demotion" option only underscores the point. Kristi Adams—the sitting Property Manager at The Overlook—attests there was no open PM position when Defendants told Ms. Griffin she would be "bumped down" to Overlook PM, confirming that the placement was illusory and served as leverage to force separation, not a genuine corrective step. (Adams Decl. ¶18., JA–8) Meanwhile, contemporaneous praise cut against any claim that performance was driving the outcome: while the PIP remained in effect, Asset Management lauded Ms. Griffin's "amazing" progress on collections and compliance. (Everson email, Bates M95–96., JA–9) Process evidence also points away from performance as the true driver.  Mr. Pico testified he was "fully briefed" only on the day of termination, and although management had discussed write-ups for missed quarterly inspections in 2021–2022, "nobody even had gotten written up," yet Ms. Griffin alone was marched through PIP, demoted (despite objective "amazing progress") and terminated before she could even start the position for which she was obviously qualified. (Pico Dep. 23:2–8; 23:23–25; 24:1–3., JA–7)

### 3. Was Insufficient to Motivate

Even if some criticisms articulated by Defendant had any kernel of truth, they were insufficient to warrant the drastic step of termination on this record. The PIP ran for roughly six weeks before a demotion was announced on June 16, 2023, and termination followed six days later on June 22, 2023, a brief window of time that senior executive Alan Weckerly acknowledged was "a quick period of time." (Weckerly Dep. 53:19–25; 54:3–8., JA–3) During that limited period, objective progress was documented and acknowledged by Asset Management, undermining any contention that only termination could address performance. (Everson email, JA–9)

The company also bypassed reasonable, less drastic alternatives. Ms. Griffin's objective qualifications and long, successful history in the very roles Defendants purported to offer her (Regional Manager and Property Manager) are undisputed, yet the company terminated her rather than place her in roles she had demonstrably performed well. At the same time, the Overlook PM position was already occupied by a substantially younger, less-experienced manager. (Adams Decl. ¶¶3–5, 18, JA-8; Moore Dep. 52:14–19; 53:4–9., JA–6) Finally, the "new supervisor" discoveries are post-hoc and thin: Ms. Griffin met Alexandra Thompson for the first time on the day of termination, and Ms. Adams recounts that Ms. Thompson initially had no input and later stated she wanted to "find anything Ms. Griffin had ever done wrong." (Adams Decl. ¶21., JA–8) On this record, a jury could reasonably conclude that the proffered reasons were insufficient to motivate the decision and are unworthy of credence.

### 4. Objective Qualifications & Reasonableness (Levine / Wexler)  Griffin's objective qualifications for Regional Manager—and Property Manager at Overlook—make termination unreasonable and support pretext under Levine and Wexler.

Griffin was highly qualified for the Regional Manager and Property Manager roles and had already succeeded in those jobs for years. The company knew this: Griffin started as Property Manager in 2016, was promoted to Senior Property Manager in 2017, Regional Manager in 2018, and Regional Property Director in 2021; she also received merit raises in 2020 and 2021.

Her objective track record as Regional Manager included strong HUD outcomes across multiple Tennessee properties during her leadership: e.g., Summit Towers scored 94 (Sept. 13, 2021), Watauga Square 96b (May 17, 2023), Maple Oak 98c/94b (2022), and The Weldon improved from 44c (pre-Griffin) to 82c (Sept. 23, 2022) under Griffin's tenure. A senior executive agreed that a 94 is a "strong score." (Weckerly Dep. 50:24–51:3, JA–3)[4]

---

[4] REAC scores cited above are each discussed with Weckerly in his deposition from pages 44-52 (JA-3)

Even during the PIP window, Asset Management wrote that Griffin's team had made an "amazing amount of progress" and "amazing efforts" on collections as of May 28, 2023. (Amazing Progress JA 9)

Despite this record, Millennia chose termination while floating a supposed demotion to Property Manager at Overlook—a position that did not exist because it was already filled. Kristi Adams (the Overlook PM) attests: "I knew there was no opening since it was my job." (Adams Decl. ¶18., JA–3) This underscores that the "demotion" option was illusory, not a genuine performance-based solution.

Additionally, Adams attests she was substantially younger than Griffin and had far less experience than Griffin for the Overlook Property Manager role. (Adams Decl. ¶¶3–5, 18., JA–8) Yet Millennia opted to terminate Griffin rather than place her in the same PM role Adams occupied—despite Griffin's superior qualifications and prior success in that very job. This further strengthens pretext under Levine's qualifications analysis (and Wexler's reasonableness lens) because a reasonable employer would not discard a clearly more qualified employee in favor of keeping a less-experienced one without some other strong consideration.

Under *Levine v. DeJoy*, courts give weight to empirically verifiable, objective qualifications and performance when assessing pretext. Such proof can show a reasonable employer would have found the plaintiff significantly better qualified. Rejecting an evidently better-qualified employee can support an inference that the employer consciously selected a less-qualified option unless some other strong consideration (like discrimination) entered the picture. In explaining how to analyze qualifications evidence, the court reaffirmed that a jury may question the reasonableness of the employer's decision where the record shows the plaintiff's

20

superior performance and evaluations and warned that subjective assessments are easily susceptible to manipulation.

Levine builds on Wexler, which permits juries to evaluate reasonableness insofar as it illuminates whether the employer's proffered reason was the actual motivation—and recognizes three classic routes to pretext: no basis in fact, didn't actually motivate, or insufficient to warrant the action.

Applied here, Griffin's years of documented success in the very roles Millennia claimed to offer (PM at Overlook; RM) and the absence of a real PM opening would permit a jury to find Millennia's stated "poor RPD performance" rationale unworthy of credence. Additionally, Sinito's email just two days after Griffin's PIP response suggesting that Defendant skip letting her "work out her PIP" and instead "offer a PM position or just ask her to resign," would also permit a jury to find that a predetermined PIP was inconsistent with a good-faith performance process.

## C. Honest-Belief Rule — Limits and Application

An employer's asserted 'honest belief' does not insulate summary judgment where the decision was not reasonably informed or was made on incomplete or contradicted information. See Yazdian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 653 (6th Cir. 2015) (where honest belief rule would not apply where "the employer failed to make a reasonably informed and considered decision before taking its adverse employment action....").

Here, reassignment of Jacksonville operations, contemporaneous praise during the PIP, compressed timing, and predetermination communications collectively undercut any claim of a thorough, good-faith review.

**D. Witness Credibility**

Frequently, discrimination trials are decided on the basis of which witness is the most trustworthy.

The Defendant's witnesses agree the Plaintiff is believable.

Mr. Frank Sinito, who was President and CEO of Defendants until HUD removed him from leadership due to his lack of "integrity," stated that Plaintiff is "likeable," "friendly," "pleasant," "interacted well with customers," and "acted professionally." (Sinito Dep.. at 5:20-21; 6:1-2; 5:24-25; and 6:9-11, JA–9). Most importantly, Mr. Sinito admits Plaintiff is trustworthy! (Sinito Dep.. at 6:5-6, JA–4).

Mr. Michael Pico states he knows Gail Griffin and he has always liked her. (Pico Dep.. at 7:19-8:2., JA–7) He admits he "DID NOT HAVE ANY REASON TO DOUBT HER WHEN SHE WAS EMPLOYED." He added she always acted professionally. She was pleasant and friendly. (Pico Dep.. at 8:9-14, JA–7)

Debra Moore, head of Defendants' Human Resources, admits Gail Griffin was "pleasant" and a "good employee." Most importantly, Ms. Moore stated that she had "no reason to believe Plaintiff was not honest." (Moore Dep.. at 15:4-6, JA–6). Plaintiff even loves her adversaries. (Griffin Dep. at 276:14-18, JA–2).

There are reasons to doubt Mr. Sinito's testimony. For example, he has been found to lack integrity. (See HUD Letter dated December 14, 2023 and HUD Letter dated March 13, 2024; JA-11) Mr. Weckerly states he does not know Frank Sinito's reputation for truthfulness (Weckerly Dep. at 57:8-17, JA–3). Mr. Weckerly admits he knows Frank Sinito's problems with HUD. (Weckerly Dep. at 55:2, JA–3). When being interviewed by HUD, he knows of the "debarment" of Frank Sinito by HUD. (Weckerly Dep. at 56:5-9, JA–3).

22

Mr. Pico knows of HUD's findings, and the company is paying for a lawyer for Mr. Pico. (Pico Dep. at 16:20–17:5, JA–7). Mr. Pico refused to answer questions about Mr. Sinito without some other lawyer.

The notice of suspension and proposed debarment of Frank Sinito Millennia Housing Management, Ltd. was placed on the internet under www.hud.gov. This document is admissible under Federal Rules of Evidence Rule 9.2 in that it reflects the "original signed by the Acting Director of HUD (Mark Borum) Department Enforcement Center. This document was an exhibit to the Deposition of Frank T. Sinito. Page 4 of the document provides specific findings related to the lack of integrity of the owner of Defendants in the case at bar as well as its owner. (See paragraphs 1 and 2 on page 1 and paragraphs 1 and 2 on page 2; JA-11) The Notice demonstrates Mr. Sinito and his corporate actions. The findings demonstrate that Mr. Sinito conduct affects "integrity."

In criminal cases there are no adverse inferences when a defendant pleads the 5th amendment, however in civil litigation the court decides if there is to be an adverse inference. Language for a proper jury charge on the adverse inference in this case is expected at a later time. Counsel for Plaintiff has found no sixth circuit authority for when a deponent refuses to answer a question of whether he has a good reputation for truthfulness.

At summary judgment, courts do **not** weigh credibility or resolve competing inferences; they must view the record in the light most favorable to the non-movant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (jury may infer discrimination from disbelief of employer's proffered reason, together with the record as a whole). Mr. Sinito's Fifth-Amendment invocation—on a question that goes to veracity—permits a reasonable jury to doubt Defendants' narrative and to credit

23

Plaintiff's evidence of age-based motive and predetermination. At a minimum, it adds weight to the pretext showing and confirms that the case turns on credibility determinations reserved for the jury, not for resolution on summary judgment.

## IV. Conclusion

For the reasons set forth herein, Plaintiff requests that this Court deny Defendant's Motion for Summary Judgment and allow this matter to proceed to trial.

Respectfully submitted,

BURNETTE, DOBSON & PINCHAK

BY:  s/*H. Eric Burnette*
       H. Eric Burnette, TN BPR No. 024342
       Harry F. Burnette, TN BPR No. 004803
       Attorneys for Plaintiff Gail Griffin
       711 Cherry Street
       Chattanooga, Tennessee 37402
       (423) 266-2121
       eburnette@bdplawfirm.com
       hburnette@bdplawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

By:  s/ *H. Eric Burnette*

24