GAIL A. GRIFFIN,       *

                             *

         Plaintiff,       *    NO. 1:24-CV-00248-TRM-SKL

                             *    JURY DEMAND

v.                         *

                             *

MILLENNIA HOUSING       *

MANAGEMENT, LTD. and MILLENNIA       *

HOUSING DEVELOPMENT, LTD.,,,       *

                             *

         Defendants.

## COMBINED JOINT APPENDIX

**JA_1** —Declaration of Debra Moore

**JA_2** —Plaintiff's Deposition Pages and Relevant Exhibits

**JA_3** —Alan Weckerly Deposition Pages

**JA_4** —Frank Sinito Deposition Pages

**JA_5** —Declaration of Alan Weckerly

**JA _6**—Debra Moore Deposition Pages

**JA_7** —Michael Pico Deposition Pages and Relevant Exhibit

**JA_8** —Declaration of Kristi Adams

**JA_9** —Everson Amazing Email

**JA_10** —Response to PIP

**JA_11** —HUD Letters

Respectfully submitted,

BURNETTE, DOBSON & PINCHAK

BY:   /s H. Eric Burnette
        H. Eric Burnette, TN BPR No. 024342
        Harry F. Burnette, TN BPR No. 004803
        Attorneys for Plaintiff Gail Griffin
        711 Cherry Street
        Chattanooga, Tennessee 37402
        (423) 266-2121
        eburnette@bdplawfirm.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2025, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

By:  s/ H. Eric Burnette

# *Exhibit 1*

E andIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | | |
|---|---|---|
| GAIL A. GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00248-TRM-MJD |
| | ) | |
| MILLENNIA HOUSING | ) | JURY DEMANDED |
| MANAGEMENT, LTD. | ) | |
| and MILLENNIA HOUSING | ) | |
| DEVELOPMENT, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DEBRA MOORE

I, Debra Moore, hereby declare as follows:

1.      I am over the age of eighteen and give this declaration of my own free will, pursuant to 28 U.S.C. 1746, based upon personal knowledge.  If called to testify as a witness, I am competent to testify and would testify to the following facts:

2.      I am employed by Millennia Housing Management as the Vice President of Human Resources and have been employed by Millennia since March 2018. As part of my job duties, I regularly access and maintain personnel records of current and former employees, which are maintained in the normal and ordinary course of business.  I have reviewed personnel and business records and am familiar with record-keeping practices related to this matter.

3.      Millennia is based in Cleveland, Ohio. Millennia employs about 800 people and manages approximately 20,000 affordable and market-rate apartment units in 26 states.

Case 1:24-cv-00248-TRM-MJD    Document 29-1    Filed 08/18/25    Page 2 of 33
PageID #: 220
Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/03/25    Page 4 of 229
PageID #: 381

Docusign Envelope ID: 9C21AEC1-C996-4012-A22D-25B0A7EABFE9

4.      Millennia's core mission is "to provide the highest quality of standards in the management of affordable and market rate rental housing."

5.      On July 27, 2022, Millennia's CEO, Frank Sinito, recommended placing Gail Griffin ("Griffin") on a Performance Improvement Plan ("PIP") citing Griffin's failure to properly conduct quarterly inspections for her properties and based on a review of the financials for two Jacksonville properties, Valencia and Callaway.  Attached hereto as Exhibit A is a true and correct copy of Sinito's July 27, 2022, email. Griffin was not placed on a PIP at that time.

6.      On November 28, 2022, I received an email from Philip Krakowiak stating:

Just making sure Gail is okay. She has been consistently going up in errors over the last few weeks. It's never been this bad, so just making sure. I'm going to start estimating to correct and approve.

Attached hereto as Exhibit B is a true and correct copy of Krakowiak's November 28, 2022, email.

7.      Griffin eventually received a PIP which outlined the following "Areas of concern":

a.      Receivables / Financials – Griffin's properties had substantial receivables issues, including over $11,000 in undeposited rent checks, persistent high AR balances well above affordable housing standards, and properties that did not meet financial obligations in 2022 and 2023 despite repeated discussions and directives.

b.      Occupancy – Griffin consistently failed to achieve company-mandated 98% occupancy across her Tennessee properties (except one), with no effective corrective actions implemented despite clear targets and deadlines.

c.      Recertifications (Past Due) – Griffin allowed 125 HUD and Tax Credit recertifications to become past due, jeopardizing regulatory compliance, and failed to ensure timely completion despite written directives and extended deadlines.

Case 1:24-cv-00248-TRM-MJD     Document 29-1     Filed 08/18/25     Page 3 of 33
PageID #: 221
Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25     Page 5 of 229
PageID #: 382

Docusign Envelope ID: 9C21AEC1-C996-4012-A22D-25B0A7EABFE9

d.   Morningside Gardens and Summit Towers – Griffin did not maintain acceptable security, cleanliness, or inspection standards at these properties, resulting in HUD oversight, mandated 100% unit inspections, and additional reporting obligations for these two properties.

e.   Leadership/Decision Making – Griffin made staffing and promotion decisions contrary to company policy and without required approvals, rehired or promoted employees with known performance or conduct issues, failed to report serious incidents, and mishandled employee relations matters in ways that exposed the company to legal risk.

f.   Payroll Matters/Overtime – Griffin managed a portfolio with the highest payroll costs in the company in 2022, without implementing necessary controls to reduce unsustainable expenses.

Attached hereto as Exhibit C is a true and correct copy of Griffin's Performance Improvement Plan.

8.    For each Area of Concern, the PIP also outlined the specific items for an Action Plan.

9.    On May 4, 2023—two days after Griffin received a PIP and agreed to a demotion— Vice President of Operations Dawn Meyers sent an email to Frank Sinito, Alan Weckerly, and me regarding the Jacksonville properties that had been under Griffin's supervision. Attached hereto as Exhibit D is a true and correct copy of Meyers' May 4, 2023, email and attachments.

10.    Meyers' email stated that there were "very serious compliance, [Enterprise Income Verification] and file concerns that exist to some extent at all 4 Jacksonville sites." See Exhibit D.

11.    Meyers' email and report further stated, among other things:

Case 1:24-cv-00248-TRM-MJD     Document 29-1     Filed 08/18/25     Page 4 of 33
PageID #: 222
Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25  08/25 -002 Page 6 of 229 004
PageID #: 383

Docusign Envelope ID: 9C21AEC1-C996-4012-A22D-25B0A7EABFE9

a. "We had been assured by Griffin and Willie that ALL of the REAC repairs were complete. This was found not to be true…. The physical portion of this review is believed to be the demise and likely the reason we may not get satisfactory at the Weldon."

b. "Valencia had 62 move-ins from 1/1/2022 through 3/21/23. At least half of the files could not be located."

c. "Mary Ellen advised Dawn of the piles and boxes of paperwork… so the missing files could be re-created."

d. "Dawn advised Griffin of this extreme concern that last week in March. Griffin did not agree with our concerns."

e. "While fishing through paperwork a box of what appeared to be undeposited money orders and checks was found by the new PM… The property gained $11,000 in revenue from those efforts."

f. "Unable to locate ANY unit inspections from 2022… Griffin was asked by Pearl the location of 2022 as that is part of the MOR—no response from Griffin."

See Exhibit D.

12. Meyers' email also included photographs of resident files at these properties. See Exhibit D. These files were in complete disarray, creating a severe and unacceptable risk to HUD compliance. In my opinion, if a review—including a Management and Occupancy Review (MOR)—had been conducted, the disorganized state of the files would likely have resulted in significant deficiencies, jeopardizing Millennia's compliance status and potentially affecting funding or program participation.

Case 1:24-cv-00248-TRM-MJD    Document 29-1    Filed 08/18/25    Page 5 of 33
PageID #: 223
Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 7 of 229
PageID #: 384

Docusign Envelope ID: 9C21AEC1-C996-4012-A22D-25B0A7EABFE9

13.     On May 6, 2023, in response to Meyers' email, Sinito emailed me and Weckerly stating:

> Based on the attached and following our meeting, we need to consider her not working out her PIP and offering a PM position or just asking her to resign.

Attached hereto as Exhibit E is a true and correct copy of Meyers' May 6, 2023 email and attachments.

14.     In addition to the performance deficiencies noted above, Alexandra Thompson, who had recently taken over responsibility for Griffin's properties, reported to me the following performance issues and staff complaints she had received about Griffin, including:

a.     Multiple property managers reported that they did not feel supported by Griffin and that her leadership style was ineffective, particularly in East Tennessee.

b.     Morningside Gardens and Summit Towers—two properties under Griffin's oversight—had serious operational deficiencies, including security problems, homelessness within the buildings, and failure of a HUD REAC inspection, placing the company at risk of losing management control.

c.     Property managers, including at Maple Oak, reported that Griffin instructed them not to record resident move-outs in the system so that HUD rent payments would continue, which resulted in inaccurate records and repayments to HUD.

d.     Griffin routinely delegated critical financial and operational tasks, such as ledger corrections, to a Senior Property Manager instead of ensuring property managers performed their own duties in compliance with policy.

e.     At a meeting with regional leadership at Overlook, Griffin expressed distrust and extreme dislike for her supervisor, spoke negatively about the company in front of staff, and resisted reassignment despite documented performance concerns.

Case 1:24-cv-00248-TRM-MJD     Document 29-1     Filed 08/18/25     Page 6 of 33
PageID #: 224
Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/03/25-002 Page 8 of 229 06
PageID #: 385

Docusign Envelope ID: 9C21AEC1-C996-4012-A22D-25B0A7EABFE9

15.     I was scheduled to attend Griffin's termination meeting on June 22, 2023. That day, I received a text message from Ms. Thompson stating:

> …And now I'm pissed. I almost just did it myself… She asked me if I've seen Django. I told her yes and she said "Steven from that movie is Debra Moore." She said I don't know if that's your cousin or whatever but that's how I feel.

Attached hereto as Exhibit F is a true and correct copy of the June 22, 2023 text message exchange between Thompson and me.

16.     I had never seen *Django Unchained*, so I searched it online. I learned that "Steven" from the movie is described as a "house slave."

17.     I responded to Ms. Thompson:

> Of course, I never saw Django so I had to Google it. I am pissed.

See Exhibit F.

18.     Because of how I felt about that comment, I asked Michael Pico to conduct the termination meeting in my place.

19.     At the time of Griffin's termination, June 22, 2023, there were 23 regional managers and directors. Their ages were as follows: 44, 64, 50, 60, 56, 43, 55, 52, 46, 42, 46, 55, 61, 44, 46, 48, 41, 60, 54, 54, 25, 24, 47.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Debra Moore

# *Exhibit A*

Case 1:24-cv-00248-TRM-MJD    Document 29-1    Filed 08/18/25    Page 8 of 33
PageID #: 226

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 10 of 229
PageID #: 387

-----Original Message-----
From: Michael Pico <mpico@mhmltd.com>
Sent: Wednesday, July 27, 2022 10:26 AM
To: Frank Sinito <fsinito@mhmltd.com>; Alan Weckerly <aweckerly@mhmltd.com>; Elizabeth
Gabor <egabor@mhmltd.com>; Frank Sinito Jr. <fsinito1@mhmltd.com>; Lori Iacona
<liacona@mhmltd.com>
Cc: Debra Moore <dmoore2@mhmltd.com>
Subject: RE: Gail Griffin

understood

-----Original Message-----
From: Frank Sinito <fsinito@mhmltd.com>
Sent: Wednesday, July 27, 2022 10:25 AM
To: Alan Weckerly <aweckerly@mhmltd.com>; Elizabeth Gabor <egabor@mhmltd.com>; Frank
Sinito Jr. <fsinito1@mhmltd.com>; Lori Iacona <liacona@mhmltd.com>
Cc: Michael Pico <mpico@mhmltd.com>; Debra Moore <dmoore2@mhmltd.com>
Subject: Gail Griffin

She definitely needs to be placed on PIP based on Valencia and Calloway review. Not doing
quarterly's properly! We are losing a TON of $$$. We need a monthly plan to oversee HAP and
collections.

Frank T. Sinito
Chief Executive Officer
The Millennia Companies

# *Exhibit B*

**From:** Philip Krakowiak <pkrakowiak@mhmltd.com>
**Sent:** Monday, November 28, 2022 2:27 PM
**To:** Debra Moore <dmoore2@mhmltd.com>
**Subject:** *FYI* Recurring Theme

Just making sure Gail is okay. She has been consistently going up in errors over the last few weeks.

It's never been this bad, so just making you aware.

I'm going to start estimating to correct and approve.

Thank you.



Phil Krakowiak
**Payroll**
The Millennia Companies®
4000 Key Tower, 127 Public Square
Cleveland, Ohio 44114
(216) 520-1250 (Office) | (216) 236-0440 (Direct)
themillenniacompanies.com | pkrakowiak@mhmltd.com

# Exhibit C



Millennia Housing Management, Ltd.
4000 Key Tower, 127 Public Square
Cleveland, Ohio, 44114
(216) 520-1250 | themillenniacompanies.com

| | |
|---|---|
| TO: | Gail Griffin, Regional Property Director, Operations Division-Knoxville, TN |
| FROM | Alan Weckerly, Executive Vice President and Debra Moore, Vice President of Human Resources |
| SUBJECT: | Performance Improvement Plan |
| DATE: | May 2, 2023 |

Introduction: We understand that upon your assignment over the Jacksonville Portfolio in September 2021, this could have been considered a year of transition and that there were many challenges within this portfolio. There was a lack of staff and staff discord, which undoubtedly hindered progress. It must be recognized that the volume of work and issues presented to you was high and time-consuming; we thank you! We must now focus on the deficiencies and matters that were problematic and uncovered in Jacksonville that did put the company at risk and now Tennessee to prevent the company from being at risk.

There have been many conversations about the financial condition of your troubled properties; you will find within this Performance Improvement Plan items that are essential to the successful performance of your portfolio. Your role as the Regional Director seemed to have evolved into a task-driven role rather than that of a leadership strategic advisor to the Property Managers. Working through the plan presented below will ensure the success of your Tennessee portfolio as taking the initiative is vital for your position.

Please note that this is not an all-inclusive list of items that must be done on a regular basis, we are just bringing attention to those that now must be done either immediately and/or on a regular basis.

**Area of Concern 1: Receivables / Financials**

1. It was determined that Valencia Way had over $11,000 in non-deposited received rent check that dated between December 2022 and March 2023.
2. Each week you were in discussion about the receivables for all your properties, especially the third week of the month. Your failure to move towards the solution pertaining to receivables is problematic.
3. Currently, all your Tennessee properties except for Watauga Square are severely lacking in collections. The AR balance should be no more than 2% of the monthly rent amount, this is standard for Affordable Housing.
4. 2022 and 2023 financials (file attached) for your properties that did not meet financial obligations.

**Action Plan:**

1. You are being held directly responsible for the lack of accountability of the A/R for Valencia Way. This was negligent on your part to allow this to transpire. It was only until our CEO visited the property, the current PM discovered a box of checks that was not known if they were deposited. Once the deposits were made in the total amount of $42,000, of the total checks that were found, $11,000 of this amount was determined not to have been deposited.
2. You will need to understand the impact of your receivables, this is done by reviewing your receivable ledgers line-by-line each day to ensure there is no negative financial impact on each property.

MILLENNIA000040

3. If you follow the guidelines, we will expect to see improvement within the next 30 days and thereafter. You are expected to review the Delinquent and Prepaid report for each property each day to ensure compliance. ***In the absence of a manager, it is your responsibility to ensure receivables are maintained as well as all other aspects of the property.***

4. You will need to develop solid knowledge of the financial status of your properties. Properties are measured by their economic occupancy to determine the health of the property.

**Area of Concern 2:  Occupancy**

1. Each property must improve occupancy and must be at 98%.
2. Currently, all your Tennessee properties except for Watauga Square are severely lacking in occupancy.

**Action Plan:**

1. You must reach the occupancy of 98%  of all your Tennessee Properties no later than July 31, 2023.
2. **Weekly**  Property Walks/Inspections. Specifically in unit inspections and building/property conditions. You are responsible for ensuring the property managers perform weekly inspections and following the unit inspection policy.
3. Weekly property walks of common area halls, grounds, buildings, and specific unit inspections must occur. Each documented and provided to property specific leadership.
   a. For example: Each property manager must complete and submit a Site Visit form and provide updates accordingly.
4. For all your properties, you must personally perform 100%-unit inspections on a quarterly basis, per company policy for all occupied and vacant units, based on the direction Alan.
   a. You must complete and submit a Site Visit Form for each property, per visit.
5. Make surprise visit to ensure compliance and direct and correct accordingly holding the Property Manager responsible for the effective direction in obtaining needed results.

**Area of Concern 3:  Recertifications (Past Due)**

ı As of April 5, 2023, there were a total of 125, both Tax Credit and HUD Recertifications that were past due

**Action Plan:**

3. You must review your current recertification report as of today and inform both Alan and Debra in an email, a copy of the report.
4. If there are any past due recertifications, they must be rectified no later than June 30, 2023.
5. You must report each month to both Alan and Debra a copy of the report where we can see the recertifications are being managed according to company policy.

**Area of Concern 4:  Morningside Gardens and Summit Towers**

ı **Morningside**  is now under HUD's eyes, for operations corrections as dictated by the Jacksonville Regional Office
ı Based on lack of security and cleanliness, MHM is now obligated to provide regular reports to HUD as well as open inspections.
ı **Summit Towers**  is problematic and needs to have a plan of action as it pertains to security and cleanliness.

MILLENNIA00041

**Action Plan:**

- **Morningside Gardens:**
- MHM is required to do a 100%-unit inspection as mandated by HUD as of 5.1.2023, completion date is no later than May 26, 2023.
  - Inspections with complete documentation must be done each week, effective immediately to ensure compliance by May 26, 2023.
- You will need to provide to both Alan and Debra the site visit notes from CEO's visit and the notes from HUD's visit no later than May 5, 2023
- You must maintain the plan of action and report accordingly. You will meet on a regular, scheduled basis with Alan to ensure compliance with the plan.
- The update to the plan needs to be presented to Alan every two (2) weeks in writing.
- **Summit Towers**: you will need to provide the site visit notes to both Alan and Debra no later than May 5, 2023, and provide updates every two (2) weeks.

**Area of Concern 5: Leadership/Decision Making**

1. Sabrina has been used within your entire portfolio from the time you were assigned the Jacksonville Market. She was being used in more of a District Manager role and not a Senior Manager. Effective immediately, Sabrina will only focus on Morningside until the property has been stabilized.
2. Overall staffing decisions have been problematic, and not always made in the best interest of the property/MHM.
   a. **Antonio Blevins:** was hired and transferred from Jacksonville to Morningside Gardens. He was subsequently terminated based on being served a "restraining order" for having inappropriate relationships with a tenant. After the investigation was completed, it was determined that he was having relationships with tenants in Jacksonville, he was doing illegal activities (drugs) and his workmanship was not according to the standards of the company.
   b. **Shawn Williams:** You requested the promotion for her to oversee both Galloway Cove and Valencia Way as the Senior Property Manager. In addition, Shawn had performance issues prior to her being rehired in Jacksonville and you rehired her without approval from HR. Shawn has been found to speak in a non-professional way to her staff in Jacksonville where she has been placed on a final written warning or the company may terminate her based on her atrocious behavior.
   c. **Donnie Davis:** You recently requested to promote him from his current MT role located in Cherokee Hills to the RMM, this would be a 70% increase in salary. Did you take into consideration his home base location and his travel costs to oversee the portfolio? Per our conversation, Donnie is needed to turn the units at Cherokee at this time and you will provide a 30-day plan and submit to both Alan and Debra for review and approval.
3. You must partner with HR when it comes to all employee relations matters, no matter how minor you feel the situation may be. You have put the company at risk by not reporting claims, now filed by former employees of discrimination. You must have better self-awareness of these matters and you can no longer "assume" you are having private conversations, by sharing your personal experiences. Comparing your personal story about your dimples did not negate the fact his concerns were valid, and you were dismissive of his concerns.
4. You failed to report the personal destruction of a property managers automobile. All incidences MUST be reported to the proper areas.

**Action Plan:**

1. Alan must approve in advance any recommendations made by you in writing. Alan will then inform others of the approvals, this includes but is not limited to, Vendor commitments, staffing plans, supplies/products, advertising – basically any financial commitment including your travel

2. All considerations for promotions or transferring employees must follow policies and reviewed by Alan and Debra in advance.

   a. For example, you made the recommendation to promote a MT from Cherokee to the RMM, this was almost a 70% increase in his base salary. In addition, did you take into consideration his travel costs based on where he lives, verses the properties he would support.

   b. These factors need to be taken into consideration prior to decisions being made.

3. When you visit properties, you must be engaged with the staff, residents, and vendors if applicable. You should conduct/complete the following (this is not a complete list):

   o Complete audit of petty cash

   o Audit move-in files

   o Audit move-out file

   o Ensure make-ready boards are in line with what is in OneSite

   o Ensure special claims are being completed based on policy

   o Engage with staff to see what is needed to complete tasks

   o Ensure compliance posters are updated and relevant

**Area of Concern 6:  Payroll Matters / Overtime**

ı In 2022, your portfolio had the highest amount of payroll within the entire company, this is not sustainable.

**Action Plan:**

ı You are responsible for ensuring that all timecards are correct, and that all employees clock in/out as required.

   a. You will need to follow the overtime policy and procedures. An overtime approval form must be completed each week, prior to an employee working the OT.

   b. You will need to ensure all hourly employees take a one (1) hour lunch, per policy.

   c. You will need to review payroll no later than Monday morning of each week to ensure employees are adhering to policy.

**Effective immediately, the following will occur:**

ı Approvals must be received in writing from Alan Weckerly prior to making any financial decisions on behalf of your portfolio.

ı Sabrina Nichols must focus on Morningside Gardens until stabilization, this means, she will no longer oversee Cherokee Hills, oversee your weekly staff meetings or any other "Senior Property Manager" duties that may have been previously assigned to her.

ı You must hold staff accountable to complete related goals/t 🔲 assigned in a timely manner. Specifically weekly report/OBW processes so you and your supervisor can monitor and guide to results needed. When staff is unable to complete this task, you will proactively provide the support and ensure the reporting is completed.

   o As noted above, the determination of results will be Software/Business Intelligence reporting and documentation driven to be used in achieving the results.

   o Hold weekly staff meetings, directing/teaching/educating staff on all property related matters. Again, you must schedule and chair these meetings moving forward.

In summary, the meaning of "Great" states "of an extent, amount, or intensity considerably above the normal or average. At the current state of the majority of your properties, your region is not "Great", and you should refrain from calling your region "Team Great" until your portfolio amplifies the above meaning of "Great".

Based on the deficiencies in the Jacksonville portfolio and moving you back to your original portfolio, your title will change from Regional Property Director to **Regional Manager** to allow you to focus on the Tennessee portfolio and your salary will decrease to **$90,000.00.**

We want to always deliver the best product and service to our employees. Seek Alan Weckerly, Executive Vice President or Debra Moore, VP of Human Resources, and other support staff to help you remove barriers and obstacles that prevent you from successfully delivering on the expectations we have outlined for you as well as the expectation of property management. You are encouraged to spend additional time with accounting to fully understand your budget and your financial obligations to ensure your portfolio is stabilized.

If you fail to reach the goals within this plan, you may be subject to further disciplinary action, reassignment of your role or separation from the company .

Please sign below to acknowledge you have received this letter and understand its content.

See attached document for signature  05/05/2023

_____

Gail Griffin                                                                                           Date

# *Exhibit D*

| | |
|---|---|
| **From:** | Frank Sinito |
| **To:** | Debra Moore; Alan Weckerly |
| **Cc:** | Kevin Milluzzi |
| **Subject:** | Fwd: MORs: Weldon and Valencia |
| **Date:** | Saturday, May 6, 2023 12:05:54 PM |
| **Attachments:** | DKM-MOR findings Valencia -Weldon 5-2023.docx |
| | 2.jpeg |
| | 6.24.22 FW_ Naquan Howard Unit 342-Valencia Way-Duel Subsidy (1).pdf |
| | 6.24.22 FW_ Naquan Howard Unit 342-Valencia Way-Duel Subsidy.pdf |
| | 10.jpeg |
| | 15.jpeg |
| | 17.jpeg |
| | 22.jpeg |
| | 24.jpeg |
| | A Jones Has multiple income discrepancies.docx |
| | closet in valencia 1.jpeg |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

Based on the attached and following our meeting, we need to consider her not working out her PIP and offering a PM position or just asking her to resign.

Frank T. Sinito
Chief Executive Officer
The Millennia Companies

---

**From:** Dawn Klapkowski Meyers <dmeyers@mhmltd.com>
**Sent:** Thursday, May 4, 2023 1:59:09 PM
**To:** Frank Sinito <fsinito@mhmltd.com>; Alan Weckerly <aweckerly@mhmltd.com>; Debra Moore <dmoore2@mhmltd.com>
**Subject:** MORs: Weldon and Valencia

Frank,

Per our discussion this morning, please find attached a narrative that describes the conditions of the files, the MORs, some of the findings and my recommendations to correct these very serious compliance, EIV and file concerns that exist to some extent at all 4 Jacksonville sites.

I also attached a few pictures to give some perspective to the challenges the team faced while preparing for these MORs.

If you have any questions or would like to discuss further – please let me know.

Im sorry I do not have better news with regards to these 2 MORs.



Dawn Klapkowski Meyers, CPM, BOS, TCS, C3P
Vice President of Operations, Millennia Housing Management, Ltd.
1300 Key Tower | 127 Public Square | Cleveland, OH 44114-1310
o 216.236.0842 | c 412.657.8186| dreed@mhmltd.com
http://www.themillenniacompanies.com

  

**The Weldon MOR date 4/25/23:**

*       Marcia arrived at the Weldon 4/13. Manager walked out and never returned (abandoned position) at or about 1 pm on 4/14.
*       Marcia created EIV books (users and reports) for 2022 and 2023.  2022 did not exist and had to be created from nothing and helped review ARs.
*       Pearl reviewed move in files.  7 move ins from 4/1/22 through 3/31/23.  Pearl also reviewed files of the residents who showed up on EIV reports (new hires and income discrepancy).
*       Pearl created the MOR book.
*       1 move in file missing (could not find anywhere).  We were able to re-create it with the help of the tax credit file and the resident.
*       Minor errors in the files (9 chosen).  EIV book no errors.
*       There was a finding for utility allowance checks being cut late.  They are supposed to be paid between the 1st and the 5th of the month, and many months were the 7th, 8th or 9th.
*       When walking the REAC EH&S units, one of them (now vacant) had the EH&S items repaired, but there were holes in the walls.  Auditor went back to the REAC inspection and compared the photos….they were the same holes.  We had been assured by **Gail and Willie** that ALL of the REAC repairs were complete. This was found not to be true. (the 2 ops specialists were fully focused on the files and relied on the information given by Gail and Willie). The physical portion of this review is believed to be the demise and likely the reason we may not get satisfactory at the Weldon.
*       1 Vacant Ready was hit because we didn't have the refrigerator in there (we haven't been putting appliances in the vacant units due to vandalism and theft).
*Auditor made comments to the team while at Valencia, that if it hadn't been for the physical, we would've had definitely had a Satisfactory there. Wont know for sure how the points added up until the report is released.*

**Valencia Way MOR date 5/2 and 5/3**

*       Marcia arrived onsite at Valencia 4/10 through 4/12, then had to go to The Weldon to work on that MOR as it was on the 26th.
*       Valencia had 62 Move ins from 1/1/2022 through 3/21/23. At least half of the files could not be located.

\*       Mary Ellen had been onsite at Valencia beginning the week of 3/27. MaryEllen advised Dawn of the piles and boxes of paperwork that she would begin by sorting piles of papers into searchable piles. So the missing files could be re-created.

*There are piles and boxes of paperwork everywhere.  When needing to rebuild a file, it is extremely difficult because you can't find anything.  Of the time spent there, at least 2 full work weeks were spent searching. Dawn advised Gail of this extreme concern that last week in March. Gail did not agree with our concerns. Requested that Dawn move MaryEllen's focus to late recerts. Dawn replied with no, that she would have 3 ops specialists in place by early April with the sole focus on the 2 upcoming MORs. Gail proceeded to tell Dawn to have faith and I did not know the team (each pm was brand new) and that we are team great. Dawn proceeded with the directives to the Ops specialists to ready for MOR. Dawn was onsite the first week in April and saw the challenge. Dawn then called in Marcia to assist. Marcia arrived 4/9.*

\*       Of the 62 move ins – 31 files were missing.  MaryEllen was able to rebuild some from the piles of paperwork and onesite , as uploads as well as tax credit docs. However these efforts need to continue. While fishing through paperwork a box of what appeared to be undeposited money orders and checks was found by the new PM. Efforts switched at that time to process the checks and verify what was deposited and not. The property gained 11g in revenue from those efforts.
\*       Pearl worked on the MOR binder and annual recerts that showed up on the new hire and discrepancy lists, as well as people with repayment agreements (historically these files are chosen).
\*       Marcia worked on the EIV book (2022 was there this time, but 2023 needed to be created from scratch, as well as the Master with all of the user information)
\*       Marcia didn't get to review any move ins, as she focused on all of the late ARs and review of as many as possible that were finalized in the preceding 12 months as a large portion of the MOR would be reviewing this.  MaryEllen and Pearl were tasked with auditing the MI files and re-creating the missing 31.

*Keeping in mind at both the Valencia and Weldon it was new staff. Marcia was assisting with some training and a ton of questions that were never answered upon hire or onboarding. Mostly on policy and procedure. This is to be expected. HAPs still had to be corrected, the now vacant manager position at the Weldon*

*had to be covered, many managers needed ledger corrections, month end, FAS's…etc were all still happening, so Marcia was pulled in many directions.*

\*     The auditor pulled 6 move ins.
     Findings on move in files:
     \*Incorrect security deposit (LMSA property – and we have asked MULTIPLE times to get the security deposit fixed in the system to be the TTP with no minimum, but nothing has happened)
     \*Incorrect lease terms (see note above)
     \*EIV findings: reports run but not notated for the work that was done to correct. MANY of the corrections had been made, but they were not noted in the file or the EIV book (2022).
          \*EIV failed verifications left on report for months before correction
          \*Deceased tenants left on report for months before term or move out
          \*Multiple subsidy for almost a year before action taken (Pearl has been asking the (previous now) regional and Jesica for help fixing this one since June 2022 with no response-memos attached). The resident has a voucher in a subsidized unit, and we are being paid by both. Property subsidy for this resident has now been termed back to move in, but the unit is still not billing properly. Marcia has asked Jesica to help (a few times).
     \*9887A not signed by O/A
     \*Owner summary not verified by O/A
     \*Some residents over housed from move in
     \*Resident HUD repayment agreement payments not being posted correctly. Some not paying at all and no follow up.
     \*Income calculations
     \*Assets not on 50059
\*     Unable to locate ANY unit inspections from 2022. Gail had been using a 3rd party, USIG every year, but we could not locate the binder for 2022. We have 2021 and 2023. Nothing for 2022. Gail was asked by Pearl the location of 2022 as that is part of the MOR – no response from Gail.
\*     NOTHING has been filed for 2021 or 2022 with regards to ARs, IRs, Move ins - everywhere. We have many photos.

\*     Marcia found a stack of IR requests (all from 2022), employment verification signed, but never sent…doesn't look like any of them have been

MILLENNIA000104

processed. We must return to this while auditing files – and likely will find incomplete or never started IR's

\*        Many ARs and IRs that were found were NOT signed, but were marked as complete in the system.  It appears to be standard practice at these sites. Tina (Valencia PM) sent Marcia the following statement:

"When I first started with millennia I was working with Ms. Pearl she informed Ms. Gail about the issue we had with the deceased residents that came up on EIV she stated we are not worried about the past just move forward with the present. We informed her the files that we're not completed they were signed  she said just work on the present. I advised Ms. Gail about a new hire Dominique who  residents stated he lived on property and they did not want him in their units because he was a thief,  she stated we don't go by word of mouth. "

### *Dawns final statement and plan:*

If both Weldon and Valencia end up with another below average or worse (as suspected)– a 100% file audit will be required as will a follow up MOR/or file review likely again in 6 months. I recommend that all 4 sites undergo a 100% file audit immediately. (Calloway and Palmetto are both due for MORs next). A team of at least 2-3 for each site and 4-5 (Valencia) will need to be assembled to complete this task. This task will undoubtedly result in a lot of file work that will need to be performed by the selected auditors and that is the reason for the need for such a team. This task cannot be started and stopped. It cannot have multiple different hands in the files. We need to truly assemble solid teams to each site that maintain that role until completion. I propose Valencia and possibly Calloway we consider a professional 3rd party for this task. The damage is widespread and has existed year after year. In my opinion there has been little to no oversight on these files, new move ins, EIV findings etc in the past 12 months and the same in the prior years.

I believe we can handle with the ops specialists as well as Onix and myself to audit Palmetto and Weldon make all necessary corrections and begin an accountable process with the new managers on new move ins, AR's IR's and EIV. Valencia really needs help to get these files audited (many left still need re-created) and corrections completed.

I include Calloway in the 3rd party recommendation for a number of reasons. Onix and I have genuine concerns with the management of Calloway remaining under Shawn. Onix would like some time to truly assess the condition of Calloway, files, maintenance, etc before making this decision. Up until today the focus has been on the 2 MORs and the Fair housing audits. Our concerns are coming from the many files at Weldon that she assisted with AR's that were simply not completed properly and put away without signatures. That concerns me greatly as she was recommended to be a senior PM. Additionally, her interaction with other team members has created some concerns, her lack of transparency, the lack of follow up with criminal activity, her reaction to trivial situations. Etc.

Now that we are past the 2 MORs – Onix plans to spend some significant time with Shawn and review files, and dig in. Until we get the other 2 new PMs in place at Palmetto and Weldon – he will also be covering those sites along with MaryEllen.

I want to stress that I believe the only way to get Jacksonville to where it should be and pass the next MORs is to open each and every file. Review all EIV findings and CORRECT EVERYTHING. This way the new management teams (including our new RM) already in place have a chance to succeed and bring these 4 sites to MHM standards. In reality, these properties have enough on their plate (with being so new) in just the day to day responsibilities, learning their new positions, MHM procedures, process, etc. The day to day alone, on these sites bring enough challenges to keep everyone busy without the burden of correcting hundreds of files and the mistakes from their predecessors. This task should involve the team – but I want to be clear in the need to have a separate team assembled just for the file audit and repairs. Whether we do that all in house or consider a 3rd party.

I have worked with AJ Johnson in the past in this manner. He assembles a team and they audit, correct and offer training. Spectrum also has these services; Quadel. Im sure there are 100s of options out there with prices that vary depending on location and scope of work.

Please feel free to follow up with any more questions.

MILLENNIA000106



MILLENNIA-000107



MILLENNIA 000113







# *Exhibit E*

| From: | Frank Sinito |
|---|---|
| To: | Debra Moore; Alan Weckerly |
| Cc: | Kevin Milluzzi |
| Subject: | Fwd: MORs: Weldon and Valencia |
| Date: | Saturday, May 6, 2023 12:05:54 PM |
| Attachments: | DKM-MOR findings Valencia -Weldon 5-2023.docx |
| | 2.jpeg |
| | 6.24.22 FW_ Naquan Howard Unit 342-Valencia Way-Duel Subsidy (1).pdf |
| | 6.24.22 FW_ Naquan Howard Unit 342-Valencia Way-Duel Subsidy.pdf |
| | 10.jpeg |
| | 15.jpeg |
| | 17.jpeg |
| | 22.jpeg |
| | 24.jpeg |
| | A Jones Has multiple income discrepancies.docx |
| | closet in valencia 1.jpeg |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

---

Based on the attached and following our meeting, we need to consider her not working out her PIP and offering a PM position or just asking her to resign.

Frank T. Sinito
Chief Executive Officer
The Millennia Companies

---

**From:** Dawn Klapkowski Meyers <dmeyers@mhmltd.com>
**Sent:** Thursday, May 4, 2023 1:59:09 PM
**To:** Frank Sinito <fsinito@mhmltd.com>; Alan Weckerly <aweckerly@mhmltd.com>; Debra Moore <dmoore2@mhmltd.com>
**Subject:** MORs: Weldon and Valencia

Frank,

Per our discussion this morning, please find attached a narrative that describes the conditions of the files, the MORs, some of the findings and my recommendations to correct these very serious compliance, EIV and file concerns that exist to some extent at all 4 Jacksonville sites.

I also attached a few pictures to give some perspective to the challenges the team faced while preparing for these MORs.

If you have any questions or would like to discuss further – please let me know.

Im sorry I do not have better news with regards to these 2 MORs.



Dawn Klapkowski Meyers, CPM, BOS, TCS, C3P
Vice President of Operations, Millennia Housing Management, Ltd.

1300 Key Tower | 127 Public Square | Cleveland, OH 44114-1310
o 216.236.0842 | c 412.657.8186| dreed@mhmltd.com
http://www.themillenniacompanies.com

 

# *Exhibit F*



💗

Let me know when you are here and I will make sure you meet her

Jun 22, 2023 at 1:05 PM

FYI....... She is leaving at 2:30 with the PM to take her to her doctors appointment

And now I'm pissed. I almost just did it myself.

She asked me if I've seen Django. I told her yes and she said "Steven from that movie is Debra Moore". She said I don't know if that's your cousin or whatever but that's how I feel. 😡

Of course I never saw Django so I had to Google it. I am pissed.

Same.

Jun 22, 2023 at 4:38 PM

She is gone

Aug 10, 2023 at 3:06 PM



iMessage

# *Exhibit 2*

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF TENNESSEE

3                 SOUTHERN DIVISION

4    _____

5    GAIL A. GRIFFIN,

6              Plaintiff,

7        v.                           Case No.

8    MILLENNIA HOUSING MGMT, LLC and        1:24-cv-00248-

9    MILLENNIA HOUSING DEV., LTD.,          TRM-MJD

10             Defendants.

11   _____

12              DEPOSITION OF GAIL A. GRIFFIN

13   DATE:          Monday, June 30, 2025

14   TIME:          10:02 a.m.

15   LOCATION:      Burnette Dobson & Pinchak

16                  711 Cherry Street

17                  Chattanooga, TN 37402

18   REPORTED BY:   Anna Carpenter

19   JOB NO.:       7441349

20

21

22

23

24

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 2 of 45
PageID #: 253

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 37 of 229
PageID #: 414

1     A    No.

2     Q    And you started with Millennia in 2016; is

3  that right?

4     A    Yes.

5     Q    Okay.  And immediately before Millennia,

6  where did you work?

7     A    I didn't work for a -- a year.

8     Q    You did not work for a year?

9     A    Yeah.  My husband got sick.  So I stopped

10  working.

11     Q    Where were you working before that year?

12     A    PK Management.

13     Q    Okay.  And what does PK Management do?

14     A    Property management.

15     Q    And where are they based out of?

16     A    Cleveland, Ohio.

17     Q    What was your -- how long were you at PK

18  Management?

19     A    I would say two years.  I started as

20  property manager and advanced to a senior property

21  manager.

22     Q    And so if you took a year off before

23  Millennia, that goes back to fall of 2015?

24     A    Mm-hmm.

Veritext Legal Solutions

800-567-8658                                  973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 3 of 45
PageID #: 254

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 38 of 229
PageID #: 415

```
1       A    Yes.  That's it.

2       Q    How much do you receive in social security?

3       A    $2,155.

4       Q    And how often do you receive that?

5       A    Monthly.

6       Q    When did you start drawing social security?

7       A    December of this year.  I mean, not -- of

8  last year.

9       Q    2024?

10      A    Mm-hmm.

11      Q    Yes?

12      A    Yes.  You have to get a bell and say, "Bing.

13 Gail, say yes."

14      Q    Any other income that you've received since

15 your employment with Millennia ended?

16      A    No.

17      Q    No?

18      A    No.

19      Q    So just unemployment, the income from

20 Cardinal Group, and then social security?

21      A    Yes.

22      Q    Okay.  And you were originally hired at

23 Millennia, I think, on August 9, 2016?

24      A    It would have been August -- it was
```

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 4 of 45
PageID #: 255

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 39 of 229
PageID #: 416

1   August 19, 2016.  Was it 2016?  I want to say

2   August 19, 2016.

3       Q   August 19th?

4       A   Mm-hmm.

5       Q   Is that a yes?

6       A   Yes -- yes, sir, August 19, 2016.

7       Q   And your first position was property

8   manager?

9       A   Yes, The Overlook.

10      Q   The Overlook Apartments in Chattanooga?

11      A   Yes.

12      Q   And at that time you were making $45,000 a

13   year?

14      A   Yes.

15      Q   And how did you get that job?

16      A   I applied for it.

17      Q   And where did you see that posting?

18      A   I want to say newspaper.

19      Q   And you filled out a job application?

20      A   I interviewed with Alan Weckerly.  And

21   during the interview found out that I had managed that

22   property previously, because it's a very difficult

23   property.  It has several different layers of programs

24   that's associated with it.  And I was very excited.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 5 of 45
PageID #: 256

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 40 of 229
PageID #: 417

1    Knoxville, all the property managers of this

2    portfolio.

3         Q    And so when The Overlook was acquired, it

4    was part of -- was it something called "219

5    Acquisition"?

6         A    2 -- 2192TN.

7         Q    2192TN?

8         A    2192TN, yeah.

9         Q    And 2192, is that the number of units that

10   was acquired?

11        A    I think so, but I'm not sure.

12        Q    Okay.  And, at that time, what were the

13   other properties part of that portfolio?

14        A    Sure.  You know, you have The Overlook;

15   Clinton, Tennessee, which is Charles Seivers; Summit

16   Towers.

17        Q    That's in Knoxville?

18        A    Knoxville.  Morning Side Gardens, Knoxville.

19        Q    Knoxville.

20        A    Maple Oak, Kingsport; Watauga Square,

21   Johnson City; and Hazard, Kentucky, Cherokee Hills.

22   Was that seven?

23        Q    It's Overlook, Morning Side, Summit Towers,

24   Maple Oak in Kingsport, Cherokee Hills in Hazard?

Veritext Legal Solutions

800-567-8658                                    973-410-4098

Case 1:24-cv-00248-TRM-MJD   Document 29-2   Filed 08/18/25   Page 6 of 45
PageID #: 257

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 41 of 229
PageID #: 418

1  A  You're missing Watauga Square.

2  Q  Watauga Square in Johnson City?

3  A  Yes.

4  Q  And Charles Seivers in Clinton?

5  A  Yes.

6  Q  And you said, "We went to Knoxville."  Who

7 went to Knoxville?

8  A  All us -- all the property managers.

9  Q  And so did each of those properties have one

10 property manager?

11  A  Yes.

12  Q  Okay.  And had you worked with any of those

13 property managers before?

14  A  I may have.  We weren't sure.  I think I may

15 have worked with Betty Thompson.  Because they

16 purchased the properties, I think, from Lawler-Wood.

17 And she was at Lawler -- she was still at Lawler-Wood

18 when I was at Lawler-Wood years ago.  But I couldn't

19 really remember.  So we think we worked together

20 previously.

21  Q  And which property was Betty Thompson at?

22  A  Charles Seivers.

23  Q  Charles Seivers.  Okay.  And what did y'all

24 do during this two and a half days of orientation?

Veritext Legal Solutions

800-567-8658              973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 7 of 45
PageID #: 258

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 42 of 229
PageID #: 419

```
 1       A    We learned about the systems.  They had, I
 2   think -- was still one site where they were changing
 3   over, policies, how to pay bills, different things
 4   like that.
 5       Q    And who conducted the orientation?
 6       A    Alan.
 7       Q    And was Alan in Knoxville with y'all?
 8       A    Yes.  I think it was Alan.  And there was
 9   some other lady too.  I can't remember her name 'cause
10   she -- she wasn't with the company long after I got
11   there.
12       Q    And was this all in-person training?
13       A    Yes.
14       Q    Okay.  And you said that they went over
15   policies?
16       A    Mm-hmm.
17       Q    Is that a yes?
18       A    Yes.
19       Q    And did they go over the employee handbook?
20       A    Yes.
21       Q    Okay.  And where was -- did you get a copy
22   of that employee handbook?
23       A    Yes.
24       Q    Okay.  And was there a employee handbook
```

Veritext Legal Solutions

800-567-8658                                                      973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 8 of 45
PageID #: 259

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 43 of 229
PageID #: 420

1  located online somewhere that you could access?

2      A    Yes.

3      Q    Okay.  And was that, like, on an intranet,

4  internal website?

5      A    Yeah, internal.  Yes.

6      Q    Okay.  Was there also a copy at the

7  property?

8      A    Yes.

9      Q    Okay.  And I'm going to be handing you some

10  documents today, and we're going to mark them as

11  exhibits as we go through them.  I'm handing you

12  what's been marked as Exhibit 1.

13              (Exhibit 1 was marked for

14              identification.)

15              MR. JACKSON:  And, Renee and Eric, this

16  is the portions of the Millennia Employee Handbook,

17  Bates stamps 51 through 68.

18  BY MR. JACKSON:

19      Q    Do you recognize what we've marked as

20  Exhibit 1, Ms. Griffin?

21      A    Yes.

22      Q    Okay.  And is that the employee handbook for

23  Millennia?

24      A    It says it is, but it was January 2023

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 9 of 45
                              PageID #: 260

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 44 of 229
                              PageID #: 421

```
 1   that's the -- dated on here, and I was probably more
 2   familiar with '20, '21, and '22.
 3        Q    And do you know what's different between the
 4   '21 and '22 version and this version?
 5        A    No.
 6        Q    And this one would have been in effect at
 7   the time of your separation; is that right?
 8        A    If it says on here January 2023, yes.
 9        Q    Okay.  And do you know if you had access to
10   this version while you were still employed at
11   Millennia?
12        A    I probably would have had access if it's
13   there.
14        Q    Okay.  Any reason to think you did not have
15   access?
16        A    No.
17        Q    I'm going to have you turn -- do you see the
18   numbers on the bottom right?  Like, the first page
19   says "Millennia 51"?
20        A    Yes.
21        Q    Okay.  And so those are Bates stamps, and so
22   I'm going to refer to those today.  So if you can turn
23   to Millennia 53.  Are you there?
24        A    Yes.
```

Veritext Legal Solutions

800-567-8658                                    973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 10 of 45
PageID #: 261

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 45 of 229
PageID #: 422

```
 1       Q    And the bottom section is called "Open-Door
 2  Policy"?
 3       A    Yes.
 4       Q    Did you know that Millennia had an open-door
 5  policy?
 6       A    Yes.
 7       Q    And as the property manager did you have
 8  other employees at the property when you were at The
 9  Overlook?
10       A    Yes.
11       Q    Who else was there?
12       A    Okay.  You talking about all the staff?
13       Q    How many people were there?
14       A    At we -- we -- are we talking about The
15  Overlook, just --
16       Q    The Overlook when you started.
17       A    Just The Overlook, okay.  Tim was there.
18  What's his name was there?  And I was there.  Three.
19       Q    And what were their positions?
20       A    Me as the property manager.  Tim was a
21  supervisor.  And his assistant, I forgot his name.
22       Q    Tim was a supervisor?
23       A    Mm-hmm.
24       Q    Is that a yes?
```

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 11 of 45
                              PageID #: 262

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 46 of 229
                              PageID #: 423

1     A    Yes.

2     Q    And there was an assistant?

3     A    Yes, a maintenance tech.

4     Q    And so was Tim in maintenance?

5     A    Yes.

6     Q    He's the maintenance supervisor?

7     A    Yes.

8     Q    And then a maintenance tech?

9     A    Mm-hmm.

10     Q    Was that a yes?

11     A    Yes.

12     Q    Okay.  And as the property manager, were you

13 responsible for ensuring that the other employees that

14 reported to you were familiar with Millennia's

15 policies?

16     A    Yes.

17     Q    And so going back to Millennia 53, you said

18 you did know that there was an open-door policy?

19     A    Yes.

20     Q    If I could have you turn to Millennia 59.

21 At the top it should have "1.1 Equal

22 Employment/Nondiscrimination Policy."

23     A    Yes.

24     Q    Do you see that?

Veritext Legal Solutions

800-567-8658          973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 12 of 45
PageID #: 263

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 47 of 229
PageID #: 424

1     A    Yes.

2     Q    Okay.  Did you know that Millennia had an

3 equal employment/nondiscrimination policy?

4     A    Yes.

5     Q    Okay.

6           MS. WEISS:  Russell, can you please

7 speak up?

8           MR. JACKSON:  Yes.

9 BY MR. JACKSON:

10    Q    If you could turn to page 60.  Are you

11 there?

12    A    Yes.

13    Q    And do you see that 1.4 says "Diversity,

14 Equity and Inclusion"?

15    A    Yes.

16    Q    Did you know that Millennia had a diversity,

17 equity and inclusion policy?

18    A    No.

19    Q    You were never informed about that policy?

20    A    If I did, I don't remember.

21    Q    Okay.  And the third paragraph in here says

22 "We embrace and encourage our employees differences in

23 age, color, disability," and then it lists a bunch of

24 different protected classes.  And then it says "And

Veritext Legal Solutions

800-567-8658                             973-410-4098

Case 1:24-cv-00248-TRM-MJD   Document 29-2   Filed 08/18/25   Page 13 of 45
PageID #: 264

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 48 of 229
PageID #: 425

1    other characteristics that make our employees unique."
2    Do you see that?
3        A    Yes.
4        Q    Did you know that that was Millennia's
5    policy?
6        A    No.
7        Q    Okay.  If I can have you turn to
8    Millennia 62.
9        A    Can I ask you a question?
10       Q    Yes.
11       A    In the 2022, was that in there?  In
12   that -- what you just asked me, that 1.4?
13       Q    This is the version that we're going -- this
14   is the document that we have.
15       A    Okay.
16       Q    Are you on Millennia 62?
17       A    I am.
18       Q    Okay.  And at the top it says "Employees are
19   not required to report any prohibited conduct to a
20   manager who may be hostile, who has engaged in such
21   conduct, who is a close associate of the person who
22   has engaged in such conduct, or with whom the employee
23   is uncomfortable discussing such matters."
24               And then not the next paragraph, but the one

Veritext Legal Solutions

800-567-8658                                          973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 14 of 45
PageID #: 265

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 49 of 229
PageID #: 426

1    after that, says "Any manager who receives a complaint
2    of harassment or retaliation must immediately report
3    the allegation to human resources."  Do you see that?
4         A    Yes.
5         Q    Okay.  And did you know that that was
6    Millennia's policy?
7         A    I honestly -- I don't remember this, I mean,
8    not being this specific.  No.
9         Q    Turn to the next page, which is
10   Millennia 63.  And do you see the heading that says
11   "Leadership's Responsibility"?
12        A    Yes.
13        Q    Okay.  It says "Members of leadership are
14   responsible for," and then there's five bullets.
15        A    Yes.
16        Q    And did you know that you had this
17   responsibility as a leader in the company?
18        A    No.
19        Q    You did not?
20        A    Mm-mm.
21        Q    Is that a no?
22        A    That's a no.
23        Q    Turn to Millennia 65.  Do you see Section
24   4.7 "Reporting and Anti-Retaliation Policy"?

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 15 of 45
PageID #: 266

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 50 of 229
PageID #: 427

1      Q    And so was she the last property manager at

2  Lawler, do you know?

3      A    I don't think so.

4      Q    Okay.  Do you know if she applied for a job

5  with Millennia?

6      A    Who?

7      Q    Nancy.

8      A    Oh, no.  I don't know.

9      Q    Okay.  And, in general, when you were the

10  property manager, what were your responsibilities?

11      A    Occupancy, collections, taking care of the

12  residents in -- in the property.

13      Q    And when you say --

14      A    Were you through with this?

15      Q    We are for now.  Yeah.

16      A    Okay.

17      Q    And you can just set those aside.  We may

18  refer to it later.

19      A    Okay.

20      Q    But those will eventually go to Anna.

21      A    Okay.

22      Q    Okay.  And so you said occupancy,

23  collections, taking care of residents and property?

24      A    Yes.

Veritext Legal Solutions

800-567-8658                          973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 16 of 45
PageID #: 267

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 51 of 229
PageID #: 428

1       Q    And just so we have our dates, so you were

2    the property manager starting in August of 2016?

3       A    Mm-hmm.

4       Q    Yes?

5       A    Yes, sir.

6       Q    And then your next position was senior

7    property manager; correct?

8       A    Yes.

9       Q    And that was in October of 2017; is that

10   right?

11      A    I -- I don't remember the dates.  Yes.

12   But --

13      Q    But does that sound right?

14      A    Yes.

15      Q    And then you received a promotion to

16   regional manager in October of 2018?

17      A    Okay.

18      Q    Is that right?

19      A    Yes, sir.

20      Q    Does that sound right?

21      A    Yes, sir.

22      Q    Okay.  And so you were at The Overlook,

23   specifically, from August of 2016 to October of 2018;

24   is that right?

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 17 of 45
PageID #: 268

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 52 of 229
PageID #: 429

1     A     Yes, sir.

2     Q     And so did she have East Tennessee and West

3  Tennessee within her portfolio?

4     A     Yes.

5     Q     Okay.  And when you became the senior

6  property manager, how did your responsibilities

7  change?

8     A     Just they would call me versus Anna.

9     Q     The property manager would?

10    A     The property managers, and I would go to the

11  properties.

12    Q     And are those those seven properties that we

13  talked about earlier?

14    A     Yes.

15    Q     Okay.  But you were still just at The

16  Overlook?

17    A     Right.

18    Q     Okay.  And so did you do any hiring or

19  staffing at the other properties?

20    A     I don't think I needed any at that time.

21    Q     Okay.  Did you ever issue any discipline to

22  anybody at the other properties?

23    A     No.

24    Q     Okay.  And so only if they had a problem,

Veritext Legal Solutions

800-567-8658                                                 973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 18 of 45
PageID #: 269

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 53 of 229
PageID #: 430

1      A    Yes.

2      Q    And then I believe you got a raise right

3  after that to $75,000.

4      A    Okay.

5      Q    Does that sound right?

6      A    Yes, sir.

7      Q    And you were still the regional manager at

8  that time?

9      A    Yes, sir.

10      Q    Okay.  And in September of 2021, I believe

11  that's when you received responsibility for the

12  Jacksonville properties?

13      A    That's correct.  In August of -- it was on

14  Sunday.  Frank and Alan -- well, Frank and Alan had

15  already mentioned to me they -- they were considering

16  it.  And then Alan and -- Frank and Alan called me.  I

17  think it was on a Sunday.

18          And Frank said to me, "Gail," he said, "we

19  got some problems in Jacksonville, and I really think

20  you could handle it.  You're the right person for the

21  job."  And he was -- assured me how terrible it was

22  and everything.  But he still said, with the way I am,

23  and with my knowledge, and my determination, I was the

24  right person for the position.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 19 of 45
                              PageID #: 270

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 54 of 229
                              PageID #: 431

1     A     This was a announcement from the company
2  that we had -- we were being promoted.  Well, I was
3  supposed to have been promoted to regional property
4  director.  After seeing this, I made a phone call to
5  Lee, who was Lee Felgar, and said that he -- he -- I
6  was -- put me as regional manager.  And I was supposed
7  to be regional property director.

8           And I happened to have been in Cleveland at
9  that time.  'Cause I was really upset about it.  And I
10 called him.  And then Michael Pico, who was over the
11 person -- HR at that time, he came down and assured me
12 that I was regional property director.

13    Q     Okay.  So you received this document?

14    A     Mm-hmm.

15    Q     Yes?

16    A     Yes, sir.

17    Q     And then you're saying you called Lee, and
18 then you called Michael Pico?

19    A     Yes.

20    Q     Okay.  And then did your title change from
21 senior regional manager to regional property director?

22    A     Correct.

23    Q     Okay.  Did you talk with anybody else about
24 that?

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 20 of 45
                              PageID #: 271

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 55 of 229
                              PageID #: 432

1     Q    Yes?

2     A    Yes.

3     Q    And at that time during that conversation,

4  she said, "You may want to be thinking about retiring

5  or another position"?

6     A    Yes.

7     Q    Okay.  And then when does this second

8  conversation occur when she gives you the option to

9  retire the second time?

10    A    I want to say May 28th, or is that when BJ's

11 email came out?

12    Q    Was it the day of BJ's email?

13    A    No.  That -- BJ's email came that -- on a

14 Sunday.  'Cause I was doing -- getting a -- a REAC

15 here at The Overlook.  And I was real excited 'cause

16 it came on a Sunday, and I sent it out to all of my

17 team, let them see it.  I'm going to say maybe

18 a -- I -- I don't know if it was the week after or

19 week before.

20    Q    Okay.  So between May 21st and, like,

21 June 5th?

22    A    Right.

23    Q    Is that a yes?

24    A    Yes.

Veritext Legal Solutions

800-567-8658                                          973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 21 of 45
PageID #: 272

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 56 of 229
PageID #: 433

1    Q    And she talks to you.  Does she come to

2  Chattanooga?

3    A    No.

4    Q    Okay.  This is on the phone, Teams?

5    A    On the phone.  And -- and Alan was there as

6  well.

7    Q    Okay.  And what was this meeting about?

8    A    They decided either to go ahead and make me

9  a -- offer me the position -- I mean, offer me to

10  retire, give me enough money, you know.  So I can go

11  ahead and start my retirement and/or become a property

12  manager.

13        She said, "It's your choice."  I said,

14  "Property manager."  And she asked me, "You sure you

15  don't want to go ahead and just retire?"  "No.  I want

16  to work."

17    Q    And did they tell you which property?

18    A    The Overlook.

19    Q    It was?

20    A    Mm-hmm.

21    Q    But did they tell you Overlook?

22    A    Yes.

23    Q    Okay.  And who was the property manager at

24  Overlook?

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 22 of 45
PageID #: 273

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 57 of 229
PageID #: 434

1     A     Kristi Adams.

2     Q     And what was happening to Kristi?

3     A     Nothing.

4     Q     So were y'all going to be co-property

5  managers?

6     A     That's what we assume.

7     Q     Okay.

8     A     You know, it wasn't clear.  It just said I

9  was going to be a property manager there.  When they

10  finally gave me the offer letter, which was -- they

11  gave it to me on June 15th, a offer letter.

12          I signed it on June 16th, and everything was

13  going to go into effect on June 24th.  But I was

14  terminated on June 22nd.  So being -- before it had

15  went into effect.

16          One other thing, I was just curious 'cause I

17  couldn't figure out, why not keep me and get -- let

18  Kristi go.  The only thing that I could see is

19  Kristi's younger than I am.  Because, see, I got the

20  experience.  I got the knowhow.  I got -- everything

21  was moving forward, you know, positively.

22     Q     And how had the performance of The Overlook

23  been under Kristi?

24     A     It'd been okay.  It wasn't great.  It was

Veritext Legal Solutions

800-567-8658                                          973-410-4098

Case 1:24-cv-00248-TRM-MJD     Document 29-2     Filed 08/18/25     Page 23 of 45
PageID #: 274

Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25     Page 58 of 229
PageID #: 435

1        And then you talk about paid time off and
2   reimbursement of some expenses.  And did you actually
3   see the severance agreement?
4        A    Yes.
5        Q    Okay.  At that time?
6        A    I don't think I saw it at that time because
7   she couldn't get the printer to print.
8        Q    Okay.  When did you see it?
9        A    When I got home.
10       Q    Okay.  Had you seen the severance agreement
11  before then?
12       A    Yes.
13       Q    Okay.
14       A    When Debra gave it to me -- and tried to
15  give it to me.  And I told her I didn't need it.
16       Q    Was that at the time that you got the PIP?
17       A    It was the time when they had definite made
18  me the property manager.
19       Q    Okay.
20       A    So it'd be after that.  Yes.
21       Q    Okay.  All right.  So you never saw it when
22  you received the PIP, but during a subsequent
23  conversation when they were talking about demoting you
24  to the property manager?

Veritext Legal Solutions

800-567-8658                                                973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 24 of 45
PageID #: 275

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 59 of 229
PageID #: 436

1    Q    And did you look into that?

2    A    I don't care.

3    Q    You didn't look into it?

4    A    I just heard what I heard.

5    Q    Okay.

6    A    I -- I don't care.

7    Q    And do you know about those lawsuits against

8  Frank?

9    A    I've heard of several lawsuits with Frank.

10  When we all were working at Millennia -- I'm sorry.

11  You got me -- when you ask about my passion about the

12  job.  Working with Millennia, you run into all kind of

13  lawsuits and everything.

14        And we -- we was always dealing with

15  something.  So I didn't -- I wasn't an attorney.  I

16  didn't deal with it.  They asked me questions.  They

17  would want me to look into discovery and find some

18  stuff.  I pulled all the information, gave it to them.

19    Q    Okay.  And after your separation, have you

20  had any conversations with Frank?

21    A    Yeah.

22    Q    Okay.

23    A    Well, he was here in town, and we just

24  texted each other.  "How you doing?"  "Doing great."

Veritext Legal Solutions

800-567-8658                                      973-410-4098

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 25 of 45
PageID #: 276

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 60 of 229
PageID #: 437

1     Q     Okay.

2     A     And stuff like that.

3     Q     Okay.  And did you reach out to him?

4     A     Yes.  "I heard you was in town."

5     Q     Okay.

6     A     Yeah.

7     Q     And were you asking to meet up?

8     A     No.

9     Q     So what did you say in the text?

10    A     That -- "Heard you was in town," and stuff.

11   That's -- that's it.

12    Q     You just said, "Heard you were in town"?

13    A     Yeah.  "Heard you was in town."  Yeah.

14    Q     Okay.  Any conversations with Alan?

15    A     Mm-mm.

16    Q     No?

17    A     Mm-mm.

18    Q     Is that a no?

19    A     I'm -- come on -- no.

20    Q     Okay.

21    A     Mash the button.

22              MR. JACKSON:  Okay.  Give me one break.

23   Let me look over some things, but I may be done.

24              THE WITNESS:  Okay.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 26 of 45
PageID #: 277

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 61 of 229
PageID #: 438

1          MR. BURNETTE:  Okay.

2          THE REPORTER:  Taking a -- going off

3    the record, and it's 4:16 p.m. Eastern Standard Time.

4          (Off the record.)

5          THE REPORTER:  We are back on the

6    record at 4:24 p.m. Eastern Standard Time.

7    BY MR. JACKSON:

8       Q    All right.  I just have a few more

9    questions, Ms. Griffin.  You mentioned Marilyn Ortize.

10   What was Ms. Ortize's position?

11      A    She was -- what is Marilyn?  She was in

12   compliance, but she was, like, second in control

13   of -- of compliance.

14      Q    And we were off the record, but I think I

15   heard you say that you love Frank?

16      A    Yes.

17      Q    Is that true?

18      A    Yes.

19      Q    Okay.  And as we sit here today, is there

20   any answer that you think you need to correct?

21      A    No.

22      Q    Okay.  Is there anything else that you think

23   would help me better understand your claims?

24      A    That I did nothing wrong, and they continued

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 27 of 45
                        PageID #: 278

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 62 of 229
                        PageID #: 439



## Employee Handbook
### Effective: January 2023

MILLENNIA00051


## Welcome

Welcome to The Millennia Companies®! We wish you every success here! We believe that every employee contributes directly to our Company's growth and success, and we hope you will take pride in being a member of our team.

This Employee Handbook was developed to describe some of our expectations for our employees working at Millennia Housing Management, Millennia Housing Development, Millennia Commercial Group and Millennia Housing Capital. You should familiarize yourself with the contents of this Handbook as soon as possible, as you are required to comply with all the policies and practices it contains. It will answer many questions about employment with The Millennia Companies®, from now on referred to as "Millennia" or the "Company."

We hope that your experience here will be challenging, enjoyable, and rewarding. We look forward to collaborating with you.

## Mission Statement

Millennia's mission is to provide the highest quality of standards in the management, operation, and development of affordable and market-rate rental housing, thereby striving to enrich the quality of life for those we serve. A set of values lead how we operate, behave and perform; we are guided by respect, performance, service and collaboration.

## Purpose of this Document

This document is intended to provide employees with a general understanding of the policies and practices of the Company. However, this document cannot anticipate every situation or answer every question about employment. Should an employee have any questions about this Handbook, we welcome you to address them with Human Resources.

In addition, employees can email HR@mhmltd.com for any payroll, benefit, and other HR-related questions.

This Employee Handbook supersedes and replaces all previous policies and procedures including, but not limited to, all memoranda or written policies that may have been issued on the subjects covered in this document. The policies included are guidelines only and are subject to change as the Company deems appropriate and necessary. To retain the necessary flexibility in the administration of policies, practices, and benefits, the Company reserves the right to change, revise, interpret, or eliminate any of the policies, practices, or benefits described in this document at any time, with or without notice. From time to time, employees may receive notice of new or modified policies, procedures, benefits, or programs. Any oral or written statements contrary to the policies, practices, or benefits described in this Employee Handbook, by anyone at the Company, are unauthorized and disavowed and should

Page 2

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 29 of 45
PageID #: 280

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 94 of 229
PageID #: 441

MILLENNIA00052
3:24-cv-00248   Document 64   6dca7 2062


not be relied upon. Any deviations from the stated policies must be authorized and approved in writing by Human Resources.

Nothing in this Handbook or in any other document or policy is intended to violate any local, state, or federal law. Nothing in this Handbook is intended to limit any concerted activities by employees relating to their wages, hours, or working conditions, or any other conduct protected by Section 7 of the National Labor Relations Act. Furthermore, nothing in this Handbook prohibits an employee from reporting concerns to, filing a charge or complaint with, making lawful disclosures to, providing documents or other information to, or participating in an investigation or hearing conducted by, the Equal Employment Opportunity Commission ("EEOC"), National Labor Relations Board ("NLRB"), Securities and Exchange Commission ("SEC"), or any other federal, state, or local agency charged with the enforcement of any laws.

Failure to comply with any policies or procedures in this Handbook will result in discipline, up to and including termination of employment.

## State-Specific Policies

The Company complies with applicable state and local laws. This Handbook may apply to employees working in a state with greater or different rights. To the extent that any provision outlined in this Handbook is inconsistent or to the extent that state law provides employees working in that state with additional benefits beyond those spelled out in this Handbook, the state law will be upheld.

## Open-Door Policy

We encourage open communication, feedback, and discussion about any matter of importance to an employee; therefore, employees are free to talk with any Manager at any time. Whether you have a concern, a suggestion, or an observation, we want to hear from you. By listening to you, the Company can improve, address complaints, and foster employee understanding of the rationale for practices, processes, and decisions.

Most situations can and should be solved in discussion with your Manager; this is encouraged as your first effort, but you may also discuss your concerns with the next level of management and/or Human Resources.

While we provide employees with this opportunity to communicate their views, please understand that not every complaint can be resolved to the employee's satisfaction. Even so, we believe that open communication is essential to a successful work environment and all employees should feel free to raise issues of concern without fear of reprisal. Please note that some Company policies, such as the Sexual and Other Unlawful Harassment policy, contain specific reporting procedures that should be followed. Employees should utilize this Open-Door policy for any issues or ideas that are not addressed through specific reporting procedures.

Page 3

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 30 of 45
PageID #: 281
Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 65 of 229
PageID #: 442

MILLENNIA00053
24-cv-00248 Agreement Exhibit 2083


## Table of Contents

Welcome ........................................................................................................................ 2

Mission Statement ...................................................................................................... 2

Purpose of this Document ....................................................................................... 2

State-Specific Policies .............................................................................................. 3

Open-Door Policy ...................................................................................................... 3

Table of Contents ...................................................................................................... 4

**Section 1: Employment Practices** ...................................................................... **9**

1.1 Equal Employment/Nondiscrimination Policy ............................................ 9

1.2 Nature of Employment ....................................................................................... 9

1.3 Disability Accommodation ............................................................................... 9

1.4 Diversity, Equity and Inclusion ....................................................................... 10

1.5 Immigration Compliance .................................................................................. 11

1.6 Employment Applications and Resumes ...................................................... 11

1.7 Introductory Period ............................................................................................ 11

1.8 Employment Classifications ............................................................................. 11

1.9 Personnel Files ..................................................................................................... 12

1.10 Disclosure of a Criminal Charge or Conviction ....................................... 13

1.11 Rehire Eligibility ................................................................................................. 14

1.12 Employment of Minors .................................................................................... 15

1.13 Promotions and Transfer .................................................................................. 15

1.14 Performance Evaluations ................................................................................ 16

1.15 Benefit Eligibility ............................................................................................... 16

1.16 Statutory Insurance Programs ....................................................................... 16

**Section 2: Pay Practices** ....................................................................................... **18**

2.1 Pay Schedule ....................................................................................................... 18

2.2 Pay Corrections ................................................................................................... 18

2.3 Pay Deductions ................................................................................................... 18

2.4 Discussion of Wages ......................................................................................... 19

2.5 Work Schedules ................................................................................................... 19

2.6 Attendance and Punctuality ........................................................................... 19

2.7 Job Abandonment ............................................................................................. 21

2.8 Timekeeping ......................................................................................................... 21

Page 4

Creation Date: January 2023

Copyright © 2023 by HR Knowledge

All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.


2.9 Overtime ................................................................................. 21

2.10 On-Call Pay ........................................................................... 22

2.11 Meal and Break Periods ...................................................... 23

2.12 Referral Bonus Program ...................................................... 24

2.13 Wage Reviews ...................................................................... 26

**Section 3: Time Off and Leaves of Absence** ......................... **27**

3.1 Paid Time Off (PTO) ............................................................. 27

3.2 Family Medical Supplement Bank ...................................... 30

3.3 Holidays ................................................................................. 31

3.4 Bereavement Leave .............................................................. 31

3.5 Religious Observances ......................................................... 31

3.6 Jury/Witness Duty ................................................................ 32

3.7 Voting Duty ........................................................................... 33

3.8 Community Outreach ........................................................... 33

3.9 Military Leave ....................................................................... 34

3.10 Pregnancy and Lactation Accommodation ...................... 35

3.11 Federal Family and Medical Leave (FMLA) ....................... 36

3.12 Personal Leave of Absence (non-FMLA) ........................... 36

**Section 4: The Workplace** ..................................................... **38**

4.1 Flexible Work Arrangements/Working Remotely ............... 38

4.2 Appearance and Dress Code ............................................... 38

4.3 Code of Conduct .................................................................. 40

4.4 No Solicitation or Distribution ............................................ 40

4.5 Prohibition Against Harassment ......................................... 41

4.6 Fair Housing Policy ............................................................... 45

4.7 Reporting and Anti-Retaliation Policy ................................ 46

4.8 Workplace Bullying ............................................................... 49

4.9 Personal Relationships at Work ........................................... 50

4.10 Workplace Violence Prevention ........................................ 51

4.11 Weapons in the Workplace ................................................ 51

4.12 Video and Audio Recording .............................................. 53

4.13 Disciplinary Standards ....................................................... 53

4.14 Confidential Company Information .................................... 55

Creation Date: January 2023

Copyright © 2023 by HR Knowledge.
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express
written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD     Document 29-2     Filed 08/18/25     Page 32 of 45
PageID #: 283

Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25     Page 32 of 45
PageID #: 444

MILLENNIA00055

1:24-cv-00248    Millennia App 2065


4.15 Outside Employment ............................................................................... 56

4.16 Conflicts of Interest and Related Parties ............................................ 56

4.17 Gifts ............................................................................................................ 59

4.18 Corporate Communications and Media ............................................ 60

**Section 5: Health and Safety** .............................................................................. **62**

5.1 Safety ........................................................................................................... 62

5.2 Reporting Injuries and Accidents ........................................................ 63

5.3 Drug and Alcohol Use ............................................................................ 64

5.4 Security Inspections ................................................................................. 65

5.5 Visitors ......................................................................................................... 66

5.6 Workplace Monitoring ........................................................................... 66

5.7 Smoke-Free Workplace .......................................................................... 66

5.8 Adverse Weather and Emergencies ................................................... 67

5.9 Proper Use of Equipment and Vehicles ............................................ 68

5.10 Communicable Diseases ...................................................................... 68

**Section 6: Operational Policies** ......................................................................... **70**

6.1 Business-Related Travel Pay ................................................................. 70

6.2 Expenses and Credit Card Usage ....................................................... 72

6.3 Company Vehicles ................................................................................... 72

6.4 Personal Vehicles ..................................................................................... 73

6.5 Tuition Reimbursement .......................................................................... 73

6.6 Professional Training and Development ............................................ 76

**Section 7: Technology** ........................................................................................... **77**

7.1 Electronic Resources ............................................................................... 77

7.2 Social Media .............................................................................................. 80

7.3 Bring Your Own Device .......................................................................... 81

7.4 Personal Electronics ................................................................................ 83

**Section 8: Leaving the Company** ...................................................................... **84**

8.1 Separation of Employment .................................................................... 84

8.2 Final Pay ..................................................................................................... 84

8.3 Exit Interviews ........................................................................................... 84

8.4 Returning Company Equipment .......................................................... 84

Page 6

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD       Document 29-2       Filed 08/18/25       Page 33 of 45
PageID #: 284

Case 1:24-cv-00248-TRM-MJD       Document 30-1       Filed 09/08/25       Page 33 of 45
PageID #: 445

MILLENNIA00056
24-cv-00248 Page 68 of 229


8.5 Employment Verifications ................................................................ 85

**Employee Handbook Acknowledgment** ........................................... **86**

**Addendum 1: Federal Family and Medical Leave** ............................ **87**

**Addendum 2: Connecticut Employee Handbook Supplement** .......... **93**

Sexual and Other Unlawful Harassment ........................................ 93

Crime Victim Leave ........................................................................ 93

Emergency Responder Leave .......................................................... 93

Family and Medical Leave .............................................................. 94

Paid Family and Medical Leave ...................................................... 98

Family Violence Victim Leave ....................................................... 101

Military Caregiver Leave ............................................................... 102

**Addendum 3: Illinois Employee Handbook Supplement** ............... **103**

Human Rights Act (IHRA) ............................................................ 103

**Addendum 4: Maryland Employee Handbook Supplement** ........... **104**

Paid Sick, Safe and Parental Leave ............................................... 104

**Addendum 5: Massachusetts Employee Handbook Supplement** ..... **105**

Emergency Responder Leave ......................................................... 105

Massachusetts Parental Leave ....................................................... 105

Massachusetts Paid Family and Medical Leave .............................. 106

Veterans' Day and Memorial Day Leave for Veterans ................... 109

**Addendum 6: Michigan Employee Handbook Supplement** ............ **111**

Social Security Number Privacy .................................................... 111

**Addendum 7: Missouri Employee Handbook Supplement** ............. **112**

Domestic or Sexual Violence Victim Leave and Accommodations ..... 112

**Addendum 8: New Jersey Employee Handbook Supplement** ......... **115**

Family Leave Act ........................................................................... 115

**Addendum 9: New York Employee Handbook Supplement** ........... **120**

Paid Family Leave Benefits ........................................................... 120

Prohibition Against Harassment .................................................... 123

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 34 of 45
PageID #: 285

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 69 of 229
PageID #: 446

MILLENNIA00057



Harassment Fact Sheet ................................................................................................ 124

Employee Complaint Form ......................................................................................... 125

**Addendum 10: Travel and Expense Reimbursement Policy** .......................................... **127**

**Addendum 11: Corporate Credit Card Policy** ............................................................. **135**

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD     Document 29-2     Filed 08/18/25     Page 35 of 45
PageID #: 286
Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25     Page 35 of 45
PageID #: 447

MILLENNIA00058

24-cv-00248 Page 70 of 229


### Section 1: Employment Practices

## 1.1 Equal Employment/Nondiscrimination Policy

The Company provides equal employment opportunities to all employees and applicants for employment without regard to race, color, religion, sex (including pregnancy, lactation, childbirth or related medical conditions), gender identity, sexual orientation, national origin, ancestry, age (40 and over), physical or mental disability, genetic information (including testing and characteristics), military service or veteran status, citizenship status, or any other classification protected by applicable local, state, and federal law. This policy applies to all terms and conditions of employment, including, but not limited to, hiring, placement, promotion, termination, layoff, recall, transfer, compensation, training, scheduling, and leaves of absence.

The Company does not tolerate harassment, discrimination, or retaliation of any kind, including, but not limited to, these protected classes. Any employee who believes they have been discriminated against should report their concerns to their Manager, Human Resources, or any other member of management with whom they feel comfortable.

## 1.2 Nature of Employment

Employment with the Company is at-will unless state law provides otherwise. This means that employment may be terminated for any or no reason, with or without cause or notice at any time by the employee or by the Company. Nothing in this Handbook or any oral statement shall limit the right to terminate at-will. This at-will employment policy is the sole and entire agreement between the employee and the Company regarding the fact that employment with the Company is at-will. No Manager has any authority to enter into a contract of employment express or implied that changes the fact that employment with the Company is at-will. Only the Chief Executive Officer (CEO) or their authorized representative has the authority to enter into an employment agreement that alters the fact that employment is at-will, and any such agreement must be in writing signed by the CEO or their authorized representative.

## 1.3 Disability Accommodation

The Company will not discriminate against qualified individuals with disabilities regarding any aspect of their employment. The Company will provide reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee unless undue hardship or a direct threat to the health and/or safety of the individual or others would result.

We will communicate with the employee and engage in an interactive process to determine the nature of the issue and what, if any, reasonable accommodation(s) may be appropriate. In some cases, this interactive process may be triggered without a request from the employee, such as when

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.


the Company receives notice from its own observation or another source that a medical impairment may be impacting the employee's ability to perform their essential job functions.

Employees who believe they need an accommodation must specify, preferably in writing, what barriers or limitations prompted the request. The Company will evaluate information obtained from the employee, and their health care provider or another appropriate health care provider, regarding any reported or apparent barriers or limitations, and will then work with the employee to identify possible accommodations. If an identified accommodation is reasonable and will not impose an undue hardship or a direct threat to the health and/or safety of the individual or others, we will make the accommodation, or may propose another reasonable accommodation. Employees are required to cooperate with this process by communicating with the Company regarding their request, providing all necessary documentation and being willing to consider alternative accommodations when applicable. The Human Resource Department is responsible for implementing this policy, including resolution of reasonable accommodation, safety/direct threat and undue hardship issues. Contact Human Resources with any questions or requests for accommodation.

## 1.4 Diversity, Equity and Inclusion

The Company is committed to fostering, cultivating, and preserving a culture of diversity, equity and inclusion.

Our human capital is the most valuable asset we have. The collective sum of the individual differences, life experiences, knowledge, inventiveness, innovation, self-expression, unique capabilities and talent that our employees invest in their work represents a significant part of not only our culture, but our reputation and the Company's achievement as well.

We embrace and encourage our employees' differences in age, color, disability, ethnicity, family or marital status, gender identity or expression, language, national origin, physical and mental ability, political affiliation, race, religion, sexual orientation, socio-economic status, veteran status, and other characteristics that make our employees unique.

The Company's diversity, inclusion and equity initiatives are applicable—but not limited—to our practices and policies on recruitment and selection; compensation and benefits; professional development and training; promotions; transfers; social and recreational programs; layoffs; terminations; and the ongoing development of a work environment built on the premise of gender and diversity equity that encourages and enforces:

- Respectful communication and cooperation between all employees.
- Teamwork and employee participation, permitting the representation of all groups and employee perspectives.

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 37 of 45
PageID #: 288

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 72 of 229
PageID #: 449

MILLENNIA00060
20-cv-002-Agreement 2021220


All employees of the Company always have a responsibility to treat others with dignity and respect. All employees are expected to exhibit conduct that reflects inclusion during work, at work functions on or off the work site, and at all other Company-sponsored and participative events.

Any employee found to have exhibited any inappropriate conduct or behavior against others may be subject to disciplinary action.

Employees who believe they have been subjected to any kind of discrimination that conflicts with the Company's diversity, inclusion and equity policy and initiatives should seek assistance from any Supervisor, Manager or Human Resources.

## 1.5 Immigration Compliance

The Company is committed to employing only individuals who are authorized to work in the United States. As a condition of employment, every individual must provide satisfactory evidence of their identity and legal authority to work in the United States within three business days of commencing employment. If the employee cannot verify their work status within three business days of employment, the Company will be required to terminate their employment immediately.

## 1.6 Employment Applications and Resumes

The Company relies upon the accuracy of all information provided during the hiring process, including, but not limited to, employment applications, resumes, and any other forms associated with the hiring process. All data presented by individuals throughout their employment must be true and accurate to the best of their knowledge. Any deliberate misrepresentations, falsifications, or material omissions in any form, whether deemed pertinent or not, in regard to the information or data provided may result in the exclusion of the individual from further consideration for employment, or if the person has already been hired, the termination of their employment with the Company.

## 1.7 Introductory Period

The first ninety (90) days of employment are considered an introductory period. The introductory period provides employees with an opportunity to better understand their position. In support of an employee's success, we may schedule a 90-day evaluation to review their progress and discuss any challenges or areas of opportunity. An employee's status as an at-will employee is not altered during the introductory period or successful completion of the introductory period.

## 1.8 Employment Classifications

It is the intent of the Company to clarify the definitions of employment classifications so that employees understand their employment status and benefit eligibility. These classifications do not guarantee

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD     Document 29-2     Filed 08/18/25     Page 38 of 45
PageID #: 289

Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25     Page 73 of 229
PageID #: 450

MILLENNIA00061
1:24-cv-00248     Document 73 of 229


Employees are not required to report any prohibited conduct to a Manager who may be hostile, who has engaged in such conduct, who is a close associate of the person who has engaged in such conduct, or with whom the employee is uncomfortable discussing such matters.

Employees are encouraged, but not required, to communicate to the offending person that their conduct is offensive and unwelcome.

Any Manager who receives a complaint of harassment or retaliation must immediately report the allegation to Human Resources.

After a report is received, a thorough and objective investigation will be undertaken. Confidentiality will be maintained to the extent practical and permitted by law. Investigations will be conducted as confidentially as possible and related information will only be shared with others on a need-to-know basis. The investigation will be completed, and a determination made and communicated to the employee, as soon as practicable.

The Company expects all employees to fully cooperate with any investigation conducted by the Company into a complaint of proscribed harassment, discrimination, or retaliation, or regarding the alleged violation of any other Company policies, and during the investigation, to keep matters related to the investigation confidential.

If a complaint of prohibited harassment or discrimination is substantiated, prompt and effective remedial action will be taken, including appropriate disciplinary action, up to and including termination of employment. If a complaint cannot be substantiated, the Company may take appropriate action, such as additional training, to reinforce its commitment to providing a work environment free from harassment.

Sexual harassment is not only prohibited by the Company but is also prohibited by state, federal, and, where applicable, local law. Aside from the internal process at the Company, employees may also choose to pursue legal remedies with the governmental entities. In addition to the above complaint process, if an employee believes that they have been subjected to sexual harassment, the employee may file a formal complaint with either the Equal Employment Opportunity Commission (EEOC) or their local state agency. Using our complaint process does not prohibit employees from filing a complaint with these agencies. Each of the agencies has a short time period for filing a claim.

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 39 of 45
PageID #: 290

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 74 of 229
PageID #: 451

MILLENNIA00062
6:24-cv-00248    Page 74 of 220



Employees can find a local EEOC office by clicking the link below.

US Equal Employment Opportunity Commission (EEOC) Headquarters
131 M Street, NE, Washington, DC 20507
202-663-4900 / (TTY) 202-663-4494
To file a claim: http://www.eeoc.gov/

To find a local/state EEOC agency: https://www.eeoc.gov/field/index.cfm

*Leadership's Responsibility:*
Members of leadership are responsible for:

- Implementing this policy, which includes, but is not limited to, taking steps to prevent harassment and retaliation;
- Ensuring that all employees under their supervision have knowledge of and understand this policy;
- Promptly reporting any complaints so they may be investigated and resolved in a timely manner;
- Taking and/or assisting in prompt and appropriate corrective action when necessary to ensure compliance with this policy; and
- Conducting themselves, at all times, in a manner consistent with this policy.

Failure to meet these responsibilities may lead to disciplinary action, up to and including termination.

*Protection Against Retaliation:*
Retaliation is prohibited against any person by another employee or by the Company for using this complaint procedure; reporting proscribed harassment; discrimination or retaliation; objecting to such conduct; or filing, testifying, assisting, or participating in any manner in any investigation, proceeding, or hearing conducted by a governmental enforcement agency. Prohibited retaliation includes, but is not limited to, termination, demotion, suspension, failure to hire or consider for hire, failure to give equal consideration in making employment decisions, failure to make employment recommendations impartially, adversely affecting working conditions, or otherwise denying any employment benefit.

Individuals who believe they have been subjected to retaliation or believe that another individual has been subjected to retaliation, should report this concern to the highest-ranking on-site Manager or to Human Resources. Any report of retaliatory conduct will be investigated in a thorough and objective manner. If a report of retaliation prohibited by this policy is substantiated, appropriate disciplinary action, up to and including termination of employment, will be taken. If a complaint cannot be substantiated, the Company may take appropriate action to reinforce its commitment to providing a work environment free from retaliation.

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 40 of 45
PageID #: 291

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 75 of 229
PageID #: 452

MILLENNIA00063


**Good Faith:**

The initiation of a good-faith complaint of harassment or retaliation will not be grounds for disciplinary action, even if the allegations cannot be substantiated. Any individual who makes a complaint that is demonstrated to be intentionally false may be subject to discipline, up to and including termination.

**Support for Individuals Impacted by Harassment or Retaliation:**

The Company will strive to assist anyone who has been subjected to unwelcome harassment or retaliation to feel more comfortable in the work environment. Such assistance may but does not necessarily include transfer or reassignment. Any such assistance is at the Company's sole discretion.

## 4.6 Fair Housing Policy

The Company is committed to following the applicable local, state and Federal Fair Housing Laws, as well as the Company's written policy, and related program regulations.

Accordingly, the Company regularly provides for the training of its employees with regard to Fair Housing both through Millennia University and local training solutions. Employees with any question regarding Equal Housing Opportunity/Fair Housing should direct them to their Manager, any member of management, or the Section 504 and Fair Housing Coordinator.

The Federal Fair Housing Law prohibits discrimination based on race, color, religion, sex, national origin, familial status, or disability. Local or state protected classes may also include additional items such as age, national ancestry or sexual preference or orientation.

All Company employees are responsible for adherence to all aspects of the Fair Housing Law.

Sexual harassment is also a violation of the Fair Housing Law. The Company prohibits sexual harassment of any resident, applicant, contractor, or guest to the property by any employee or co- worker. The purpose of this policy is not to regulate the morality of employees rather, it is to assure that in our apartment communities, no resident, applicant, contractor or guest to the property is subjected to sexual harassment. While it is not easy to define precisely what sexual harassment is, it certainly includes unwelcome sexual advances, requests for sexual favors and/or verbal or physical conduct of a sexual nature including, but not limited to, drawings, pictures, jokes, teasing, uninvited touching or other sexually related comments.

Sexual harassment of any resident, applicant, contractor, or guest to the property will not be tolerated. There will be no adverse action taken against employees who report violations of this policy or participate in the investigation of such violations.

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.


All complaints will be promptly and thoroughly investigated. The Company will investigate every reported incident immediately. Any employee, manager or agent of the Company who has been found to have sexually harassed or engaged in other inappropriate conduct towards any resident, applicant, contractor or guest to the property, may be subject to appropriate disciplinary action, up to and including immediate termination.

The Company will conduct all investigations in a reasonably discreet manner under the circumstances. The Company recognizes that every investigation requires a determination based on all the facts in the matter. We also recognize the serious impact a false accusation can have. We trust that all employees will continue to act responsibly.

The individual that reports the problem and any individual participating in any investigation under this policy has the Company's assurance that no reprisal will be taken as a result of a sexual harassment complaint. Rather, it is our policy to encourage discussion of the matter so as to help protect others from being subjected to similar inappropriate behavior. However, false claims of harassment are a violation of Company policy and will be handled as appropriate which may include disciplinary action up to and including termination.

## 4.7 Reporting and Anti-Retaliation Policy

*We Encourage A Speak Up Culture:*
The Company is deeply committed to promoting a culture of ethical conduct and compliance with:
- Our Code, Core Values, and policies;
- The laws, rules, and regulations that govern our business operations; and
- Best practices in accounting, auditing, and financial reporting matters.

Choosing to speak up about workplace concerns helps builds a healthy, ethical, and compliant Company and is part of our culture. To promote this, employees are encouraged to speak up and raise questions and concerns promptly about any situation that may violate our core values or policies.

*Raise Good Faith Questions and Concerns:*
Consistent with our commitment to ethics, compliance, and the law, we welcome employee's good faith questions and concerns about any conduct they believe may violate our Code, especially conduct that may be illegal, fraudulent, unethical, or retaliatory. For purposes of this policy, and because our Code captures standards of ethics and compliance at a broad level, references to our "Code" should be read to encompass all of our obligations to perform our jobs in a manner that is consistent with the Company's policies and procedures, as well as applicable laws.

We promote an environment that fosters honest, good faith communications about matters of conduct related to our business activities, whether that conduct occurs within the Company, involves

Creation Date: January 2023

Copyright © 2023 by HR Knowledge
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 42 of 45
PageID #: 293

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 77 of 229
PageID #: 454

MILLENNIA00065
23-CV-00248 Litigation Appendix 075



one of the Company contractors, suppliers, consultants, or clients, or involves any other party with a business relationship to the Company.

Nothing in this Employee Handbook prohibits an employee from reporting concerns to, filing a charge or complaint with, making lawful disclosures to, providing documents or other information to or participating in an investigation or hearing conducted by the Equal Employment Opportunity Commission ("EEOC"), National Labor Relations Board ("NLRB"), Securities and Exchange Commission ("SEC") or any other federal, state or local agency charged with the enforcement of any laws. Other parts of this Handbook address the confidentiality of the Company's trade secrets and other proprietary information. Employees should note that in raising any questions or concerns they may have about potentially illegal conduct, pursuant to the 2016 Defend Trade Secrets Act (DTSA), no individual will be held criminally or civilly liable under Federal or State trade secret law for disclosure of a trade secret (as defined in the Economic Espionage Act) that is: (A) made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and made solely for the purpose of reporting or investigating a suspected violation of law; or, (B) made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public. An individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court or arbitration proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order or arbitration award.

***We Do Not Tolerate Retaliation:***
Coming forward with questions or concerns may sometimes feel like a difficult decision, but we are committed to fostering an environment that does not deter individuals from speaking up when they observe conduct that may violate our Code. For that reason, the Company will not tolerate retaliation of any kind because an employee in good faith raises a question or concern about a violation or suspected violation of our Code, our policies, or the laws and regulations under which we do business, or because the employee participates in or cooperates with an investigation of such concerns.

Retaliation is any conduct that would dissuade an employee from raising, reporting, or communicating about good faith concerns through our internal reporting channels or with any governmental authority or from participating in or cooperating with an investigation or legal proceeding raising such concerns. Retaliation may occur through conduct or written communication and may take many forms, including actual or implied threats, verbal or nonverbal behaviors, changes to the terms or conditions of employment, coercion, bullying, intimidation, or deliberate exclusionary behaviors.

The following are examples of potential retaliation the Company prohibits:
- Adverse employment action affecting an employee's salary or compensation;
- Demotion, suspension, or termination of employment;

Page 47

Creation Date: January 2023

Copyright © 2023 by HR Knowledge.
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 43 of 45
PageID #: 294
Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 43 of 45
PageID #: 455

MILLENNIA00066
3:25-cv-00423 Document 78 of 229


- Taking away opportunities for advancement;
- Excluding an employee from important meetings;
- Threatening an employee who has made a report;
- Directing an employee who has made a report not to report to outside regulators;
- Deliberately rude or hostile behaviors or speech; and
- Creating or allowing the creation of a work atmosphere that is hostile toward an employee who has reported a concern.

It is the Company's policy to adhere to all applicable laws protecting our employees against unlawful retaliation or discrimination as a result of their raising good faith questions or concerns. If an employee is ever aware of an instance or threat of retaliation, please immediately report it.[1]

***How to Raise Questions and Concerns:***
Employees can submit their good faith questions or concerns about conduct they believe may violate our Code, our policies or the laws and regulations under which we do business to:
- Their Manager
- Human Resources
- Our Company's anonymous and confidential Care and Concern hotline: (855) 520-1250
- The Company's General Counsel

When an employee raises a concern, the Company will maintain confidentiality to the fullest extent possible, consistent with applicable legal requirements and the need to conduct an adequate investigation or review. When raising concerns, we ask that employees provide as much detailed information as possible, including the background and history of the concern, names, dates, and places where possible, and the reasons why the situation is cause for concern. This is especially important for concerns raised anonymously, so that the Company may conduct an appropriate review and if necessary, begin an investigation.

Please note as well that the Company does not prohibit anyone from electing to report concerns to, make lawful disclosures to, provide documents or other information to or communicate with the Equal Employment Opportunity Commission ("EEOC"), National Labor Relations Board ("NLRB"), Securities and Exchange Commission ("SEC") or any other federal, state or local agency about conduct believed to violate laws or regulations. The Company also does not prohibit employees from participating in an investigation or proceeding conducted by one of these agencies.

---

[1] Nothing in this policy prevents the Company from taking appropriate disciplinary or other legitimate employment action consistent with its usual disciplinary practices and the law. In addition, this policy prohibits and does not protect employees who knowingly and intentionally raise false concerns or reports.

Page 48

Creation Date: January 2023

Copyright © 2023 by HR Knowledge.
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD    Document 29-2    Filed 08/18/25    Page 44 of 45
PageID #: 295

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 79 of 227
PageID #: 456

MILLENNIA00067
3:25-CV-00248    Document 79 of 229


*What The Company Will Do:*
The Company is committed to reviewing all reported concerns, conducting proper, fair, and thorough investigations tailored to the circumstances, and taking appropriate remedial and concluding steps as warranted. All action taken by the Company in response to a concern will necessarily depend on the nature and severity of the concern. This may include initial inquiries and fact-gathering to decide whether an investigation is appropriate and, if so, the form and scope of the investigation. Note that an investigation into concerns raised is not an indication that they have either been confirmed or rejected.

The Company complies with the law in conducting investigations and expects that employees will cooperate with an investigation, except when voluntary compliance with an investigation is being requested. The Company also expects that employees will provide truthful information when participating in an investigation.

Remember, all good faith concerns and reports raised under this policy will be taken seriously.

*Adherence to This Policy:*
Employees who believe that they have been subjected to any conduct that violates this policy may register a complaint using the procedures outlined above. Any employee who unlawfully discriminates or retaliates against another employee as a result of their protected actions as described in this policy may be subject to corrective action, up to and including termination.

## 4.8 Workplace Bullying

The Company does not tolerate bullying behavior. Employees who engage in workplace bullying may be disciplined, up to and including termination of employment.

Workplace bullying is the repeated use of force, threats, or coercion to abuse, intimidate, or humiliate another employee. It includes, but certainly is not limited to, the following:
- Verbal abuse, such as the use of patently offensive, demeaning, and harmful derogatory remarks, insults, and epithets;
- Verbal or physical conduct that is threatening, intimidating, or obscene;
- Pushing, shoving, kicking, poking, tripping, assaulting, or threatening physical assault, or intentionally damaging a person's work area or property; or
- Sabotage, or deliberately subverting, obstructing, or disrupting another person's work performance.
- Cyberbullying, which refers to bullying, as defined above, that occurs through the use of a computer, cell phone, smartphone, tablet, or other device that transmits electronic information, regardless of whether the device is owned by or located at the Company or connected to the Company network.

Creation Date: January 2023

Copyright © 2023 by HR Knowledge.
All rights reserved. This document or any portion thereof may not be reproduced or used in any manner whatsoever without the express written permission of HR Knowledge.

Case 1:24-cv-00248-TRM-MJD   Document 29-2   Filed 08/18/25   Page 45 of 45
PageID #: 296

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 90 of 229
PageID #: 457

MILLENNIA00068
24-CV-00248 Defendant Proof 220

1      Q    Did you ever tell anybody that you felt like
2  you were being treated differently as a result of this
3  differentiation between senior regional manager for
4  you and regional property director for Dawn?
5      A    Well, I probably -- may have talked.  'Cause
6  I -- I needed to find out what's going on first.  So
7  yeah.  I need to, like -- no, they told me I was going
8  to be regional property director.
9      Q    And what is the difference between a
10 regional manager and a regional property director?
11     A    I would say the biggest difference is money
12 and making -- be able to make decisions on what to buy
13 and to how much you could buy.  Like my credit card,
14 I'm going to say for a regional, it was -- I probably
15 had 5,000 a month on it.  And for a regional director
16 I had $10,000 a month.  'Cause I could make more
17 decisions and for -- larger amounts.
18     Q    Okay.  And so your understanding is you had
19 approval to make purchases, for example, at a higher
20 value?
21     A    Yes.
22     Q    Yes?
23     A    Yes, sir.
24     Q    And at that time your salary went from

1   75,000 to 95,000?

2       A    Yes.

3       Q    Okay.  And so you had the East Tennessee

4   locations, the one in Hazard, Kentucky, and four in

5   Jacksonville?

6       A    Yes.

7       Q    Okay.  And along with your salary, were you

8   entitled to any bonuses?

9       A    I think so.

10      Q    Do you know what they were?

11      A    No.

12      Q    Did you ever earn any bonuses?

13      A    Yes.

14      Q    Okay.  What were the bonuses for?

15      A    I can't remember.  I'm -- I want to say

16  it's, like, 4 -- if I was over 4 -- got over a 4 on

17  my -- year --

18      Q    Evaluation?

19      A    -- evaluation or something like that.  Yeah.

20      Q    And did you receive evaluations every year?

21      A    All but 2022.  'Cause I asked Alan in '23,

22  the first part of '23, I said, "Alan" -- 'cause I was

23  looking for my bonus.  That's what I was looking for.

24  And I said -- he said, "You haven't got that yet?"  I

1    of '23?

2        A    Yeah.  I actually left in January, maybe

3    February, of '23 because of the -- wanted me to come

4    back to the properties in Tennessee.  And my -- my

5    supervisor, James Zapf, he told me that he didn't want

6    me to handle anything in Jacksonville, that he would

7    take care of it, even down to the hiring of the

8    property manager at Valencia Way.

9        Q    Okay.  And so from when you were promoted to

10   regional property director until February of 2023, you

11   had the responsibility for the Jacksonville

12   properties?

13       A    Yes, sir.

14       Q    And James Zapf, what was his position?

15       A    He was vice -- regional vice president.  He

16   was hired in December of 2022.  Right before I went on

17   vacation in December we went to Cleveland, Ohio for,

18   like, the manager's conference, which is, I'm going to

19   say December 16th, somewhere in there, for 2022.

20            We -- I said I was on vacation 'cause I

21   don't take vacations often.  I just take it around

22   that time.  And so we were getting ready for a REAC in

23   Calloway Cove, and he -- that's when he told me he

24   wanted me to focus on that and that alone.

1    And that he would take care of all the other

2    properties, where he had Pearl Gray, who was a ops

3    specialist, come in acting as manager.  He was

4    interviewing for managers there.  Just -- he -- he did

5    everything with -- at Valencia Way, The Weldon, and

6    Palmetto, mostly.  I just focused on Calloway Cove.

7    Q    Okay.  And I thought you said in February of

8    2023 you stopped focusing on the Jacksonville

9    properties; is that right?

10   A    Right.  So Calloway was in Jacksonville.

11   Q    Okay.

12   A    Yeah.

13   Q    And so from December, when you had this

14   conversation with James, until February of 2023, the

15   only Jacksonville property you had was Calloway?

16   A    Yep.  The -- yes.  Now I didn't come back

17   until January.  I think me, Frank Sinito, James,

18   Frank's wife -- just trying to see if anybody else was

19   on his airplane -- we all flew down together to -- for

20   James to look at the Jacksonville properties and

21   walk -- for us to walk around them and everything;

22   so --

23   Q    And is this around the time that James was

24   hired?

1          A     Yeah.  He had got hired in December.  This

2     is more, like, in the first part of January.

3          Q     And so this is after James has told you not

4     to worry about any properties other than Calloway?

5          A     Right.  'Cause in Calloway we were getting

6     ready for a REAC toward the end of January.  So that

7     was my -- my focus.  That was it.  He'd take care of

8     everything else.

9          Q     And when he told you to focus on Calloway,

10    did you understand that you didn't have any

11    responsibilities with respect to those other three

12    properties?

13         A     Correct.

14         Q     And did he tell you this in person?  Over

15    the phone?

16         A     In person.

17         Q     Okay.  And was anybody else around?

18         A     I don't know.  I'm not sure.  And he may

19    have put in an email.  I don't have access to his

20    emails and stuff.  So if you have access to his

21    emails, it may be in there.  But I know he told Pearl

22    Gray, specifically, 'cause she -- she called me and

23    told me, she said, "I don't know nothing about

24    managing.  I don't want to be no manager."

1     Q    And Pearl was an ops specialist?

2     A    Correct.

3     Q    And was she one of three ops specialists?

4     A    She -- the -- the worker that I

5 recommended -- see, it was Tori Cammon and Pearl.

6 Those are the only two that was really working with

7 me.

8     Q    Okay.  And what did Pearl tell you?

9     A    About?

10    Q    You said Pearl called you and said something

11 about she didn't want to be a property manager.

12    A    Yeah.  She said that he got her over there

13 doing, you know, property manager stuff, and he -- he

14 was gone.  Like, he would go to some other properties

15 and stuff, and she was there, and she was handling

16 everything, like research.  So whatever happened, she

17 was the one who was making the decisions.

18    Q    And other than focusing on the REAC in late

19 January, did James tell you why he didn't want you

20 focusing on the other three properties?

21    A    Sure.  I was moving back to Tennessee.

22    Q    Okay.  And when did you find out that you

23 were going to move to Tennessee?

24    A    I'm going to say in either January or

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 86 of 229
PageID #: 463

1    December.  I knew I was going to get ready to come
2    back this -- that direction.  Because at one time, me,
3    James, Alan, and Frank, we had a Teams call.  And he
4    was tell -- Frank was telling me that, you know, that
5    I was -- he wanted me to focus more on the Jack -- on
6    the Tennessee properties and everything.
7              And that James was -- got, you know, good
8    control of it.  And I didn't have to worry.  He said
9    that my title would stay the same, as well as my pay.
10   It would not change.
11        Q    And when was that call?  You said January or
12   December?
13        A    No.  That call I'm thinking is more the end
14   of February -- at the beginning of February.
15        Q    Beginning of February 2023?
16        A    Right, right after the Calloway thing.
17   Yeah.
18        Q    And did they tell you why they were removing
19   the Jacksonville properties?
20        A    He wanted somebody in Florida.
21        Q    And you're saying "he."  That's Frank?
22        A    Yes.  They thinking of someone -- he
23   said -- the last time I talked to Frank, when we were
24   down there, he told me, he said, "Yeah.  You've done a

1    great job.  This is nothing on you."  He said, "It's
2    time to pass the baton"  And that was to Onix.  Onix
3    was there, and that was it for me in Jacksonville.
4         Q    And what was Onix's position?
5         A    Regional manager.  I had very -- I didn't
6    have much work with him at all.
7         Q    When was Onix hired?
8         A    Oh, somewhere in March, I would say.
9    Because after they got rid of James, then they
10   promoted Dawn to regional vice president, and Frank
11   had told me that they were going to hire a regional
12   manager for Jacksonville.  And I was going to be in on
13   the -- the hiring and stuff.
14            And they interviewed him, and I asked John,
15   I said, "Well, when do I -- when was I supposed to
16   interview him," and everything.  And they never did
17   let me interview him.  They just went ahead and hired
18   him.
19        Q    And so your understanding was that you were
20   going to interview the new regional manager for
21   Jacksonville?
22        A    Mm-hmm.
23        Q    Yes?
24        A    Yes.

1    have been Alexandra that provides this?

2         A     It should have been.

3         Q     Okay.  Because it simply says "Reports to

4    Alexandra"?

5         A     Yes.

6         Q     Okay.  Got it.  Did you ever participate in

7    meetings with other regional managers or regional

8    property directors where the financials of the

9    properties were discussed?

10        A     Yes.

11        Q     Okay.

12        A     But we weren't in there at the same time.

13        Q     Say that again.

14        A     We weren't in there at the same time.  We

15   have a financial call, and when it's your time to come

16   in, you go in.

17        Q     Okay.

18        A     It -- it was individual like that.

19        Q     And so you were never in meetings where you

20   talked about the financial performance of other

21   regions?

22        A     Mm-mm.

23        Q     Is that a no?

24        A     That's a no.

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 89 of 229
PageID #: 466

```
1   overtime, we did get the REAC for The Weldon.  Where
2   actually The Weldon had the REAC, and we got a 78.
3   But I appealed it because they didn't -- they said
4   that they had -- I hadn't fixed something.
5           And I appealed to show where we did.  And we
6   got a -- a higher score, meaning we went from a
7   one-year inspection to a two-year inspection.
8       Q   And what's a passing score for a REAC?
9       A   Sixty.
10      Q   Sixty?
11      A   Mm-hmm.
12      Q   And so anything above 60 you pass, but you
13  get a one year-inspection?
14      A   One-year inspection, right.
15      Q   Okay.
16      A   And that -- we got a 82.
17      Q   And so what is the benchmark to go from
18  one-year to two-years?
19      A   Eighty.
20      Q   Eighty.  And so you went from 78 to 82?
21      A   Right.
22      Q   Okay.
23      A   Which gave us -- yeah.  I got -- I got us a
24  year.
```

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 90 of 229
PageID #: 467

1     Q   And when was that appeal?

2     A   Right after The Weldon's REAC. I don't -- I

3  don't have the information. You -- you can look it up

4  and find out when The Weldon's REAC was.

5     Q   And when did the Calloway Cove REAC?

6     A   The last part of January.

7     Q   And how did Calloway Cove do?

8     A   It did pretty good. Frank wanted it to be

9  higher because it had been renovated and everything,

10  but we did pass.

11     Q   Do you remember the score?

12     A   I do not. And that's actually when

13  James -- he was supposed to have been coming over

14  and -- anytime, like, a vice president -- we doing the

15  REAC -- I think I told you this before. The vice

16  president's supposed to come, and they supposed to be

17  there, do like a -- a walk through 20 -- every 24

18  hours, and check everything, and stuff.

19        And he didn't come maybe once, maybe twice,

20  of the whole time of us getting ready and stuff. And

21  that's when he would say, you know, he said, "Aren't

22  you tired of this? Don't you want to go ahead and

23  retire?"

24        He said, "At our age, we need to, you know,

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 91 of 229
PageID #: 468

1  get out of here." And I said, "I'm not retiring.

2  That's not what I want to do." And he says,

3  again -- he -- at a later time, he said, "Gail," he

4  said, "You're not frustrated with this?" I said, "No.

5  I'm not." He said, "Well, I thought you might be

6  ready to retire," and stuff.

7         I said, "Look, I ain't finna retire. So

8  leave me alone." And I -- I just said it like that,

9  you know. And he just -- would kept on, like,

10  badgering me about -- about stuff like that. But I

11  don't -- I didn't know.

12     Q   And James was only with the company for

13  three months?

14     A   Yes. That's what I would assume. Yeah.

15     Q   From November '22 to February '23?

16     A   Okay. I don't --

17     Q   Does that sound right?

18     A   Yes.

19     Q   Okay. And during this time, how many times

20  did he talk to you about retiring?

21     A   About four.

22     Q   Okay. And were those in person?

23     A   Yes.

24     Q   Where were they?

1    A    One was in Cleveland, Ohio.  And I'm going

2    to say three times at Calloway.

3    Q    And was this when y'all were in Cleveland,

4    Ohio, in November, December.

5    A    December.

6    Q    December.  And what did he say to you in

7    Cleveland?

8    A    Oh, he said, you know, "We're getting on up

9    there."  He said that, you know, "We'se getting

10   ready -- we need to be looking at our age and -- and

11   thinking about retiring."  And I looked at him kind of

12   funny because Alan and I had had conversations before

13   about retirement and everything.  Both of us decided

14   we wasn't going to never retire.

15   Q    And when did you and Alan have that

16   conversation?

17   A    Off and on.  I can't tell you exactly when.

18   Q    And so Alan was never forcing you or

19   encouraging you to retire?

20   A    Oh, no, no.  Only other persons that did

21   that was Debra and Frank had brought that up to me.

22   One time we was here at The Overlook, Debra, and Alan,

23   myself, and Kristi was in a meeting.  They were, like,

24   doing evaluations of properties and stuff.  And

1  she -- we were talking in a -- like, in a -- not a

2  conference area, but just us by ourself.

3      Q    And you said -- sorry.  This was Alan,

4  Debra, you, and Kristi?

5      A    Yeah.  Kristi was the -- the property

6  manager of The Overlook.  And she was saying about,

7  you know, make -- Debra was saying that, you know, "We

8  need to make sure that the staff is trained and

9  everything.  And it doesn't matter that you have your

10  TCS or your" -- TCS is tax credit specialist -- "or

11  your COS, that's just a piece of paper.

12          "You need to make sure that they

13  have -- because, you know, at our age and everything,

14  we're going to need to be retiring," stuff.  And

15  I'm -- I'm looking at her, "I'm -- I'm not going to

16  retire."  And she says, "Well, you know, you -- as you

17  get older and everything."

18          And I felt some type of way, you know.  "No.

19  All right.  I -- am I doing something wrong here?  You

20  know, what -- why would you even think stuff like

21  that?"

22      Q    Okay.  And so Debra said, "We need to make

23  sure our staff is trained"?

24      A    Mm-hmm.

1    Q    Is that a yes?

2    A    Yes.

3    Q    She said, "At our age" -- say that again.

4    A    Yeah.  "You need to think about retiring."

5    Q    She said, "You need to be thinking about

6  retiring"?

7    A    Yes.  She said that, specifically.

8    Q    When was this?

9    A    I'm going to say 2019, maybe.

10   Q    And so this is before you got the

11 Jacksonville properties?

12   A    Yes.

13   Q    Yes?

14   A    Yes.

15   Q    So you were the regional manager of just the

16 East Tennessee and Hazard?

17   A    Correct.

18   Q    Okay.  Okay.

19   A    And then Frank had said something to me --

20   Q    Let's focus on -- hold -- I want to hear

21 everything about this conversation.

22   A    Oh, okay.  I'm sorry.

23   Q    And so what did you say in response to that?

24   A    "I'm not retiring."

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 95 of 229
PageID #: 472

1    Q    Okay.  Anything else during that?

2    A    No.  Like I said, she kind of hurt my

3    feelings when she was -- 'cause I asked Alan

4    afterwards, I said, "Alan, did you hear her say that

5    about the -- that the -- the certificates, the TCS and

6    everything, wasn't important?"

7         He said, "Well, no."  He was on a phone

8    call.  I said, "That kind of hurt my feelings.  That's

9    just like me getting my degree, and you saying it's

10   not worth anything.  And that hurt my feelings really

11   bad.  'Cause it -- it's hard to get a TCS."

12   Q    And TCS is?

13   A    Tax credit specialist.

14   Q    And that's that certificate that you talked

15   about earlier?

16   A    Yes.  Yes.

17   Q    Okay.

18   A    As well as my COS.

19   Q    And what's the COS?

20   A    Certified occupancy specialist.

21   Q    Okay.

22   A    Tax credit specialist is dealing more with

23   tax credit, which is IRS and the state.  The COS would

24   be just more dealing with HUD, federal government.

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 96 of 229
PageID #: 473

1     Q   Okay.

2     A   You remember I told you that they're

3  parallel to each other?  They do similar, but they're

4  not -- they don't cross over.

5     Q   Got it.

6     A   And that -- those are some really important

7  honors.  I'll put it like that.

8     Q   And was Alan present when you said that

9  Debra told you, "At our age you need to be thinking

10  about retiring"?

11     A   Yes.

12     Q   Okay.  And you said that you talked to Alan

13  about Debra's mentioning the COS and the -- is it TSC?

14     A   Yeah, TCS.

15     Q   TCS, tax credit -- right.  And did you

16  mention anything about the retirement statement to

17  Alan?

18     A   I don't think so.  But like I said, he and I

19  have talked about it.  So I don't know if I mentioned

20  to him again.  I said, "If she says something about

21  the age and everything" -- 'cause he and I both

22  laughed and said, "We're going to be on our" -- what

23  do you call the little mobile cars -- "knocking on

24  doors, hollering, 'housekeeping inspections.'"  I

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 97 of 229
PageID #: 474

1    Q    And Alan participates via Teams?

2    A    Yes.

3    Q    Okay.  And is this document actually

4    presented to you?

5    A    Yes.

6    Q    Okay.  And who leads the conversation?

7    A    Debra.

8    Q    And what does Debra say during this

9    conversation?

10    A    She just said that, you know, there was some

11    issues, performance issues, and they were going to put

12    me on this PIP.  And I'm shocked at that moment.

13    Because I'm like, "A PIP?"  You know, like, "Okay.

14    Well, you know, what are you talking about?"  And we

15    went through the document itself.  And I'm just

16    looking at -- like, in shock about it and everything.

17            And then after we went through it -- I know

18    you want to ask about the questions still.  But as we

19    went through it, at the end, I'm like, "Okay."  And

20    they would give me all these bullets that I need to

21    meet, or points I need to meet, and everything.

22            And I'm like, "Okay."  When you get me back

23    to Tennessee, we need to -- "You need to focus on

24    Tennessee and get it together."  I'm devastated at

1      A     Kristi Adams.

2      Q     And what was happening to Kristi?

3      A     Nothing.

4      Q     So were y'all going to be co-property

5  managers?

6      A     That's what we assume.

7      Q     Okay.

8      A     You know, it wasn't clear.  It just said I

9  was going to be a property manager there.  When they

10  finally gave me the offer letter, which was -- they

11  gave it to me on June 15th, a offer letter.

12          I signed it on June 16th, and everything was

13  going to go into effect on June 24th.  But I was

14  terminated on June 22nd.  So being -- before it had

15  went into effect.

16          One other thing, I was just curious 'cause I

17  couldn't figure out, why not keep me and get -- let

18  Kristi go.  The only thing that I could see is

19  Kristi's younger than I am.  Because, see, I got the

20  experience.  I got the knowhow.  I got -- everything

21  was moving forward, you know, positively.

22      Q     And how had the performance of The Overlook

23  been under Kristi?

24      A     It'd been okay.  It wasn't great.  It was

1  okay.  But it's the same thing with Alexandra.

2  Her -- her properties was terrible compared to mine.

3  And she -- 39 years old and came up over -- on to over

4  me.

5      Q    And going back to the May 2nd conversation,

6  because that's the first time Debra brought up

7  retirement?

8      A    Yes.  No.  It's not the first time she

9  brought -- she brought up retirement when we was over

10  here at The Overlook.

11     Q    What day was that?

12     A    I don't know.  That was probably in '18 or

13  '19.

14     Q    Oh, okay.

15     A    When she brought -- okay.

16     Q    Okay.  Got it.  The first time she brought

17  it up in 2023 was May 2nd?

18     A    Yeah.

19     Q    At the time of the PIP?

20     A    Yeah.

21     Q    And did she talk about giving you any money

22  or a severance package at that time?

23     A    Yes.

24     Q    Okay.

1      A    She's -- that was --

2      Q    And was it similar to what she said in this

3  May 28th through June 5th, the later conversation?

4      A    Yes.

5      Q    Giving you some money to retire?

6      A    Yes.

7      Q    Okay.  Okay.  Do you recognize what we've

8  marked as Exhibit 6?

9               (Exhibit 6 was marked for

10               identification.)

11      A    Yes.

12               MR. JACKSON:  Millennia 151, 152.

13               MR. BURNETTE:  151?

14               MR. JACKSON:  Yeah.

15               THE WITNESS:  Okay.

16  BY MR. JACKSON:

17      Q    What is Exhibit 6?  What is Exhibit 6?

18      A    This is the email.  I don't know what the

19  "Great.  Will do" -- there was something apparently

20  before then.  Where it says "Great.  Will do."  Debra

21  says "We are not making a public announcement.  We're

22  going to update the RM allocation."

23      Q    And let me just stop you.  I think this is

24  backwards.

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 101 of 229
PageID #: 478

1      A      I put it like that.

2      Q      And how were you told that you were being

3  terminated?

4      A      I got a phone call.  Well, I didn't get the

5  phone call.  Alexandra was at the property.  I was

6  showing her how some things were done with the CHA.

7      Q      Is this at Overlook?

8      A      Yes.  It was the first time I ever met

9  Alexandra.  First time she had been at the property.

10  And I was showing her how to do some things, and she

11  had talked to me about how that the company actually

12  thought that I was going to accept their offer versus

13  keep working.  They wanted me to go ahead and stop

14  working and stuff.

15          And she -- she said, "I -- I haven't talked

16  to anybody or anything like that."  She said, "It's

17  just -- I just know that they -- they were very

18  shocked that you didn't take the offer," and stuff.

19  And I said, "Okay."  You know, "I want to work."  You

20  know, that's who I am.

21          I like -- I like my job, and I can do The

22  Overlook with my eyes closed.  I've been there

23  50 years and stuff.  And so about an hour later she

24  called me, and she said -- she was running around

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 102 of 229
PageID #: 479

1    Q    Okay.

2    A    And -- but this is -- this -- just -- those

3  just comments -- conversations that we had had.

4    Q    Okay.  And so this was in the car?

5    A    Yeah.

6    Q    In April of 2019?

7    A    No.  This is in the car in '21.

8    Q    Okay.  Do you know what month of '21?

9    A    It would had to have been in September or

10  October.

11    Q    Okay.  And was it before you got promoted to

12  regional property director?

13    A    After.

14    Q    After you got promoted?

15    A    Mm-hmm.

16    Q    Okay.  And so -- all right.  And in April of

17  2019, the first retirement comment he ever made, what

18  did he say?

19    A    He was just saying, "Did -- we need to be

20  looking at letting the younger generation take over.

21  We need to -- you need to retire or think about

22  retiring."

23    Q    Okay.  And what did you respond?

24    A    "I ain't retiring."

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 103 of 229
PageID #: 480

1     Q    Okay.

2     A    That -- that was -- that -- that was

3  just -- that was it.

4     Q    Okay.  And then after April of 2019, when is

5  the next time Frank mentioned something about

6  retirement to you?

7     A    I'm going to say then, and then '21.

8     Q    And the September, October?

9     A    Mm-hmm.

10    Q    And that's the one in the car?

11    A    Mm-hmm.

12    Q    Okay.  And that's what's listed in G(1) of

13  the EEOC charge?

14    A    Mm-hmm.

15    Q    Yes?

16    A    Yes.

17    Q    Okay.  Okay.  And anything else he said

18  during that conversation in the car, other than y'all

19  talking about the phone and the letting the younger

20  generation take over?

21    A    No.

22    Q    Okay.  And then what is the next comment

23  that Frank made to you about retirement?

24    A    "At your age, you need to retire soon."

1    Q    And when was that?

2    A    That was during that time too.

3    Q    The September, October of '21?

4    A    Mm-hmm.  Mm-hmm.

5    Q    Yes?

6    A    Yes.

7    Q    Okay.  And then what is the next comment

8  after that?

9    A    It says "Should strongly consider

10 retirement."  I was thinking that may have been one of

11 his trips here at The Overlook, when I was walking the

12 property with him.

13    Q    And what time period?

14    A    It would have been before Jacksonville.

15    Q    So before September, October of '21?

16    A    Mm-hmm.

17    Q    Yes?

18    A    Yes.

19    Q    And then --

20    A    Every time he asked me something like that,

21 I say, "I love my job."

22    Q    Okay.  All right.  And then next to

23 letter I, it says "The company's HR head talked to me

24 several times and said, 'At my age that I needed to

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 105 of 229
PageID #: 482

1    retire.'"

2          A    That was Debra Moore.

3          Q    Okay.  And we've talked about those

4    incidents?

5          A    Yes.  And then it was James Zapf, and we've

6    talked about those times.

7          Q    Okay.

8          A    And I -- I don't know if I reiterated about

9    Alexandra being 39, and she was the regional, my

10   regional.  And she made the comment that they expected

11   me to take the retirement versus keep working.

12         Q    And you said that that happened on the day

13   that you were terminated; right?

14         A    Yes.

15         Q    Okay.  And on Griffin 14, next to letter

16   R --

17         A    Mm-hmm.

18         Q    Is that a yes?

19         A    Yes, sir.

20         Q    It says "I was then contacted by the chief

21   administrative officer, Michael Pico.  Mr. Pico had

22   left the company for a time but then returned.

23   Mr. Pico re-extended the severance package and release

24   to me.  We spoke about several matters."

# *Exhibit 3*

# Transcript of the Testimony of

## Alan Weckerly

July 02, 2025

GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.



**Cleveland Reporting Partners, LLC**
(216) 459-7880
scheduling@clereporting.com
clereporting.com

```
 1      Q.    Is it typical to have a property manager
 2   in two years be promoted all the way up to a
 3   regional manager?
 4      A.    I don't know that the word would be
 5   "typical," but there has been individuals that
 6   have taken other responsibilities rather quickly
 7   after starting with us.
 8      Q.    She was doing something right to be able
 9   to be promoted that quickly, I would assume?
10      A.    Yes.  At that time, yes.
11      Q.    Okay.  While you worked with her, did
12   you like the way she conducted business?
13      A.    As an answer, yes or no, yes.  Although,
14   things did change over a course of time.
15      Q.    And did you find she's an honest person
16   in your dealings with her?
17      A.    Yes.
18      Q.    She never did anything that would have
19   led you to believe she was dishonest in any way,
20   did she?
21      A.    Not for the first few years.  There was
22   times probably from 2022, leading into 2023,
23   there was some questions.
24      Q.    Questions about what?
25      A.    Performance.
```

*Cleveland Reporting Partners, LLC  (216) 459-7880*
*GLEreporting.com*

Case 1:24-cv-00248-TRM-MJD    Document 29-3    Filed 08/18/25    Page 3 of 3
PageID #: 299

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 109 of 229
PageID #: 486

1      Q.    Is it typical to have a property manager

2   in two years be promoted all the way up to a

3   regional manager?

4      A.    I don't know that the word would be

5   "typical," but there has been individuals that

6   have taken on more responsibilities rather quickly

7   after starting with us.

8      Q.    She was doing something right to be able

9   to be promoted that quickly, I would assume?

10     A.    Yes.  At that time, yes.

11     Q.    Okay.  While you worked with her, did

12  you like the way she conducted business?

13     A.    As an answer, yes or no, yes.  Although,

14  things did change over a course of time.

15     Q.    And did you find she's an honest person

16  in your dealings with her?

17     A.    Yes.

18     Q.    She never did anything that would have

19  led you to believe she was dishonest in any way,

20  did she?

21     A.    Not for the first few years.  There was

22  times probably from 2022, leading into 2023,

23  there was some questions.

24     Q.    Questions about what?

25     A.    Performance.

1     Q.     But not the honesty, correct?

2     A.     No.  Other than when you have the

3  accountability of day-to-day responsibilities,

4  honesty should be a part of what we're

5  discussing.  I don't know so much that we were

6  receiving courtesy.

7     Q.     While she was a property manager, was

8  she able to perform those duties well?

9     A.     Yes.

10     Q.     And when she was a senior property

11  manager, was she performing the duties of senior

12  property manager well?

13     A.     Yes.

14     Q.     When she was then promoted to regional

15  manager in 2018, did she perform well in that

16  position?

17     A.     For about three years, yes.

18     Q.     Okay.  Did you perform evaluations and

19  annual reviews for employees under your direct

20  supervision?

21     A.     Yes, I did.

22     Q.     And did you have an opportunity to

23  perform annual reviews for Ms. Griffin?

24     A.     Yeah, there was probably at least two.

25     Q.     All right.  I believe the performance

Page 12

1   review that you did in February of 2022 you

2   scored her a 4.15 out of 5.  Is that consistent

3   with your recollection?

4       A.    Yes.  I did review that before this

5   meeting.

6       Q.    Okay.  And it is -- since you did review

7   that before this meeting, do you have a copy of

8   that performance review with you today?

9       A.    I did not print it off.  It's on the

10  computer.  I looked at it on the computer.

11          MR. BURNETTE:  Counsel, any objection to

12  making that Exhibit 1?  We can flash it up on the

13  screen, if we need to.

14          MR. JACKSON:  That's fine.  Do you want

15  me to put it up on the screen like we did

16  earlier?

17          MR. BURNETTE:  Sure, you can.  It's your

18  Bates Number 69 through 79.

19                  - - - - -

20          (Deposition Exhibit 1, Millenia 00069 -

21          00079, was marked for identification

22          purposes.)

23                  - - - - -

24          MR. BURNETTE:  It was Exhibit 1 to the

25  earlier depositions today.

Page 13

```
 1            MR. JACKSON:  I'm just about to show my
 2   screen.  Can you see that, Alan?
 3            THE WITNESS:  Yes, I can.
 4   BY MR. BURNETTE:
 5      Q.    It says on the first page there that she
 6   reports to
 7      A.    Uh-huh.
 8      Q.    And this review period was from 2021 --
 9   or for the calendar year 2021; is that correct?
10      A.    That would be correct.
11      Q.    And you were the reviewer down there.
12   On page 3 of that report you gave her a "Very
13   Good" in the financial category; is that correct?
14      A.    Yes.  As the review says, yes.
15      Q.    And on the next page, the MOR, what is
16   an MOR?
17      A.    MOR is Management Operations Review,
18   which is a site visit by the most common
19   regulated agency, HUD -- a HUD visit to the
20   property or properties supervised.
21      Q.    And she received "Excellent," 5 out of 5
22   on that?
23      A.    That's correct.
24      Q.    Under the REAC, the Real Estate
25   Assessment Center Inspections, she received a
```

1      "Very Good" on that; is that correct?

2          A.     Yes.

3          Q.     4 out of 5?

4          A.     Yes.

5          Q.     On the following page, "Unit Turn."

6      Explain to me what "Unit Turn" is.

7          A.     It's basically the efficiency and timing

8      of getting carpet, when it's vacant, to get it

9      ready for a new occupant to become a resident.

10     So it's a time period between vacating and the

11     next occupant.

12         Q.     And she received an "Acceptable," 3 out

13     of 5 on that; is that correct?

14         A.     That's correct.

15         Q.     Getting a property ready, the

16     turnaround, is that primarily a regional director

17     responsibility or would that fall more on a local

18     property manager to do that?

19         A.     No.  Unit turns pretty much encompass

20     everybody's attention.  The property manager,

21     maintenance staff and leadership.

22         Q.     I mean, somebody has to get in there and

23     prepare all the drywall or something like that?

24         A.     That's the hourly staff, yep.

25         Q.     So, Ms. Griffin wouldn't have been out

1    there with a drywall knife and dry mud fixing

2    that, would she?

3        A.    No.

4        Q.    What would her responsibilities be to

5    get a higher score on that?

6        A.    Would work with the property managers and

7    the hourly staff as a supervisor -- in a

8    supervisor role to talk about the challenges, if

9    there was challenges, and/or the needs,

10   materials, labor, otherwise, to get the expected

11   turnaround for unit turns.

12       Q.    Did Millenia ever limit the funds that

13   were available to property managers to be able to

14   timely get these units turned around?

15       A.    Millenia was just the property

16   management company.  It was not a direct

17   financial supporter of the property.  The

18   property was an independent operating business.

19   So the challenges that may have existed

20   financially were a result of excess vacancies or

21   other.

22       Q.    So there should have been enough money

23   to handle repairs?

24       A.    Should have been, yes.

25       Q.    Were there ever instances where there

1    was not enough money to handle the repair?

2        A.    On her properties specifically, I don't

3    know that answer today, as we sit, because that

4    would have been a time period of 2021.

5        Q.    Okay.  On the following page there,

6    "Customer Service," you scored her a 5 out of 5,

7    "Excellent"?

8        A.    Uh-huh.

9        Q.    Is that consistent with what you saw

10   from her?

11       A.    Yes.

12       Q.    The following page, the next category is

13   Communication."  You scored her a "Very Good," 4

14   out of 5?

15       A.    Yes.

16       Q.    The following category, "Job Knowledge

17   and Skills," you scored her a 4 out of 5, "Very

18   Good" again?

19       A.    Yes.

20       Q.    You have a comment there that says,

21   "Gail is very confident in her ability to right

22   size problem situations"?

23       A.    Yes, that's my comment.

24       Q.    Moving onto Number 8, "Problem Solving."

25   It's cycles down and goes into the next page, but

1　you scored her a "Very Good" on that as well; is

2　that correct?

3　　　A.　　Yes, correct.

4　　　Q.　　The following section, Teamwork," you

5　scored her an "Excellent," 5 out of 5, correct?

6　　　A.　　That's correct.

7　　　Q.　　And again, the overall score was a 4.15.

8　And can you please read your closing comment

9　there?

10　　　A.　　Closing comment states, "Gail does very

11　well overall."

12　　　Q.　　Thank you.

13　　　　　　MR. BURNETTE:　There is another

14　performance review that I'd like to ask about,

15　and that is Bates Number 128 to 139 on your

16　documents.

17　　　　　　MR. JACKSON:　Got it.

18　　　　　　　　　- - - - -

19　　　　　　(Deposition Exhibit 2, Millenia 000128 -

20　　　　　　000139, was marked for identification

21　　　　　　purposes.)

22　　　　　　　　　- - - - -

23　　　Q.　　Mr. Weckerly, are you familiar with this

24　document as well?

25　　　A.　　Yes, I am.

1    that made the PIP, the performance improvement

2    plan.
GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.          1:24-CV-00248-TRM
Alan Weckerly on 07/02/2025

3         Q.    My question is, this review, was it

4    considered in the decision to place her on a PIP?

5         A.    During the course of the calendar year,

6    my recollection with communications that occurred

7    during the last half of 2022 is things began to

8    falter with the portfolio.  It was discussed that

9    we should look at a performance improvement plan.

10        Q.    If on the objective categories where she

11   scored a 2, if those -- in fact, let's take the

12   REACs, for example.  If, in fact, all of her

13   properties scored higher than a 60, should she

14   not have received a higher -- an excellent, a 5

15   in that category?

16        A.    From what we looked at on the wording of

17   the review, yes.

18        Q.    Okay.  And if the objective data were

19   different, her score would have been higher; is

20   that correct?

21        A.    That's correct.

22        Q.    I'm going to shift gears just for a

23   moment with you and ask you about some other

24   employees.

25             James Zapf, are you familiar with

1   Mr. Zapf?

2   GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.    1:24-CV-00248-TRM
Alan Weckerly on 07/02/2025 A little bit, yeah. I think he was a

3   short-term, three month, regional vice president.

4      Q.   And would he have been Ms. Griffin's

5   supervisor at any time?

6      A.   Yeah. I think his portfolio included

7   Gail for that time he was with us.

8      Q.   Okay. Why was he a short-term vice

9   president?

10      A.   I don't remember enough of his tenure or

11   time to tell you why that was. I don't remember.

12      Q.   If he had given Ms. Griffin an

13   instruction regarding a property, would you

14   expect her to follow his direction?

15      A.   Yes.

16      Q.   Do you know whether he was terminated or

17   if he voluntarily resigned?

18      A.   I don't remember the situation there.

19      Q.   Okay. Would you have been involved in a

20   decision to terminate him at that time?

21      A.   Yes, I would have been.

22      Q.   Did Ms. Griffin ever tell you that

23   Mr. Zapf informed her that he would handle

24   certain Florida properties and that she needed to

25   focus on the Knoxville properties? Do you recall

1  a conversation with her about that?

GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.    1:24-CV-00248-TRM
Alan Weckerly on 07/02/2025

2  A.    I did not.

3  Q.    Let me ask you about BJ Everson.  Are

4  you familiar with that employee?

5  A.    Yeah.  He was an internal home office

6  asset manager.

7  Q.    What would his job duties have entailed?

8  A.    I've never been an asset manager, so I'm

9  not sure exactly what they do.  I think his role

10  was to work with ownership on the overall

11  performance of the properties from a wholistic

12  financial view.

13  Q.    For the CFO?

14  A.    He would work with the COO and CFO

15  directly related to the portfolios.

16  Q.    A numbers the guy?

17  A.    A numbers guy, absolutely.  Yep.

18  Q.    He's not still with the company, is he?

19  A.    No, he's not.

20  Q.    Do you know why he is no longer with the

21  company?

22  A.    I think there was a reduction in force

23  at one time that occurred.  I think he was a part

24  of it.

25  Q.    Moving back to Ms. Griffin's performance

1    last update."  That's pretty good.

2          Moving on down to the "Delinquent &

3    Prepaid."  He says, this is the third area that

4    shows massive improvement since our last update.

5    Thank you for these efforts."

6          So this was the first objective review

7    since her performance improvement plan was in

8    place; is that correct?

9    A.    Yeah, that's fair to say.

10   Q.    Reading this seems like she's doing a

11   good job, wouldn't you say?

12   A.    Everything BJ pointed out here, yes.

13   Q.    Okay.  And a few days later she was

14   terminated.  Do you know why she was terminated a

15   few days after this glowing review?

16   A.    I do not.

17   Q.    Were you involved in that termination

18   decision?

19   A.    I don't recall if I was or not.

20   Q.    And I believe Ms. Griffin agreed to take

21   on the role of just a property manager at a lower

22   salary.  Do you recall that?

23   A.    Yeah, I do recall that.

24   Q.    And are you aware that they offered her

25   a severance package at the time they offered her

1   occurred several weeks earlier or -- how fast do

2   they usually release those?

3       A.    You're correct.  The actual inspection

4   date could have been just a day before or several

5   days before.

6       Q.    Okay.  And then the other scores it

7   received were a 64c, up from the 50, on October

8   28, 2022.  And then the final score does look

9   really good in 2024, an 87?

10      A.    Yeah.

11            MR. BURNETTE:  Scroll down to the next

12  property, Summit Towers.

13      Q.    Those scores begin in 2017, 61c.  Do you

14  see that?

15      A.    Yes, I do.

16      Q.    That would be prior to her being the

17  regional manager; is that correct?

18      A.    Correct.

19      Q.    And the 11/2/2018 it received a 71c.

20  And finally -- and again, that might have

21  been -- that was another one that was just right

22  after she took on that role.  Final score looks

23  like, during her leadership on September 13,

24  2021, scored a 94; is that correct?

25      A.    Yep.  That's what I see, yes.

Page 51

1    Q.    So that would be -- is 94 a strong

2    score?

3    A.    Yes, it is.

4    Q.    Okay.  Scroll down to the next property

5    in Kingsport.  There's a 2016 score of 81, a 2022

6    score of 98c, and a 2022 score of 94b.  And those

7    94 and 98 would have been during her leadership,

8    correct?

9    A.    Yeah.  The 94b, yes.  Once again, in

10   2018, I don't know when that transition occurred.

11   Q.    Okay.

12          MR. BURNETTE:  Scroll down to the next

13   one.

14   Q.    Watauga Square in Johnson City.  Do you

15   see that?

16   A.    Yeah.

17   Q.    The 2016 score of 81, prior to

18   Ms. Griffin's involvement, and a November 2018 of

19   a 99a and a May 17, 2023 of a 96b.  Do you see

20   those?

21   A.    Yes.

22          MR. BURNETTE:  Scroll down to the next

23   one.

24   Q.    Charles Seivers in Clinton, Tennessee.

25   Looks like there's a 2018 score of 85, a 2020

1     score of 96, and a 2023 score after she had left

2     of 94b.

3          We can go to the Overlook, the next page

4     down.  And those scores, 2014 of a 92b, a 2018

5     score of 93c, and a 2023 score of 86b.

6          Would you agree that the two latter

7     scores would have been during Ms. Griffin's time

8     at either the Overlook or as regional manager for

9     those?

10     A.     Yes.

11     Q.     Scroll to the next one.  This may be the

12     last one.  There's a February 2, 2018 score of

13     74c, a July 24, 2019 score of 89c, and an August

14     2, 2021 score of 89c.  Do you see those?

15     A.     Yes, I do.

16     Q.     None of the scores that we looked at are

17     below 60 that would have involved Ms. Griffin's

18     leadership; is that correct?

19     A.     In the portfolios that we looked at,

20     correct.

21     Q.     Okay.  One more thing before I change

22     topics.

23          With regard to the timeline of

24     Ms. Griffin's employment after the personal

25     improvement plan -- she was placed on the

Page 53

1    personal improvement plan on May 22, 2023; is

2    that correct?

3         A.    Yes.

4         Q.    She was demoted to property manager of

5    the Overlook on June 16, 2023; is that correct?

6         A.    That sounds about right.

7         Q.    And she was terminated six days later on

8    June 22, 2023; is that correct?

9         A.    Yeah, I don't recall the exact date.

10        Q.    I will submit to you that those are the

11   dates that I believe are correct.

12        A.    Okay.

13        Q.    But my question is, is the time period

14   of May 2nd to June 16th enough time for someone

15   to perform according to the personal improvement

16   plan that was put in place?  In other words, is

17   it reasonable to give her that amount of time

18   prior to termination?

19        A.    That is a quick period of time.

20        Q.    Would you -- if you were given a

21   personal improvement plan, would you expect to

22   have more time to complete the objectives in the

23   plan?

24        A.    Yeah.  I would want to look at the plan

25   that we did for Gail specifically.  It seems

1    there was some timing that was to be expected in

2    the plan itself.

3        Q.    And it looks like there was one review

4    GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.          1:24-CV-00248-TRM
     Alan Weckerly on 07/02/2025

4    during that period of time, that the numbers guy,

5    Mr. Everson, reported on?

6        A.    Yeah, we looked at that earlier.

7        Q.    And I believe that's the only feedback

8    that we've seen in between the implementation of

9    the plan and her termination?

10       A.    Yes.  I think that's the only thing we

11   looked at today, yes.

12       Q.    Do you believe there are any other

13   documents that would explain -- were there any

14   other evaluations that we're missing that would

15   explain why they terminated her so quickly after

16   the plan?

17       A.    I'm not aware of any.

18       Q.    Okay.

19                    - - - - -

20              (Deposition Exhibit 8, U.S. Department

21              of Housing and Urban Development Letter,

22              was marked for identification purposes.)

23                    - - - - -

24       Q.    Mr. Weckerly, have you ever seen this

25   letter?

# *Exhibit 4*

# Transcript of the Testimony of

## Frank Sinito

July 02, 2025

GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.



**Cleveland Reporting Partners, LLC**
(216) 459-7880
scheduling@clereporting.com
clereporting.com

```
 1              MR. BURNETTE:  I am asking if there was
 2   ever a charge filed with the federal government
 3   or state government.  I'm also asking on its
 4   basic terms, if someone accuses you of that, then
 5   you are charged with age discrimination, for
 6   example.
 7   BY MR. BURNETTE:
 8      Q.    Have you understood what we were talking
 9   about, sir?
10      A.    Yes.
11      Q.    And is your answers the same?
12      A.    Yes.
13      Q.    Do you ever recall making any statements
14   that it's time to turn things over to the younger
15   generation, that you had children and that it's
16   time to turn everything over to them?
17      A.    I may have.
18      Q.    Do you recall how many times you said
19   that it was time to turn it over to the younger
20   generation?
21      A.    Not many.
22      Q.    Who would be people that you recall that
23   you said that to?
24      A.    I don't recall who I may have said it
25   to.  My kids are obviously in the business and
```

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com
Case 1:24-cv-00248-TRM-MJD    Document 29-4    Filed 08/18/25    Page 3 of 6
PageID #: 302

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 129 of 229
PageID #: 506

```
 1      Q.    Do you recall her being given bad

 2   evaluations?

 3      A.
```
GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.          1:24-CV-00248-TRM
Frank Sinito on 07/02/2025
```
 3      A.    I recall there being issues.

 4      Q.    You don't recall there being any issues?

 5      A.    I do recall there being issues.

 6      Q.    Oh, okay.  What area was there an issue,

 7   do you know?

 8      A.    I know from -- she worked for us from

 9   2016 to 2023.  So probably 2022, 2021, from my

10   perspective.

11      Q.    Okay.  What issues was there?

12      A.    We, as a company, conduct financial

13   meetings.  And the issue was her ability to

14   control -- to maintain budgeted occupancy.  And

15   even more importantly, receivables.  Her

16   receivables were not good.

17      Q.    Do you remember anything specific about

18   that?

19      A.    Just pretty regularly the receivables

20   were not good in her portfolio and the occupancy

21   was not good.

22      Q.    Does your company have any union

23   employees?
```
```
24      A.    No.

25      Q.    Has there ever been any unionizing
```

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com
Case 1:24-cv-00248-TRM-MJD   Document 29-4   Filed 08/18/25   Page 4 of 6
PageID #: 303

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 130 of 229
PageID #: 507

1    she was somebody that was going to be able to get

2    it out of the dumps?

3         A.   I don't know that those were my words.

4         Q.   Was that -- what was communicated,

5    whether those were your exact words or not?

6         A.   Oh, I don't think I would have implied

7    it was "terrible" and "out of the dumps."  The

8    properties needed better management than what was

9    currently there.

10        Q.   And you felt like she could do the job

11   and you complimented her when she got there that

12   she was doing a good job, didn't you?

13        A.   I don't recall complimenting her.  I

14   don't recall me complimenting her because there

15   were issues with her management in Jacksonville.

16        Q.   It looks like on our notes -- let's see

17   if this jars your memory, or if you agree with

18   this.  She was hired as a property manager in

19   August of 2016.  Does that sound right?

20        A.   I know it was 2016.

21        Q.   Okay.  That's fine.  And then in 2017

22   she was promoted to senior property manager.

23             What would be a senior property manager?

24        A.   They provide support to other

25   properties.

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

Case 1:24-cv-00248-TRM-MJD    Document 29-4   Filed 08/18/25   Page 5 of 6
PageID #: 304

Case 1:24-cv-00248-TRM-MJD    Document 30-1   Filed 09/08/25   Page 131 of 229
PageID #: 508

```
1       A.    She communicated well with me.

2       Q.    Okay.  That's good.

3             MR. BURNETTE:   And then Number 10 at the

4    bottom of that same page deals with "Job

5    Knowledge/Skills."  Let's see if your excellent

6    counsel can go down to 10 there.

7             Thank you, sir.

8       Q.    It says, "Measures employee's

9    demonstrated job relevant knowledge and essential

10   skills, such as work practices, policies,

11   procedures, resources, laws, customer service,

12   and technical information, as well as the

13   relationship of work to the organization's

14   mission.  Also measured are the employee's

15   self-improvement efforts to enhance skills and

16   knowledge and to stay current with changes

17   impacting the job."

18            Is that -- when you dealt with her, did

19   she demonstrate good knowledge and skills?

20      A.    Not as it relates to maintaining the

21   financial viability of the properties.

22      Q.    Okay.

23      A.    Or the compliance of the properties.

24      Q.    Do you remember any particular one that

25   she didn't do well in?
```

*Cleveland Reporting Partners, LLC  (216) 459-7880*
*CLEreporting.com*

Case 1:24-cv-00248-TRM-MJD    Document 29-4    Filed 08/18/25    Page 6 of 6
PageID #: 305

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 132 of 229
PageID #: 509

1    some day they will -- you know, my daughter

2    already has, and they're already in leadership

3    roles.

4        Q.    Do you recall using the term of "passing

5    the baton to the younger generation"?

6        A.    I don't recall using that term.

7        Q.    Have you, in fact, passed the baton to

8    the younger generation?

9        A.    Yes.

10       Q.    Do you recall an employee named Jim or

11   James -- and I may not pronounce this correctly,

12   so I'll attempt to spell it, Z-A-P-F?

13       A.    Yes.

14       Q.    And did I spell that name correctly, do

15   you think?

16       A.    I don't know.

17       Q.    Okay.

18            MR. JACKSON:  I think it's Z-A-P-F.

19            MR. BURNETTE:  Z-A-P-F?

20            MR. JACKSON:  Correct.

21            MR. BURNETTE:  Okay.

22   BY MR. BURNETTE:

23       Q.    What was he hired to do and what was his

24   title?

25       A.    If I recall correctly, regional vice

```
 1   don't believe that would be subject to --
 2       A.    I'm going to take the fifth on the
 3   advice of counsel.
 4       Q.    Okay.  So you're not going to tell me
 5   whether you got that in 2023?
 6       A.    I'm going to take the fifth on the
 7   advice of counsel.
 8       Q.    Are you aware that HUD found your
 9   misconduct affects the integrity of HUD's
10   multi-family programs because it jeopardizes the
11   financial viability of the projects?  Are you
12   aware of that, that HUD made that finding?
13       A.    Again, on the advice of counsel, I'm
14   going to assert my fifth amendment right and
15   decline to answer.
16       Q.    Do you believe you have a good
17   reputation as far as being a truthful person?
18       A.    Again, on the advice of counsel, I'm
19   going to assert my fifth amendment right and
20   decline to answer.
21       Q.    And this document seems to provide that
22   you had unauthorized distributions of $4,578,671?
23            MR. JACKSON:  I'll object and instruct
24   him not to answer.
25       A.    Again, sir, I'm going to assert my fifth
```

# *Exhibit 5*

Docusign Envelope ID: 649DFE69-A7E0-477A-8F71-E8AF2A97ACFE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

| | | |
|---|---|---|
| GAIL A. GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00248-TRM-MJD |
| | ) | |
| MILLENNIA HOUSING | ) | JURY DEMANDED |
| MANAGEMENT, LTD. | ) | |
| and MILLENNIA HOUSING | ) | |
| DEVELOPMENT, LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ALAN WECKERLY

I, Alan Weckerly, hereby declare as follows:

1. I am over the age of eighteen and give this declaration of my own free will, pursuant to 28 U.S.C. 1746, based upon personal knowledge. If called to testify as a witness, I am competent to testify and would testify to the following facts:

2. I worked for Millennia Housing Management for approximately 20 years. My most recent position was Regional Property Director. Prior to that, I served as Executive Vice President. I resigned from Millennia on May 16, 2025.

3. At the time of Gail Griffin's ("Griffin") termination, I was serving as Executive Vice President of Millennia.

4. In 2022 and 2023, I observed a significant decline in Griffin's performance, particularly with respect to her oversight of the Jacksonville properties. Her management of those properties became extremely concerning.

Case 1:24-cv-00248-TRM-MJD    Document 29-5    Filed 08/18/25    Page 2 of 18
PageID #: 307
Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 136 of 229
PageID #: 513

Docusign Envelope ID: 649DFE69-A7E0-477A-8F71-E8AF2A97ACFE

5.      In 2022, the portfolio under Griffin's supervision had the highest total payroll expense of any portfolio in the company, including overtime pay. Attached hereto as Exhibit A is a true and correct copy of an email I received regarding payroll expenses.

6.      In 2022, I completed Griffin's annual performance review. Attached hereto as Exhibit B is a true and correct copy of the 2022 Performance Review I completed.

7.      I do not remember if I provided the evaluation to Griffin, but the evaluation ratings were completed by me based on my observations of Griffin's performance.

8.      In that 2022 Performance Evaluation, I rated Griffin as "Needs Improvement" in the following categories:

a.      Financial Performance – Controllable Net Operating Income – Location/Area

b.      Financial Performance – Individual Contribution

c.      REAC – Individual Contribution – Real Estate Assessment Center Inspection

d.      MOR – Location/Area – File Audits and Management Occupancy Reviews

e.      MOR – Individual Contribution – File Audits and Management Occupancy Reviews

f.      Unit Turn and Inspections

9.      In the comments section of the 2022 Performance Evaluation, I specifically wrote: "Gail had a tough year with the portfolio under her supervision."


**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Signed by:

*Alan Weckerly*

Alan Weckerly

Case 1:24-cv-00248-TRM-MJD      Document 29-5      Filed 08/18/25      Page 3 of 18
PageID #: 308
Case 1:24-cv-00248-TRM-MJD      Document 30-1      Filed 09/08/25      Page 137 of 229
PageID #: 514

# *Exhibit A*

| | |
|---|---|
| **From:** | Frank Sinito |
| **To:** | Alan Weckerly; Debra Moore |
| **Cc:** | Gail Griffin |
| **Subject:** | Overtime for 2022 |
| **Date:** | Sunday, February 19, 2023 10:26:05 AM |

Alan

Please see OT costs for Gail's region as it was the highest in the portfolio and review with Gail. Debra, please advise on OT in Gail's portfolio for January 1 to February 17th.

Frank T. Sinito
Chief Executive Officer
The Millennia Companies

Case 1:24-cv-00248-TRM-MJD    Document 29-5    Filed 08/18/25    Page 5 of 18
PageID #: 310

MILLENNIA00050

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 139 of 229
PageID #: 516

# *Exhibit B*

# Griffin, Gail

## 39-Regional Manager of Property Operations

**Position ID -** K06195167

**Reports To -** Thompson, Alexandra

**Department -** 000006-Regional Managers

**Business Unit -** MHM-Millennia Housing Management

**Location -** 10007-Regional Managers

## REVIEW INFORMATION

### 2022 - Affordable Review Form

**Review Period -** 01/01/2022 to 12/31/2022

**Status -** Finalized

**Target Completion Date -** 03/31/2023

## REVIEWER INFORMATION

**Reviewer -** Weckerly, Alan

Case 1:24-cv-00248-TRM-MJD    Document 28-5    Filed 08/18/25    Page 7 of 18
PageID #: 312

MILLENNIA000128

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 141 of 229
PageID #: 518

# INTRODUCTION

## 2022 Performance Reviews

Performance reviews are an opportunity for staff and supervisors to step back from the day-to-day tasks to review past year accomplishments and think about how we can develop professionally to achieve ongoing and future Company goals and objectives.

People are at the core of Millennia, and to be successful, people need to know how they're doing and how they can improve. Managers will complete this form as part of the performance development process, an ongoing process that enables two-way conversation addressing goal-setting, competencies, development planning, and continuous feedback. Millennia uses a pay-for-performance compensation model and the final 2022 employee performance rating will be used to determine merit increases for 2023.

# RATING SCALE

| | |
|---|---|
| **5 - 5 - Excellent** | Performance consistently far exceeds the requirements needed to fulfill the principal duties, responsibilities, objectives and expectations of the position. Performance is exceptional. |
| **4 - 4 - Very Good** | Performance is often above the level expected in fulfilling the principal duties, responsibilities, objectives, goals and requirements of the position. |
| **3 - 3 - Acceptable** | Performance consistently meets the requirements needed to fulfill the principal duties, responsibilities, objectives and expectations of the position. |
| **2 - 2 - Needs Improvement** | Performance meets some requirements of the position but does not consistently meet the key, most important duties, responsibilities, requirements, expectations and/or objectives. |
| **1 - 1 - Unacceptable** | Employee demonstrates work that is clearly below the level of acceptability and immediate and substantial improvement is necessary. |

Case 1:24-cv-00248-TRM-MJD    Document 28-5    Filed 08/18/25    Page 8 of 18
Printed on 06/26/2025                     PageID #: 313                      Page 2 of 12
MILLENNIA000129

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 142 of 229
PageID #: 519

## Instructions

Conducting employee performance appraisals is a productive and meaningful activity that positively contributes to the success of our organization. For each of the questions or key performance indicators, you should measure the productivity of the employee and how he/she builds relationships across all levels of your organization to assist with effective and coordinated work.

| 1 - Financial Performance - CNOI - Location/Area | Weighted at 15% |
|---|---|
| **The Controllable Net Operating Income goal is met if the business exceeds or comes within 2% of the Full-Year Budget. Properties and area scores will be negatively impacted if an advance of funds was received if the company could not pay management fees, and/or the location needed assistance with payroll costs.**<br><br>**\*\*SCORES WILL BE PROVIDED \*\* Managers must enter the score provided by leadership.**<br><br>**There will only be three scoring options:**<br><br>**"5 - EXCELLENT" will be scored if the property exceeded or came in within 2% of Full Year Budgeted Controllable Net Operating Income**<br><br>**"3 - Acceptable" will be scored if the business failed to meet the financial requirements but there was extenuating circumstances. This will only be used with approval from Vice President and Human Resources.**<br><br>**"1 - UNACCEPTABLE" will be scored if the property did not meet objective** | |
| Category - KPI - Financial/Results Driven | |

## Reviewer Response

| 2.0 | 2 - Needs Improvement |
|---|---|

Comments not provided

| | Weighted at 10% |
|---|---|
| | |

Case 1:24-cv-00248-TRM-MJD    Document 28-5    Filed 08/18/25    Page 9 of 18
Printed on 06/26/2025          PageID #: 314                          Page 3 of 12
MILLENNIA000130
Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 143 of 229
PageID #: 520

**2 - Financial Performance - Individual Contribution**

**The Controllable Net Operating Income goal is met if the business exceeds or comes within 2% of the Full-Year Budget. Properties and area scores will be negatively impacted if an advance of funds was**

**received if the company could not pay management fees, and/or the location needed assistance with payroll costs.**

**All employees are responsible for the financial health of the business as it pertains to their role and responsibilities. How did the employee's performance influence the financial health of the business positively or negatively?**

**For example, if the property met it's financial objectives, did the employee significantly affect the financial by completing duties timely and with a high quality of work focus on driving business results?**

Category - KPI - Financial/Results Driven

## Reviewer Response

| 2.0 | 2 - Needs Improvement |
|-----|------------------------|

Comments not provided

**3 - REAC Location/Area Score - Real Estate Assessment Center Inspection**                                      Weighted at 15%

**\*\*SCORES WILL BE PROVIDED TO MANAGERS\*\* Managers must add the score in the comment section and rate as directed by Human Resources. There will only be two scoring options if the location had a REAC in 2022.**

**"Excellent" - the property earned a score of 60 or above**
**"Unacceptable" - the property earned a score of 59 or lower**

**If the location did not have a REAC in 2022, the location would be rated according to the location's REAC readiness throughout 2022. This may include a score of "3 - Acceptable" in some cases. In addition, newer employees who were not with the Company at the inspection may also receive a "3 - Acceptable". Both situations will need leadership and HR approval.**

Category - KPI - REAC

## Reviewer Response

Case 1:24-cv-00248-TRM-MJD    Document 29-5    Filed 08/18/25    Page 10 of 18
Printed on 06/26/2025    MILLENNIA000131    Page 4 of 12
PageID #: 315
Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 144 of 229
PageID #: 521

| 3.0 | 3 - Acceptable |
|------|----------------|

Comments not provided

| **4 - REAC - Individual Contribution - Real Estate Assessment Center Inspection** | Weighted at 10% |
|---|---|
| **Please rate the employee's performance on their contribution to keeping the location/area REAC ready throughout 2022.** | |
| **If the property had a REAC Inspection 2022, how did the employee's performance influence the score positively or negatively? For example, if the property received a passing score, did the employee significantly affect this score outside the help of others? Did they have good attendance and a positive attitude throughout the process? Did the employee travel to other locations to assist with other location REACs? If so, this would increase their rate and should be acknowledged in the comments.** | |
| **Rate the employee accordingly and add detailed notes in the comment section. Keep in mind the employee's individual performance may differ from the previous question, REAC Location or Area score. For Example, the location may have failed the REAC, but the employee may have been very skillful and accomplished all individual goals, but another factor may have caused the failed score. In this case, the employee should be rated fairly with an "3 - Acceptable" or higher to acknowledge their efforts.** | |
| **Category -** KPI - REAC | |

**Reviewer Response**

| 2.0 | 2 - Needs Improvement |
|------|-----------------------|

Comments not provided

| | Weighted at 15% |
|---|---|
| | |

Case 1:24-cv-00248-TRM-MJD   Document 29-5   Filed 08/18/25   Page 11 of 18
PageID #: 310
MILLENNIA000132
Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 145 of 229
PageID #: 522

**5 - MOR - Location/Area - File Audits and Management Occupancy Reviews**

**\*\*SCORES WILL BE PROVIDED to Managers\*\* Manager must add the score in the comment section and rate directed below. There will only be two scoring options.**

**"5 - EXCELLENT" will be scored if the property earned a "Satisfactory" MOR rating.**
**"1 - UNACCEPTABLE" will be scored if the property earned anything**

**that was rated below "Satisfactory."**

**If the location did not have a MOR in 2022, the location would be rated according to the location's MOR readiness throughout 2022. This may include a score of "3 - Acceptable" in some cases. In addition, newer employees who were not with the Company at the inspection may also receive a "3 - Acceptable". Both situations will need leadership and HR approval.**

**Category** - KPI - MOR

## Reviewer Response

| 2.0 | 2 - Needs Improvement |

Comments not provided

**6 - MOR - Individual Contribution - File Audits and Management Occupancy Reviews**

Weighted at 10%

**Please rate the employee's performance on their contribution to keeping the location/area MOR ready throughout 2022.**

**If the property had a MOR Inspection 2022, how did the employee's performance influence the score positively or negatively? For example, if the property received a passing score, did the employee significantly affect this score outside the help of others? Did they have good attendance and a positive attitude throughout the process? Did the employee travel to other locations to assist with other location MORs? If so, this would increase their rate and should be acknowledged in the comments.**

**Rate the employee accordingly and add detailed notes in the comment section. Keep in mind the employee's individual performance may differ from the previous question, MOR Location or Area score. For Example, the location may have failed the MOR, but the employee may have been very skillful and accomplished all individual goals, but another factor may have caused the failed score. In this case, the employee should be rated fairly with an "3 - Acceptable" or higher to acknowledge their performance and efforts.**

Printed on 06/26/2025

MILLENNIA000133

Page 6 of 12

Case 1:24-cv-00248-TRM-MJD   Document 29-5   Filed 08/18/25   Page 12 of 18
PageID #: 317

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 146 of 229
PageID #: 523

| Category - KPI - MOR |
| --- |

## Reviewer Response

| 2.0 | 2 - Needs Improvement |
| --- | --- |

Comments not provided

| **7 - Unit Turn and Inspections** | Weighted at 5% |
| --- | --- |
| **Average unit turnaround time completed unit turns within 5 days, Employee assists with timely unit turn related to his/her position. Units are inspected and made readily available to rent for applicants and residents.** | |
| **\*\*SCORES WILL BE PROVIDE TO MANAGERS\*\* Once the scores are received, Manager must add the score in the comment section and rate directed below. There will only be two scoring options.** | |
| **"5 - EXCELLENT" will be scored if the property's average unit turn is less than industry standard five days.** | |
| **"1 - UNACCEPTABLE" will be scored if the property's average unit turn is greater than industry standard five days.** | |
| Category - KPI - Unit Turn | |

## Reviewer Response

| 2.0 | 2 - Needs Improvement |
| --- | --- |

Comments not provided

| | Weighted at 5% |
| --- | --- |

MILLENNIA000134

Case 1:24-cv-00248-TRM-MJD   Document 29-5   Filed 08/18/25   Page 13 of 18
Printed on 06/26/2025                                PageID #: 318                                Page 7 of 12
Case 1:24-cv-00248-TRM-MJD      Document 30-1      Filed 09/08/25   Page 147 of 229
PageID #: 524

**8 - Customer Service**

Always acts professionally and calmly when interacting with others; consistently demonstrates concern and courtesy towards colleagues and customers; treats all people respectfully; takes personal responsibility for correcting problems; follows up with individuals to ensure satisfaction with the level of service they have received.
- Works well with other staff and third parties
- Remains calm in stressful situations
- Demonstrates pleasant disposition that puts people at ease
- Builds and maintains customer satisfaction with the products and services offered by the organization; provides excellent service to internal and external customers.

**Examples:**
• Can describe customers' business and expectations. Shows interest in, anticipates, and responds timely to customer needs.
• Focuses on the customer's business results, rather than own. Goes beyond basic service expectations to help customers implement complete solutions.
• Delivers products and services when and where the customer needs them. Explores options when unable to deliver a requested product or service and pursues solutions until the customer is satisfied.
• Provides to customers status reports and progress updates. Seeks customer feedback and ensures needs have been fully met.
• Seeks ways to improve service delivery. Assesses the organization and its services from the customer's point of view. Emphasizes a team approach to providing great customer service.
• Recognizes adverse customer reactions and develops better alternatives.
• Presents a positive disposition when interacting with customers.

Category - KPI - Customer Service 2022

## Reviewer Response

| 5.0 | 5 - Excellent |

Comments not provided

Weighted at 5%

Case 1:24-cv-00248-TRM-MJD    Document 29-5    Filed 08/18/25    Page 14 of 18
PageID #: 319
Printed on 06/26/2025                                                              Page 8 of 12

MILLENNIA000135

**9 - Communication**

**Expresses oneself clearly, respectfully and effectively when speaking and/or writing to individuals or groups; listens attentively; ensures that information is understood by all parties; shares information in a timely manner using the most appropriate method; presents well-organized information in a group setting.**

**Examples may include, but not limited to:**
**- Ensures that others on the team or involved in a project or effort are**

**kept informed and developments**
**- Ensures that important information from management is shared with employees and others as appropriate.**
**- Ensures that regular consistent communication takes place where necessary.**
**- Keeps manager informed about progress and problems.**
**- Gives and receives constructive feedback.**

**Category** -  Communication 2022

## Reviewer Response

| **5.0** | 5 - Excellent |

Comments not provided

---

**10 - Job Knowledge/Skills**        Weighted at 5%

**Measures employee's demonstrated job relevant knowledge and essential skills, such as work practices, policies, procedures, resources, laws, customer service, and technical information, as well as the relationship of work to the organization's mission. Also measured are the employee's self-improvement efforts to enhance skills and knowledge and to stay current with changes impacting the job.**

**Category** -  Job Knowledge

## Reviewer Response

| **5.0** | 5 - Excellent |

Comments not provided

Case 1:24-cv-00248-TRM-MJD   Document 29-5   Filed 08/18/25   Page 15 of 18
MILLENNIA000136
PageID #: 320
Printed on 06/26/2025
Page 9 of 12
Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 149 of 229
PageID #: 526

**11 - Teamwork**

Weighted at 5%

**1. Willingness to work harmoniously with others in getting a job done. Readiness to respond positively to instructions and procedures.**

**2. Works well with others, cooperating in both interpersonal and team relationships; fosters enthusiasm and maintains mutual trust, candor, and respect. If applicable, manages groups effectively and builds partnerships with others.**

**3. Has demonstrated engagement and is sensitive to diversity awareness and exhibits respect towards others**

**Examples:**
**- Fosters a sense of collegial partnership and teamwork**
**- Manages groups effectively by facilitating the participation and contributions of others and building shared goals**
**- Encourages cooperation and establishes common ground to achieve larger organization objectives**
**- Builds network of informal friendly relationships to get things done**
**- Works well as a member of a team**
**- Recognizes talented people and brings them together in unique ways to accomplish goals**

**Category** -  Teamwork 2022

## Reviewer Response

**5.0**  |  5 - Excellent

Comments not provided

Printed on 06/26/2025

Page 10 of 12

Case 1:24-cv-00248-TRM-MJD    Document 29-5    Filed 08/18/25    Page 16 of 18
PageID #: 321

MILLENNIA000137

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 150 of 229
PageID #: 527

## OVERALL COMMENTS

### Reviewer Response

| Overall Rating | Questions |
|---|---|
| **2.75 2 - Needs Improvement** | **2.75** |

Gail had a tough year with the portfolio under her supervision

MILLENNIA000138

Case 1:24-cv-00248-TRM-MJD   Document 29-5   Filed 08/18/25   Page 17 of 18
Printed on 06/26/2025                    PageID #: 322                    Page 11 of 12
Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 151 of 229
PageID #: 528

# SIGNATURES

_____     _____

**Employee Signature**                          **Reviewer Signature**

Case 1:24-cv-00248-TRM-MJD    Document 29-5    Filed 08/18/25    Page 18 of 18
Printed on 06/26/2025                    PageID #: 323                                    Page 12 of 12
Case 1:24-cv-00248-TRM-MJD       Document 30-1        Filed 09/08/25    Page 152 of 229
                                 PageID #: 529

# *Exhibit 6*

# Transcript of the Testimony of

## Debra Moore

July 02, 2025

GAIL A. GRIFFIN vs MILLENIA HOUSING MANAGEMENT, LLC, et al.



**Cleveland Reporting Partners, LLC**
(216) 459-7880
scheduling@clereporting.com
clereporting.com

```
 1      A.    Currently, four.

 2      Q.    Who are those employees?

 3      A.    By title?  If you can clarify that.

 4      Q.    Title and name.

 5      A.    Philip Krakowiak, payroll manager.

 6   Catherine Piedmont, human resource business

 7   partner.  Janine Cherry, human resource business

 8   partner.  And Emma Samuels, human resource

 9   assistant.

10      Q.    Who is your direct supervisor?

11      A.    Michael Pico, president and chief

12   operating officer.

13      Q.    Hold on just a second, let me turn my

14   volume up a little louder.

15            Okay.  What are your primary job

16   responsibilities?

17      A.    Overall responsibilities for payroll,

18   benefits, employee relations, policies and

19   procedures.  Most likely under the HR umbrella,

20   with the exception of the staffing, because I do

21   have a peer that's responsible for that.

22      Q.    And staffing at what level?

23      A.    All levels.

24      Q.    Okay.  Ms. Griffin just arrived here as

25   well.
```

*Cleveland Reporting Partners, LLC  (216) 459-7880*
*CLFreporting.com*

Case 1:24-cv-00248-TRM-MJD     Document 29-6     Filed 08/18/25     Page 3 of 15
PageID #: 326

Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25     Page 155 of 229
PageID #: 532

```
 1      Q.    What type of employee evaluations are

 2   done for property managers?

 3      A.    If you can be a little bit more specific

 4   in the timing because the process, or the way it

 5   has been facilitated has changed -- the way it

 6   was done in the past as it is today, which is an

 7   electronic version.  I don't know how granular

 8   you want me to go.

 9      Q.    Well, prior to an electronic evaluation,

10   were they evaluated with a pen and paper?

11      A.    I believe they were, yes.

12      Q.    Okay.  Let's go to the electronic

13   version.  When did the electronic evaluations

14   begin?

15      A.    So, we had two different types.  The one

16   that I recall was more an Excel spreadsheet

17   version.  And then probably three to four years

18   ago we went to the ADP, which is a software --

19   our payroll solution, that we then implemented

20   performance management through that process.

21      Q.    Okay.  Who evaluates -- let's just talk

22   about the current system, the electronic ADP

23   version.  Who evaluates property managers?

24      A.    Their direct supervisor.

25      Q.    Who would a direct supervisor of a
```

**Cleveland Reporting Partners, LLC  (216) 459-7880**
*CLPreporting.com*

Case 1:24-cv-00248-TRM-MJD　　Document 29-6　　Filed 08/18/25　　Page 4 of 15
PageID #: 327

Case 1:24-cv-00248-TRM-MJD　　Document 30-1　　Filed 09/08/25　　Page 156 of 229
PageID #: 533

```
 1    property manager be?

 2        A.    It depends on the structure and the

 3    staffing levels.

 4        Q.    I'm just trying to get an idea of the

 5    hierarchy of the properties.

 6              If we start at the property level,

 7    there's going to be a manager of that individual

 8    property; is that correct?

 9        A.    Correct.

10        Q.    That property could have any number of

11    rental units in it; is that right?

12        A.    Correct.

13        Q.    And someone is in charge of that

14    property.  What would that person's title be?

15        A.    It depends on the structures.  It really

16    depends.  It depends upon the structure and it

17    depends upon the staffing levels.

18        Q.    Would one property manager manage

19    multiple properties?

20        A.    Yes, they can.

21        Q.    And who would be above the property

22    manager in that case?

23        A.    Are you looking for a specific title?

24        Q.    Yes.

25        A.    So, again, it depends.  It could be a
```

```
 1      A.    A combination.  We have frequent
 2  operation's meetings.  And in these meetings we
 3  discuss occupancy, receivables, and anything else
 4  that's compliance-related matters.  So there was
 5  a number of factors or information that led to
 6  that plan.
 7      Q.    Who was involved in that meeting?
 8      A.    So we've had multiple meetings just to
 9  be clear.  There were multiple operational review
10  meetings.  Typically in those operational review
11  meetings we have a number of individuals that
12  represent various departments that impact the
13  financial performance of the properties.  They
14  can report on the financial performance and
15  operations of the property.
16      Q.    Specifically looking at the performance
17  improvement plan, the first time that you were
18  made aware of a performance improvement plan, do
19  you recall who first made you aware of the need
20  for that?
21      A.    It was in a meeting with a number of
22  individuals.  And it was in agreement that the
23  properties are declining and we have to take
24  action.
25      Q.    And do you recall who the individuals
```

Page 19

```
 1   were in that meeting?
 2       A.    It would have been Alan Weckerly, Frank
 3   Sinito, a member of our compliance team, a member
 4   of our financing -- and again, these are
 5   individuals that are part of these calls.  A
 6   member of our financial team, they prepare the
 7   financial documents, a purchasing manager.  And
 8   again, this is typical in the meetings that we
 9   have.  And I'm sure I'm missing or left some
10   person out.
11       Q.    Do you frequently place employees on
12   performance improvement plans?
13       A.    When they're not performing, yes.
14       Q.    During 2022 and 2023, do you recall how
15   many performance improvement plans were
16   implemented by the company?
17       A.    I do not.
18       Q.    Do you have a ballpark guess as to --
19       A.    I have -- this is 2025.  I have no idea.
20       Q.    Do you recall any other regional
21   director being placed on a performance
22   improvement plan?
23       A.    With my tenure, yes.
24       Q.    And who were those individuals?
25       A.    I don't recall the names of each and
```

Cleveland Reporting Partners, LLC  (216) 459-7880
CLFreporting.com

Case 1:24-cv-00248-TRM-MJD   Document 29-6   Filed 08/18/25   Page 7 of 15
PageID #: 330

Case 1:24-cv-00248-TRM-MJD   Document 30-1   Filed 09/08/25   Page 159 of 229
PageID #: 536

Page 20

1    every person, but I know we have had regional

2    managers and regional directors placed on

3    performance plans.

4        Q.    Do you recall whether those individuals

5    successfully completed the performance

6    improvement plans?

7        A.    One that I can recall decided to resign.

8        Q.    And who was that individual?

9        A.    Again, I don't recall the name.  And

10   there may have been another, if my memory serves

11   me, and I don't recall her name.  We actually

12   did -- she ended up leaving the company.  We

13   separated her from the company.  And I don't

14   recall her name.

15       Q.    Do you expect the company to follow

16   through with their performance improvement plans?

17       A.    Please clarify that question.

18       Q.    Well, in a performance improvement plan

19   you're asking the employee to do X, Y and Z.  Do

20   you expect that the company would -- if the

21   employee did X, Y and Z would the company, you

22   know, continue the employment of the employee?

23       A.    So, yes.

24       Q.    Do you recall an employee by the name of

25   James /STKA*F?

Case 1:24-cv-00248-TRM-MJD    Document 29-6    Filed 08/18/25    Page 8 of 15
PageID #: 331

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 160 of 229
PageID #: 537

1    track that as well?

2         A.    No.

3         Q.    And based on -- would Alexandra Thompson

4    have had any involvement in completing this

5    review?

6         A.    I don't recollect the time frame of when

7    the transaction happened.  It has reports in our

8    system and identifies her as reporting to

9    Alexandra at the time, but it was issued to Alan

10   because that was a time period -- we will have

11   the reviewer be the person who had the most time

12   under the reporting relationship for that person.

13        Q.    And how is Ms. Griffin's performance

14   during this review period?

15        A.    It states 2.75 and needs improvement.

16        Q.    On page 5 of that document, 5 of 12?

17        A.    Yes, sir.

18        Q.    At the top of the page where it says

19   "REAC," what is an REAC?

20        A.    Real Assessment Center Inspection.

21        Q.    And in the evaluation metrics and the

22   instructions to the reviewer there, just take a

23   moment and read the second paragraph to yourself.

24        A.    Okay.

25        Q.    I'm sorry, I was on the wrong page.

*Cleveland Reporting Partners, LLC  (216) 459-7880*
*CLReporting.com*

Case 1:24-cv-00248-TRM-MJD     Document 29-6     Filed 08/18/25     Page 9 of 15
PageID #: 332

Case 1:24-cv-00248-TRM-MJD     Document 30-1     Filed 09/08/25     Page 161 of 229
PageID #: 538

```
  1       A.    Correct.

  2       Q.    Do you recall how old Alexandra Thompson

  3   was in 2023?

  4       A.    I do not.

  5       Q.    Let me hand you Exhibit 1 in our stack,

  6   Griffin 00084.

  7                    - - - - -

  8             (Deposition Exhibit 5, Griffin 00084,

  9             was marked for identification purposes.)

 10                    - - - - -

 11       Q.    Do you see that?

 12       A.    Yes.

 13       Q.    "Regional Managers and Directors as of

 14   October 18, 2023."  Do you see that?

 15       A.    Yes, sir.

 16       Q.    It has a list of names?

 17       A.    Yes, sir.

 18       Q.    And ages?

 19       A.    Yes, sir.

 20       Q.    How old was Alexandra Thompson at that

 21   time?

 22       A.    39.

 23       Q.    And how old was Onix Sosa?

 24       A.    55.

 25       Q.    I can't pronounce her name.  Jacinta
```

**Cleveland Reporting Partners, LLC  (216) 459-7880**
CLFreporting.com

Case 1:24-cv-00248-TRM-MJD    Document 29-6    Filed 08/18/25    Page 10 of 15
PageID #: 333

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 162 of 229
PageID #: 539

Page 48

```
 1   of 2023 -- May 2nd.

 2      Q.    And you delivered that performance plan

 3   to Ms. Griffin in Knoxville?

 4      A.    Yes.

 5      Q.    Who was in that meeting?

 6      A.    Alan Weckerly was on Teams, and I was in

 7   person with Gail.

 8      Q.    And do you recall telling Ms. Griffin

 9   that at your age, you can go ahead and retire, or

10   you could become a property manager?

11      A.    No, sir.

12      Q.    Did you offer her a severance package at

13   that time?

14      A.    Yes.

15      Q.    If she had accepted that severance

16   package, she would have retired, correct?

17      A.    I don't know what she would have done,

18   but she would no longer be employed with the

19   company.

20            MR. JACKSON:  Objection.

21            THE WITNESS:  Sorry, Russell.

22   BY MR. BURNETTE:

23      Q.    Was that the last time that you met with

24   Ms. Griffin?

25      A.    I believe so.
```

*Cleveland Reporting Partners, LLC  (216) 459-7880*
CLRreporting.com

Case 1:24-cv-00248-TRM-MJD    Document 29-6    Filed 08/18/25    Page 11 of 15
PageID #: 334

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 163 of 229
PageID #: 540

1      Q.      Did you speak with her on the telephone

2  anytime after that?

3      A.      I might have.  I don't recall.

4      Q.      I have one more thing to go over with

5  you.

6      A.      Yes, sir.

7      Q.      Let me hand you Exhibit 8 on our list,

8  Bates Number 00097 - 00099.

9                        - - - - -

10             (Deposition Exhibit 6, Millenia 00097 -

11             00099, was marked for identification

12             purposes.)

13                        - - - - -

14      Q.      Can you identify this document?

15      A.      This document is from Michael Pico,

16  talking points to Gail Griffin.

17      Q.      Do you know why there's a large blank in

18  the e-mail that starts very low in the page?

19      A.      No.

20      Q.      Okay.  I don't either.

21             On page 2 of this document, it appears

22  that there's some numbered points that appeared

23  to have been copied and pasted in.  And it

24  appears to be from you?

25      A.      Correct.  I would have sent this to

Page 50

```
 1   Michael Pico.

 2       Q.    So he was creating talking points for

 3   her termination meeting, it looks like; is that

 4   correct?

 5       A.    Correct.

 6       Q.    And you sent -- so the part of the

 7   e-mail that you authored is the Number 1, and

 8   then A, B, C, D, E, F, 2, 3, 4, 5, 6, 7, 8?

 9       A.    Yes, sir.

10       Q.    You believe you sent that to him?

11       A.    Yes, sir.

12       Q.    Take a minute and review part of this

13   e-mail that you authored and I'll ask you a

14   couple questions about that.

15       A.    Okay.

16       Q.    This e-mail is about a month, or a

17   little less than a month, after the e-mail from

18   Mr. Emerson where he said that she was doing

19   amazing on receivables; is that correct?

20       A.    I actually don't have the date when this

21   was submitted to him, so I don't know.

22       Q.    It refers to issues in April?

23       A.    Which number, sir?

24       Q.    Number 1-d-i.

25       A.    Yes.  Okay.
```

Page 53

1   successful as a property manager prior to her

2   termination?

3       A.    Well, she was termed.  I believe she was

4   at the property and then she was terminated.

5       Q.    She was demoted to property manager of

6   the Overlook on June 16, 2023, correct?

7       A.    She was what?

8       Q.    Demoted to property manager.

9       A.    Correct.

10      Q.    And it was to be effective June the

11  24th, I believe; is that correct?

12      A.    We always use a beginning pay period

13  date in payroll, so it's always the specific date

14  of the transaction.  For example, if payroll

15  closes on, say, the 15th, and it happened in mid

16  payroll week, we would either err in favor of the

17  employee keeping a higher salary, and typically

18  make that a later date.

19      Q.    So if she was demoted around June 16th

20  and she was terminated on June the 22nd, do you

21  feel that she had an opportunity to be successful

22  as the property manager prior to her termination?

23      A.    Could have been.

24      Q.    That should have been enough time to be

25  a successful property manager?

Page 54

```
 1      A.    Again, I can't make that judgment of

 2   what she could have done.

 3      Q.    It was, like, five days.  She was

 4   terminated five days after being demoted to

 5   property manager, a position that she has

 6   excelled in in the past; is that correct?

 7      A.    It appears.  Based upon information that

 8   was brought to our attention is the reason for

 9   the separation.

10      Q.    What information was brought to your

11   attention?

12      A.    Additional performance deficiencies, the

13   staff complaints.  And this was brought to our

14   attention when Alexandra was at the property

15   level visiting properties.  And that's why the

16   decision was made to separate.

17      Q.    And Alexandra was the new regional

18   property director?

19      A.    Yes, sir.

20      Q.    And she was 39 years old, correct?

21      A.    Yes, sir.

22            MR. BURNETTE:  I have no further

23   questions.  Anything from you, Russell?

24                     -  -  -  -  -

25
```

Case 1:24-cv-00248-TRM-MJD    Document 29-6    Filed 08/18/25    Page 15 of 15
PageID #: 338

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 167 of 229
PageID #: 544

1    had a REAC and it was above 60, they should have

2    gotten a 5, right?

3        A.    Correct.

4        Q.    And if it was below a 59, they should

5    have gotten a needs improvement?

6        A.    Unacceptable, correct.

7        Q.    And so you believe the reviewer in this

8    case probably did not follow the instructions?

9        A.    It appears so.

10        Q.    What about for Section 4 --

11        A.    I'm sorry.  If you read down below, it

12    says, "This may include a score of 3 - acceptable

13    in some cases.  In addition, newer employees who

14    were not with the company at the inspection may

15    receive a 3 - acceptable.  Both will need HR

16    approval."

17            When I'm reading that, yes, she could

18    have received a 3 because it says "Acceptable in

19    some cases."

20        Q.    But that would have needed HR approval?

21        A.    No.  In the event that they were taking

22    over a new portfolio, and if you have not been

23    with the portfolio enough time to make an impact,

24    then you would have gotten -- if they failed a

25    REAC, then they would have gotten a 3 because

1    they would not have been able to impact that

2    score.  So that would have been a 3, so he did

3    follow directions.

4        Q.    Okay.  But if they had a REAC and scored

5    over a 60, they should have gotten a 5, right?

6        A.    But in this portfolio, when you have

7    multiple properties -- and it doesn't state that.

8    If she had however many properties within the

9    portfolio, this is not one property specific.

10   This is a combination.  So if you have, say, 15

11   properties, then the score would have been

12   acceptable.  Some failed, some passed, couldn't

13   influence them, so, yes, it would have been an

14   acceptable score.

15       Q.    Do you recall whether Ms. Griffin ever

16   failed a REAC in any of her properties?

17       A.    I don't recall.

18       Q.    Well, the next page also deals with

19   REAC.  If she received a needs improvement --

20       A.    Yes.  So that was her individual

21   contribution to the REAC.

22       Q.    What is an "MOR" rating in the next

23   section?

24       A.    That's a Management Occupancy Review.

25       Q.    Explain what that is.

Page 32

1      A.     With our HUD or Section 8 properties,

2    REAC is a physical aspect of the building.  The

3    MOR is the paperwork.

4      Q.     So in Section 5 it says there will only

5    be two scoring options, 5 - Excellent or

6    1 - Unacceptable?

7      A.     Correct.

8      Q.     And the reviewer rated her as a 2?

9      A.     Yes.

10     Q.     Can you explain that?

11     A.     I cannot explain that.  I was not the

12   reviewer.

13     Q.     Is that sort of like asking a true and

14   false question and someone says "All of the

15   above"?  There are only two scoring options, a

16   5 or a 1, and they've given a 2?

17     A.     I can't -- I can't speak for the

18   individual that provided this score, so I don't

19   know.

20     Q.     But would it appear to you that they did

21   not follow the directions of the form?

22     A.     It could have been read in error, you

23   know.  Again, I can't guess at why the 2 came up

24   here -- or why there was a 2.

25     Q.     Same thing with Section 7 on the next

1    page.  There will only be two scoring options,

2    5 - Excellent or 1 - Unacceptable?

3        A.    Correct.  Should have been a 1.

4        Q.    Ms. Griffin received a 2?

5        A.    Yes.

6        Q.    Again, the reviewer didn't follow the

7    instructions?

8        A.    It appears.

9        Q.    In Section 8 on the following page,

10   Customer Service, what did Ms. Griffin score

11   there?

12       A.    A 5.

13       Q.    And that would be excellent?

14       A.    Yes.

15       Q.    Number 9 on the following page appears

16   to also deal with communication.  What was her

17   score?

18       A.    A 5, an excellent.

19       Q.    And Section 10 deals with job knowledge

20   and skills?

21       A.    5, excellent.

22       Q.    Team work?

23       A.    5, excellent.

24       Q.    The following page gives an overall

25   rating.  What was her overall rating?

Page 34

1      A.    2.75 and needs improvement.

2      Q.    If the reviewer had correctly completed

3   the form, I believe that her overall score would

4   have been higher?

5      A.    Lower.  It would have been lower.

6      Q.    It would have been lower?

7      A.    Uh-huh.

8      Q.    Can you explain why you believe it would

9   be lower?

10     A.    Instead of a 2, it would have been --

11  for the unit turn and inspections, going back to

12  the REAC where he scored a -- wait a minute.

13  Where he scored a 2, needs improvement, it should

14  have been a 1, unacceptable.  Both categories.

15  So it would have lowered the score.

16     Q.    Which page are you referring to?

17     A.    The MOR, number 5.  It's either 5,

18  excellent or 1, unacceptable.  So it should have

19  been a 1.  And then MOR number 6, right there

20  after, it was either 5, excellent or 1,

21  unacceptable.  He scored 2, it should have been

22  a 1.

23     Q.    That only deals with if the property had

24  an MOR inspection for 2022?

25     A.    Again, I'm assuming they did have an MOR

Page 35

1   and it did not -- and we failed or did not meet

2   the level that would have received a higher

3   score.

4        Q.    If the MOR was completed for her

5   properties and they were in the acceptable range,

6   she should have received a 5, correct?

7        A.    Correct.

8        Q.    And her score would have gone up

9   overall?

10       A.    Correct.  However, when you have

11  multiple properties, if you receive a failing

12  score on any of those, then it's an unacceptable.

13       Q.    Same with the REAC?

14       A.    Correct.

15       Q.    So because she received a 2 there, you

16  believe she should have received a 1?

17       A.    Correct.

18       Q.    And if, in fact, all of her properties

19  scored above a 60, she should have received a 5;

20  is that correct?

21       A.    Correct.

22       Q.    And her score would have gone up?

23       A.    Correct.  Going even to the financial

24  performance, number 1, it's either a 5, a 3, or a

25  1, and he scored her a 2.  And that would have

1    lowered the score even more.

2       Q.    What does the evaluation -- what does

3    that deal with?

4       A.    The CNOI, the financial performance of

5    the property.

6       Q.    Is that an objective evaluation or a

7    subjective evaluation?

8       A.    Objective.  We provide financial data.

9       Q.    And the REAC portion and the MOR

10   portion, those would both be objective as well,

11   correct?

12      A.    Correct, yes.

13      Q.    So you're basing your conclusion that

14   her score should have been lower, you're assuming

15   she failed REACs?

16      A.    MORs.  And did not meet the financial

17   obligations, correct.

18      Q.    Okay.  If she had passed all of the

19   REACs and passed all of the MORs, then her score

20   would have been substantially higher, correct?

21      A.    Correct.

22      Q.    When was this review set to be

23   completed?

24      A.    Target date was March 31, 2023.

25      Q.    Do you have any reason to believe that

1   it was not completed at that time?

2       A.    I -- no, I have no reason to believe

3   that.

4       Q.    And do you know whether this performance

5   evaluation was used to determine whether she

6   should be placed on a performance improvement

7   plan?

8       A.    I do not recall.

9       Q.    On April 29th Ms. Griffin was demoted to

10  a regional manager position?

11      A.    Correct.

12      Q.    And that was shortly after the

13  completion of this form; is that correct?

14      A.    I'm sorry, ask that question again.

15      Q.    The performance review had a target

16  completion date of March 31, 2023?

17      A.    Correct.

18      Q.    And on April 29th, 2023 she was demoted

19  to a regional manager position, about 29 days

20  later?

21      A.    And the question is?

22      Q.    I didn't ask one.

23      A.    Okay.  I just wanted to make sure.

24      Q.    On May 2, 2023 Ms. Griffin was placed on

25  the performance improvement plan; is that

Page 38

1    correct?

2      A.    Correct.

3      Q.    Do you recall discussing Ms. Griffin's

4    responses to the performance improvement plan

5    with anyone?

6      A.    I don't recall.

7      Q.    I forgot tell you, if at any time you

8    need to take a break --

9      A.    Perfect timing.  Five minutes.

10     Q.    That's fine.

11              (Recess taken.)

12   BY MR. BURNETTE:

13     Q.    Let me ask that Exhibit 12 in our stack

14   be handed to you.

15                  - - - - -

16          (Deposition Exhibit 3, Millennia 00095 -

17          00096, was marked for identification

18          purposes.)

19                  - - - - -

20     Q.    Ms. Moore, could you identify this

21   document?

22     A.    It was an e-mail from our former

23   employee, BJ Everson, sent to Gail.

24     Q.    And where is -- what was Mr. Everson's

25   title?

Page 39

```
 1      A.     Director of asset management.

 2      Q.     And you said he's a former employee?

 3      A.     Yes, sir.

 4      Q.     And when did he leave the company?

 5      A.     I believe in 2023.  I'm not sure of the

 6   month or the day.

 7      Q.     And why did he leave the company?

 8      A.     We had a series of reduction in force.

 9      Q.     The date of this e-mail is May 28, 2023,

10   correct?

11      A.     Yes, sir.

12      Q.     And it was sent to Gail Griffin and you

13   were on the -- you were copied on it, it looks

14   like; is that correct?

15      A.     Yes, sir.

16      Q.     Go ahead and -- have you reviewed this

17   document recently?

18      A.     Yes, sir.

19      Q.     This is in response -- this is shortly

20   after she was placed on the PIP; is that right?

21      A.     Yes, sir.

22      Q.     And Mr. Emerson says, "This is an

23   amazing amount of progress since the prior update

24   in May.  Great efforts by you and your team"?

25      A.     Yes, sir.
```

1    Q.    And then he highlights several sections.

2   "Collections, amazing efforts here across the

3   board"?

4    A.    Yes.

5    Q.    It looks like the move in, she did a

6   good job in that.  Does that look correct?

7    A.    No.  The property lost tenants, so

8   that's not a great sign for the properties.  No,

9   that's not good.

10    Q.    The property lost one to five tenants in

11   May and had a total of seven move-ins in May?

12    A.    Again, without knowing the detail of

13   these numbers, I can't really comment on it.

14    Q.    Okay.  Below that it says, "Please let

15   us know your largest move-in issue is per

16   property, and we will get you the resources."

17         Does it look like she was -- do you know

18   what was going on there?  Why she needed

19   additional resources?

20    A.    I do not.

21    Q.    But that was something the company

22   needed to provide her to address that?

23    A.    It depends upon what the issue was, so I

24   cannot really answer.  Again, I don't know the

25   specific issues of the property.

Page 41

1      Q.     Okay.

2      A.     Again, "per property," so there were

3   multiple properties.

4      Q.     The recertifications, he states,

5   "Amazing progress across all properties since the

6   last update."  That's pretty good, isn't it?

7      A.     It was progress that was being made, and

8   that should have been made.  There should not

9   have been late recertifications in the first

10  place, but there were.  There was still past due

11  certifications.  And past due certification means

12  the company is at risk of losing income.

13     Q.     The rent rolls, he states, "Thank you

14  for the levels for Morningside and Maple Oak.

15  Please let us what you need from a supplies

16  perspective and if additional manpower is needed.

17  Once we have the supply list we can engage

18  Dominic and get them ordered"?

19     A.     I'm not clear on the rent rolls -- the

20  meaning of the "rent rolls."  What he's

21  mentioning in here is not making sense to me.

22  But again, this is operations so I don't -- I

23  can't -- I don't know what information that he

24  used to provide this information.

25     Q.     Okay.  Again, the last topic point was

1    "Delinquent & Prepaid."  So, "This is the third

2    area that showed massive improvements since our

3    last update.  Thank you for these efforts."

4          So about 25 days after she was placed on

5    the performance improvement plan, she received

6    what I would describe as a glowing review.  Would

7    you describe it that way as well?

8       A.    No, sir, not from my -- I would not

9    describe it as "glowing."

10      Q.    How would you describe this?

11      A.    Knowing the severity of the collections,

12   the late recertifications, and I believe the rent

13   rolls, it could be occupancy levels, they were so

14   severely -- the properties were so severely

15   underperforming.  This was at least getting them

16   up to where they should have been.  So I believe

17   his "amazing" comments were just his way

18   of -- his communication.  But this is not amazing

19   efforts.  If you're at ground zero and it should

20   be at 100, and you bring it to 40, it's not still

21   not passing.  And again, I don't have those

22   numbers in front of me, but that's my assessment

23   of this e-mail.

24      Q.    Your assessment of the e-mail that says

25   amazing efforts here across the board, and

 1    amazing progress throughout all properties, and

 2    this is the third area that showed massive

 3    improvements, all properties are up to date, your

 4    assessment of this e-mail is that she was

 5    performing poorly?

 6        A.    I didn't say performing poorly.  I said

 7    not performing to par.  She was still not

 8    performing to where the properties should have

 9    been.

10        Q.    I'll hand you the next document.  It was

11    Exhibit 13.  Griffin 000137 to 000138.

12                     - - - - -

13            (Deposition Exhibit 4, Griffin 000137 -

14            000138, was marked for identification

15            purposes.)

16                     - - - - -

17        Q.    Could you identify what these documents

18    are?

19        A.    Accounts Receivable - Subjournal Detail.

20        Q.    Are these the objective data that would

21    be used in an employee evaluation?  Would these

22    numbers be part of that?

23        A.    This does not seem familiar to me for

24    the numbers that I've seen.  This is not what we

25    receive when we do our annual -- when we provide

1   the information on an annualized basis.  And to

2   be honest with you, I don't know what this

3   report --

4       Q.    It says, "Daily Current Period - Ending

5   05/27/2023," so shortly after that amazing

6   e-mail.  Do you see that Alexandra Thompson has a

7   past due of $693,507?

8       A.    That's what the report shows.

9       Q.    Gail Griffin's past due was only

10  $282,000.

11          The next page is the accounts receivable

12  ending 12/02/2023; is that correct?

13      A.    Yes.

14      Q.    And Alexandra Thompson's accounts

15  receivable at that time was $2.8 million; is that

16  correct?

17      A.    That's what the report shows.

18      Q.    Okay.

19      A.    But again, I don't know what makes up

20  these numbers.  If the property is under

21  construction -- so again, I don't -- these are

22  numbers, but there's more to what these numbers

23  mean and I don't have that information.

24      Q.    Onix Sosa had $2.5 million in accounts

25  receivable at that time; is that correct?

Page 45

1    A.    Correct.

2    Q.    Do you recall how old Alexandra Thompson

3    was in 2023?

4    A.    I do not.

5    Q.    Let me hand you Exhibit 1 in our stack,

6    Griffin 00084.

7                  - - - - -

8          (Deposition Exhibit 5, Griffin 00084,

9          was marked for identification purposes.)

10                 - - - - -

11   Q.    Do you see that?

12   A.    Yes.

13   Q.    "Regional Managers and Directors as of

14   October 18, 2023."  Do you see that?

15   A.    Yes, sir.

16   Q.    It has a list of names?

17   A.    Yes, sir.

18   Q.    And ages?

19   A.    Yes, sir.

20   Q.    How old was Alexandra Thompson at that

21   time?

22   A.    39.

23   Q.    And how old was Onix Sosa?

24   A.    55.

25   Q.    I can't pronounce her name.  Jacinta

```
 1   Miller, how old is she?

 2      A.    31.

 3      Q.    Do you recall how old Gail Griffin was

 4   at the time she was terminated?

 5      A.    No, I do not.

 6      Q.    If I told you she was 65 years old, do

 7   you have any reason to doubt that?

 8      A.    No, sir.

 9      Q.    In 2023, would she have been the oldest

10   regional manager or director?

11      A.    You said if she were on this list?

12      Q.    If she was a regional manager director

13   in 2023, correct.

14      A.    Yes.

15      Q.    And so is she the oldest regional

16   manager director in 2023?

17      A.    According to the list.

18      Q.    Do you recall whether Millenia

19   terminated any other regional managers or

20   directors during 2023?

21      A.    I don't recall.

22      Q.    Would you be able to produce a list of

23   regional directors or managers that were

24   separated from the company in 2023?

25      A.    Yes, if requested.
```

1        MR. JACKSON:  Are you asking if it's

2   possible?

3        MR. BURNETTE:  Correct.

4   Q.    Do you recall who made the decision to

5   terminate Ms. Griffin's employment?

6   A.    It would have been a combination of

7   individuals.

8   Q.    Do you have any idea who that

9   combination of individuals might have been?

10  A.    Based upon the timing of the separation,

11  it would have been her direct supervisor, the

12  head of operations, which would have been --

13  those are typically the decisionmakers.

14        MR. BURNETTE:  Let me take about a five

15  minute break really fast.  And hopefully we're

16  getting close to the end here.

17        MR. JACKSON:  Sounds good.

18            (Recess taken.)

19  BY MR. BURNETTE:

20  Q.    Ms. Moore, do you recall coming from

21  Cleveland down to Knoxville in 2023?

22  A.    Yes.

23  Q.    And was that in May, shortly after the

24  "amazing" e-mail?

25  A.    I delivered the performance plan in May

1    of 2023 -- May 2nd.

2        Q.    And you delivered that performance plan

3    to Ms. Griffin in Knoxville?

4        A.    Yes.

5        Q.    Who was in that meeting?

6        A.    Alan Weckerly was on Teams, and I was in

7    person with Gail.

8        Q.    And do you recall telling Ms. Griffin

9    that at your age, you can go ahead and retire, or

10   you could become a property manager?

11       A.    No, sir.

12       Q.    Did you offer her a severance package at

13   that time?

14       A.    Yes.

15       Q.    If she had accepted that severance

16   package, she would have retired, correct?

17       A.    I don't know what she would have done,

18   but she would no longer be employed with the

19   company.

20            MR. JACKSON:   Objection.

21            THE WITNESS:   Sorry, Russell.

22   BY MR. BURNETTE:

23       Q.    Was that the last time that you met with

24   Ms. Griffin?

25       A.    I believe so.

1    Q.    Did you speak with her on the telephone

2  anytime after that?

3    A.    I might have.  I don't recall.

4    Q.    I have one more thing to go over with

5  you.

6    A.    Yes, sir.

7    Q.    Let me hand you Exhibit 8 on our list,

8  Bates Number 00097 - 00099.

9              - - - - -

10         (Deposition Exhibit 6, Millenia 00097 -

11         00099, was marked for identification

12         purposes.)

13             - - - - -

14    Q.    Can you identify this document?

15    A.    This document is from Michael Pico,

16  talking points to Gail Griffin.

17    Q.    Do you know why there's a large blank in

18  the e-mail that starts very low in the page?

19    A.    No.

20    Q.    Okay.  I don't either.

21         On page 2 of this document, it appears

22  that there's some numbered points that appeared

23  to have been copied and pasted in.  And it

24  appears to be from you?

25    A.    Correct.  I would have sent this to

Page 50

1    Michael Pico.

2         Q.    So he was creating talking points for

3    her termination meeting, it looks like; is that

4    correct?

5         A.    Correct.

6         Q.    And you sent -- so the part of the

7    e-mail that you authored is the Number 1, and

8    then A, B, C, D, E, F, 2, 3, 4, 5, 6, 7, 8?

9         A.    Yes, sir.

10        Q.    You believe you sent that to him?

11        A.    Yes, sir.

12        Q.    Take a minute and review part of this

13    e-mail that you authored and I'll ask you a

14    couple questions about that.

15        A.    Okay.

16        Q.    This e-mail is about a month, or a

17    little less than a month, after the e-mail from

18    Mr. Emerson where he said that she was doing

19    amazing on receivables; is that correct?

20        A.    I actually don't have the date when this

21    was submitted to him, so I don't know.

22        Q.    It refers to issues in April?

23        A.    Which number, sir?

24        Q.    Number 1-d-i.

25        A.    Yes.  Okay.

1     Q.     She received the performance improvement

2  plan May 2nd.  And a lot of these -- the data

3  that is in this e-mail looks like it's talking

4  about 2022, December, April.  It just doesn't

5  look like it was current to me.  You don't know

6  when you authored the bullet points, I guess, is

7  that what your understanding is?

8     A.     Correct.  I don't recall.

9     Q.     At the time -- or following when she was

10 offered the -- when she was given the performance

11 improvement plan, she was demoted to regional

12 manager from regional director; is that correct?

13    A.     So I don't recall the specific time of

14 the change in her title, call it, the demotion

15 from her focusing then on the Tennessee portfolio

16 and no longer responsible for the Jacksonville

17 portfolio.  So it was a promotion to take on

18 Jacksonville, then went back to the original

19 title of regional manager over that Tennessee

20 portfolio.

21    Q.     And is it your recollection that she was

22 demoted to property manager of the Overlook

23 Apartments on June 16, 2023?

24    A.     If that's what the information shows,

25 correct.

1      Q.     And she would just be managing, at that
2   point, one property, correct?
3      A.     Correct, yes.
4      Q.     The bullet points that were referenced
5   in Millenia 98 and 99, those issues that you
6   bring up, do those deal with the management of
7   one property or do those deal with regional
8   director level issues?
9      A.     These are overall performance on
10  multiple properties.
11     Q.     Is there any justification that she
12  would not be able to be a property manager based
13  on the information that you've seen?
14     A.     At the time this information was
15  provided, that's why the offer was to go to
16  the -- I think it was a property manager.
17     Q.     She has been successful as a property
18  manager, correct?
19     A.     It appears to have been.
20     Q.     And was she given an opportunity to be
21  successful as a property manager prior to her
22  termination?
23     A.     Ask that question one or time, I'm
24  sorry.
25     Q.     Was she given an opportunity to be

1   successful as a property manager prior to her

2   termination?

3       A.    Well, she was termed.  I believe she was

4   at the property and then she was terminated.

5       Q.    She was demoted to property manager of

6   the Overlook on June 16, 2023, correct?

7       A.    She was what?

8       Q.    Demoted to property manager.

9       A.    Correct.

10      Q.    And it was to be effective June the

11  24th, I believe; is that correct?

12      A.    We always use a beginning pay period

13  date in payroll, so it's always the specific date

14  of the transaction.  For example, if payroll

15  closes on, say, the 15th, and it happened in mid

16  payroll week, we would either err in favor of the

17  employee keeping a higher salary, and typically

18  make that a later date.

19      Q.    So if she was demoted around June 16th

20  and she was terminated on June the 22nd, do you

21  feel that she had an opportunity to be successful

22  as the property manager prior to her termination?

23      A.    Could have been.

24      Q.    That should have been enough time to be

25  a successful property manager?

1    A.    Again, I can't make that judgment of

2  what she could have done.

3    Q.    It was, like, five days.  She was

4  terminated five days after being demoted to

5  property manager, a position that she has

6  excelled in in the past; is that correct?

7    A.    It appears.  Based upon information that

8  was brought to our attention is the reason for

9  the separation.

10    Q.    What information was brought to your

11  attention?

12    A.    Additional performance deficiencies, the

13  staff complaints.  And this was brought to our

14  attention when Alexandra was at the property

15  level visiting properties.  And that's why the

16  decision was made to separate.

17    Q.    And Alexandra was the new regional

18  property director?

19    A.    Yes, sir.

20    Q.    And she was 39 years old, correct?

21    A.    Yes, sir.

22    MR. BURNETTE:  I have no further

23  questions.  Anything from you, Russell?

24              -  -  -  -  -

25

# *Exhibit 7*

Transcript of the Testimony of

# Michael Pico

July 24, 2025

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.



**Cleveland Reporting Partners, LLC**
(216) 459-7880
scheduling@clereporting.com
clereporting.com

1   recruited me to Millennia.  So obviously I had a

2   connection with Lee, and then upon coming there

3   of course I met Frank.  And Frank had to sign off

4   on my hire.

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.     1:24-CV-00248-TRM
Michael Pico on 07/24/2025

5       Q.     Did you become friends with Frank?

6       A.     I wouldn't -- I wouldn't say we're

7   friends.  I would say he's my employer.  You

8   know, he's certainly the owner of the

9   organization, somebody I -- you know, I've worked

10  with for the better part of four years.

11      Q.     Now, you started to work for which

12  corporation in March of 2021?

13      A.     May of 2021 I started to work for

14  Millennia Housing Management.

15      Q.     And for Millennia Housing -- and what's

16  the rest of the name of the -- there are several

17  Millennias, and I'm trying to make sure --

18      A.     Millennia Housing Management.

19      Q.     You began work there, and what was your

20  job title?

21      A.     The chief human resource officer.

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

22      Q.     And how long did you work before you

23  were promoted?

24      A.     I was with Millennia until November 25th

25  of 2022 when I left the company for six months to

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

Case 1:24-cv-00248-TRM-MJD    Document 29-7    Filed 08/18/25    Page 3 of 13
PageID #: 341

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 195 of 229
PageID #: 572

```
 1   role at that point.  We had moved to -- for

 2   operations, I think there was, you know, senior

 3   VPs or EVPs of operations.  And then I was --

 4   remember, when I came back in May of '23 I was

 5   the chief administrative officer, so I took

 6   pieces of it.  I just didn't have operations

 7   directly reporting to me.

 8        Q.    Are you the CEO of the company at this

 9   point?

10        A.    No.  We do not have a CEO at this point.

11        Q.    But you do have a president, and you're

12   it?

13        A.    And I'm it, yeah.

14        Q.    Do you recall a phone conversation that

15   you had with Gail on the topic of an office that

16   she held, that she was a -- see if I can find it

17   here -- let me see if I understand the timeline

18   here.

19             She was fired on, I think, June 23rd.

20   And she was fired by you, and that was the -- you

21   didn't know anything more about it than whatever

22   somebody had told you?

23        A.    It wasn't somebody.  So I was fully

24   briefed on it the day of the termination by Debra

25   Moore.  Debra Moore, the VP of HR, was handling
```

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

Case 1:24-cv-00248-TRM-MJD    Document 29-7    Filed 08/18/25    Page 4 of 13
PageID #: 342

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 196 of 229
PageID #: 573

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

```
 1   the termination after Debra had found out that an

 2   extremely unprofessional derogatory comment was

 3   made about Debra.  Debra came to me and said that

 4   she felt not comfortable going forward with the

 5   termination based on that comment, and so it was

 6   asked if I would step in and do the termination.

 7   And the termination was going to be that day,

 8   because Alexandra Thompson was the -- the

 9   property director who was going to be onsite with

10   Gail that day.

11       Q.    What comment had been made about Debra

12   Moore by whom?

13       A.    It was a comment that Gail made to

14   Alexandra about a movie called Django Unchained,

15   referring to -- the comment was referring to

16   Debra being a house slave of Frank's.

17       Q.    You don't know what comment was actually

18   made, do you?

19       A.    I have the -- I mean, I have the comment

20   from Alexandra, who heard it, who relayed it to

21   Debra.  Was I privy to that?  No, I was not,

22   obviously.

23       Q.    And so you don't know what the context

24   of any comments that were made were?

25       A.    Comments about calling somebody a slave
```

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

Case 1:24-cv-00248-TRM-MJD     Document 29-7    Filed 08/18/25    Page 5 of 13
PageID #: 343

Case 1:24-cv-00248-TRM-MJD     Document 30-1    Filed 09/08/25    Page 197 of 229
PageID #: 574

```
 1    income."  Are there any additional resources,

 2    etc., that she may need.

 3             But, again, she gets an amazing rating

 4    by him, "amazing progress"?
```

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.          1:24-CV-00248-TRM
Michael Pico on 07/24/2025

```
 5    A.     I mean --

 6    Q.     Does that sound like somebody who needs

 7    to be fired?

 8    A.     Based on -- based on the facts, which

 9    you'll see, this wasn't an accurate

10    representation of her performance.  And, you

11    know, so again --

12    Q.     You don't know what her performance was

13    except by conversation with somebody else, right?

14    A.     Well, you saw in the bottom of my -- I

15    believe you have my notes from my script from

16    when I terminated her, as well as you see

17    underneath that the notes that Debra Moore had

18    provided me that day.

19    Q.     Okay.  But you don't know whether that

20    was accurate or not, do you?

21    A.     I have no reason to believe it's not
```

```
22    accurate.  I would not be given inaccurate

23    information.

24    Q.     Well, apparently Mr. Everson, who was

25    the fellow that was next to the CEO on the
```

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

Case 1:24-cv-00248-TRM-MJD     Document 29-7   Filed 08/18/25     Page 6 of 13
PageID #: 344

Case 1:24-cv-00248-TRM-MJD     Document 30-1   Filed 09/08/25   Page 198 of 229
PageID #: 575

1    hierarchy --

2        A.    He --

3        Q.    -- wrote this, correct?

4        A.    Frank at the time I believe had about 15

5    direct reports.  So when we say -- now, he

6    certainly reported to Frank.  Gail didn't report

7    to BJ.  She reported to operations.

8        Q.    It goes on down delinquencies and

9    prepaid, it says, "this is the third area that

10   showed massive improvements since our last

11   update.  Thank you for these efforts.  All

12   properties are up to date with tenant follow-ups

13   other than a handful of tenants at Maple Oaks and

14   one at Morningside.  Please continue to follow-up

15   on delinquent tenants.  Please let us know if you

16   have any questions," and then he has "thanks"

17   with an exclamatory mark.

18            Are you telling me this is not a glowing

19   recommendation by him?

20       A.    I'm saying that he clearly -- I mean, he

21   wrote what he wrote.  You know, I'm not going

22   to -- I'm certainly not going to debate his

23   words.  I think if you also look at a paragraph

24   about move-ins that lost 1 to 5 tenants in May

25   with a total of seven move-ins.  So to me he's

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com
Case 1:24-cv-00248-TRM-MJD    Document 29-7    Filed 08/18/25    Page 7 of 13
PageID #: 345

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    Page 199 of 229
PageID #: 576

```
 1   usually tend to glance down at it.  If I'm

 2   certainly doing it, like similar to Gail's, I'm

 3   almost practically reading it.  So as a matter of

 4   practice, and certainly for even occasions like

 5   this, I will always script out terminations.  And

 6   I recommend that to any member of an HR team so

 7   that it's very clear of what you are saying and

 8   what was said in the conversation.

 9       Q.    Okay.  One of the things on the next to

10   the last paragraph of the in bold writing is "for

11   what it's worth, I'm sorry to have to share this

12   news with you."

13       A.    Yeah.

14       Q.    You had one day on the job, and you're

15   having to fire somebody based on what you're

16   being told?

17            MR. JACKSON:  Object to form.

18       A.    Yeah.  And I wasn't a day on the job.  I

19   was about three weeks on the job at that point.

20       Q.    Okay.

21       A.    But, you know, look, as I told you in

22   the beginning of this deposition, I'm fond of

23   Gail as a person, and I don't take a -- I take a

24   termination very seriously.  In all aspects you

25   are changing somebody's life.  And even if it's
```

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.        1:24-CV-00248-TRM
Michael Pico on 07/24/2025

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com
Case 1:24-cv-00248-TRM-MJD    Document 29-7    Filed 08/18/25    Page 8 of 13
PageID #: 346

Case 1:24-cv-00248-TRM-MJD    Document 30-1    Filed 09/08/25    1:24-CV-00248-TRM  Page 200 of 229
PageID #: 577


| From: | BJ Everson |
|---|---|
| To: | Gail Griffin |
| Cc: | Frank Sinito; Debra Moore; Angelica Sinito; Samuel Jablonski; Alan Weckerly; Elizabeth Gabor |
| Subject: | Stabilization Plan - Region C2 Update |
| Date: | Sunday, May 28, 2023 1:08:36 PM |
| Attachments: | Stablization Plan - Region C2 Effective 4.1.23.xlsx |

Hi Gail,

Please see the attached updated plan as of last week. This is an amazing amount of progress since the prior update in early May, great efforts by you and your team!

Please see below highlights/questions based on the plan:

**Collections:**

- Amazing efforts here across the board! Only one needed help this week is Maple Oak (91.4%), so please engage that site staff to push for more collections and May will be an amazing month for your portfolio.

**Move In:**

- Each property lost 1-5 tenants in May with a total of 7 move-ins for the portfolio in May. Please let us know what your largest move-in issue is per property, and we will get you the resources.

**Recertifications:**

- Again, amazing progress across all properties since last update. Very much appreciate this, but let's get the remaining Past Due's completed so we are not at risk of losing income. Are there additional resources you need in order to get all of these completed? I believe a number of the properties needed to be caught up before month-end; please focus your attention on those.

**Rent Rolls:**

- Thank you for the Levels for Morningside and Maple Oak. Please let us know what you need from a supplies perspective and if additional manpower is needed. Please start with the Level 1s and get them occupied. Once we have the supply lists we can engage Domenic and get them ordered.

**Delinquent & Prepaid:**

- This is the third area that showed massive improvement since our last update, thank you for these efforts!
- All properties are up to date with tenant follow ups other than a handful of tenants at Maple Oaks and one at Morningside. Please continue to follow up on delinquent tenants.

Please let me know if you have any questions.

Thanks!



**Millennia**
THE MILLENNIA COMPANIES®

BJ Everson

Director of Asset Management

Millennia Housing Management

4000 Key Tower, 127 Public Square

Cleveland, Ohio 44114-1309

C: (614)-946-4686

beverson@mhmltd.com

**From:** Michael Pico <mpico@mhmltd.com>
**Sent:** Thursday, June 22, 2023 4:35 PM
**To:** Michael Pico <mpico@mhmltd.com>
**Subject:** Gail Griffin - Talking Notes

**Hi Gail,**

**Nice to see you again, and I wanted an opportunity to talk to you, I think you are alone, correct? I also realize it sounds like it has been a bumpy several months, as I am aware that you were provided with a Performance Improvement Plan on May 2, 2023, covering many operational topics, which I**

**did had a chance to review in detail. As well as I reviewed your rebuttal to it that you submitted on May 5.**

**I realize that this has been a tough time for you in so many ways. A couple of weeks ago, When it became clear to the organization that you would have not been successful ultimately in executing the components of the plan and did not see the progress on several line item, you were offered a severance plan or the demotion a couple weeks ago.**

**The organization continued to explore options on this and upon deeper and further review of the performance of the properties, both financially and physically, and the feedback from staff and other business partners, the organization has made the tough determination to re-offer you the severance plan again and separate employment effective today. For what it is worth, I am so sorry to have to share this news with you.**

**We are offering you a severance agreement which I will review for you in a couple minutes. This agreement will be at your pay rate of $90,000. I have just emailed and sent Alexandra a copy of it for you and will email it to you as well.**

1. Gail you were provided with a Performance Improvement Plan on May 2, 2023, concerning the following:
    a. ==Receivables:== Valencia Way had over $11,000 in non-deposited received rent payments that dated between December 22 and March 2023 – there was a total of $42,000 that had to be reconciled and it was determined that $11k of that was not deposited.
    b. ==No accountability of managing the delinquent and prepaid for most of the properties==
    c. ==Occupancy with the properties==
    d. ==Past due recertifications== – **met on a weekly basis – BJ, Debra and Bill**
        i. As of April 5, there were 125, both Tax Credit and HUD recertifications that were past due.
    e. Did not manage ==OT within the portfolio==, you had the highest amount of OT in 2022, within the entire portfolio.
    f. Morningside is now under HUD's eye based on lack of attention to the property – Sabrina was assigned to oversee all the other properties and was used as a DM; she did all the HAP for TN and Jacksonville properties and the attention to Morningside was lost.
2. During the month of May, Charles Seivers was in jeopardy of loosing HAP, based on your inability to staff and manage other properties – the APM, Jennifer was on loan to Morningside for over a year.
        i. ==There was a weekly meeting with BJ and Bill Worden to track and ensure the recertifications were completed – a total of 20% of the property was delinquent.==
            1. Gail was dismissive and kept stating, we won't lose all the money, she clearly did not have a full understanding of the importance of this process.

2. There is money in reserves - $316k– one boiler is down, and the other boiler is working extra – it's a matter of time before the boiler goes down – there has not been any action on your part to rectify this problem.
3. Trip hazard inside the foyer – again, nothing done to rectify this.
3. During your site visits, there's no engaged with the site staff or did they feel they were being supported.
   a. No interaction with staff or residents – did not walk units, did not audit any files during site visits.
4. Your staff was required do reporting, many that were unnecessary or even required and no further action was taken on your part with the reports.
5. Maple Oaks – city had an issue with the trash.
   a. They were paying another vendor and the trash had not been picked up for many weeks – This was finally resolved by Elizabeth, Domenic, and Accounting
6. Security at Morningside was non-existent, and we hired an outside vendor in lieu of hiring a concierge – the vendor is over $50 per hour and the shifts working was not reflective of the criminal activity hours.
7. Staff overall felt they did not receive support from you, they were instructed not to contact HR, compliance, or accounting – that they must call you – they were afraid to contact anyone and fearful of their job.
8. They felt you have favorite employees, for example, taking Kristi to all her doctors' appointments and others that were mentioned.

**Debra Moore**
**Vice President, Human Resources**
The Millennia Companies®
4000 Key Tower, 127 Public Square
Cleveland, Ohio 44114
(216) 236-0486 (Direct), (216) 570-6604 (Cell)
themillenniacompanies.com

Facebook | Twitter | LinkedIn | Instagram

1     Q.     I'm just asking you have you had

2   conversations with Frank Sinito on that topic?

3          MR. JACKSON:  He answered your question.

4   If we're going to go down this route, then we'll

5   have his other attorney present.

6     A.     I will need my attorney here, yeah.

7     Q.     Is Millennia in the business of

8   investing?

9     A.     I wouldn't say it's in business, but

10  certainly invested in properties, and they have.

11  So I would say yes.

12    Q.     Did you and Frank Sinito ever have a

13  conversation on the topic of at some point he

14  needed to turn the business over to the younger

15  generation?

16    A.     We've had many conversations on

17  succession planning within the organization.  As

18  for his need to have to do it, the answer would

19  be he certainly doesn't have to do it.  It was

20  always his intention that his children be

21  involved in the business.  So the answer to your

22  question is yes, we've had many conversations on

23  succession planning in the organization.

24    Q.     And did he tell you that at some point

25  it was time to turn it over to the younger

 1   generation?

 2       A.      No.  He never worded it that way.

 3       Q.      How did he word it?

 4       A.      That he'd like to turn over the company

 5   at some point in the future to leave it to his

 6   children to run, and for me to work with his

 7   children on, you know, succession planning and

 8   leadership training.

 9       Q.      Your last day at work before you left

10   was when?

11       A.      November 25, 2022.

12       Q.      Were you at the company at the time

13   there was a Valencia Way inspection and finding

14   checks, etc., etc.?

15       A.      I would have to know the date on that.

16   I mean, we're responsible for 288 properties at

17   that point, so you would have to give me a time

18   frame for that.

19       Q.      Without a date given to you, do you have

20   a recollection of having conversations with

21   people about checks and Valencia Way in Florida?

22       A.      I don't recall that, unless it happened

23   in the six months that I was gone.

24       Q.      Do you know a gentleman by the name of

25   James or Jim Zapf?  Z-A-P-F is the spelling of

Page 22

1    the word.

2        A.      Jim Zapf was being hired when I left, so

3    I did meet him -- I actually believe I met him

4    the day I gave notice.  He was in for an

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.        1:24-CV-00248-TRM
Michael Pico on 07/24/2025

5    interview.  So by the time Jim began in the

6    organization, I was already gone.  And by the

7    time I returned to the organization, Jim was

8    gone.  So I never worked with him, in answer to

9    your question.

10       Q.      Do you know why his employment ended?

11       A.      I don't.  I know it didn't work out.  As

12   for the details, again, I wasn't in the

13   organization at that time.

14       Q.      But he would have been there when you

15   were gone?

16       A.      He was -- his entire tenure was when I

17   was gone, starting and leaving.

18       Q.      So you would have had no opportunity to

19   know what work he did or what work he didn't do,

20   or anything along that --

21       A.      I would not, no.

Cleveland Reporting Partners, LLC  (216) 459-7880
CLEreporting.com

22       Q.      By the same token, anything dealing with

23   Valencia Way in Florida and Ms. Griffin, who's

24   the plaintiff in this case, you would have no

25   knowledge about things that would have related to

1    that either, would you?

2        A.    Knowledge -- I mean, I was briefed on

3    Ms. Griffin's situation, for lack of a better

4    word.  The day of her termination is the day I

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.        1:24-CV-00248-TRM
Michael Pico on 07/24/2025

5    got fully briefed on it.

6        Q.    So whatever you learned you learned from

7    somebody literally the day of her termination?

8        A.    Yeah.  I learned from Debra Moore.  I

9    mean, I had -- obviously in the nature of my role

10   I was -- before that I knew that there was

11   conversations on performance, there was some

12   conversations on Gail's performance regarding

13   quarterly inspections that hadn't happened.  I

14   know Frank was pretty adamant on numerous people

15   that weren't completing quarterly inspections,

16   that they would be written up, and I believe this

17   was at some point probably -- well, it would have

18   had to have been at some point in '21 or '22.

19   So, you know, I was aware that there was -- Gail

20   and others, in fairness, had struggles in this

21   area, and Frank was wanting performance

22   improvement plans issued.

23       Q.    Did the others, were they terminated?

24       A.    Well, nobody even had gotten written up.

25   So -- although Frank wanted it, there was no

1  write-ups issued at that point for this, so Gail

2  or others.  So in answer to your question, nobody

3  was terminated for that.

4      Q.    So Gail wasn't terminated, and there

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.          1:24-CV-00248-TRM
Michael Pico on 07/24/2025

5  weren't any write-ups that related to Gail on

6  that topic?

7      A.    On a that topic, no.  Frank had asked

8  for it do to performance deficiency at the point,

9  but it had not happened.

10     Q.    Do you recall the names of any of those

11 others who might have been the subject to a

12 possible write-up?

13     A.    I don't offhand.

14     Q.    Your job title currently is what?

15     A.    I'm the president and chief operating

16 officer of the company.

17     Q.    And before you assumed that position of

18 president and chief operating officer, who was

19 that person that held that title?

20     A.    Well, it was -- it was vacant from Lee

21 Felgar when Lee left.  So Lee left in -- I'm not

22 sure the date.  I believe it would have been

23 sometime in 2022 he left.  And -- but, again, it

24 could have been '21.  I'm not sure.  So there was

25 never -- so we never filled the president and COO

Page 25

1  role at that point.  We had moved to -- for

2  operations, I think there, you know, senior

3  VPs or EVPs of operations.  And then I was --

4  remember, when I came back in May of '23 I was

GAIL A. GRIFFIN vs MILLENNIA HOUSING MANAGEMENT, LLC, et al.        1:24-CV-00248-TRM
Michael Pico on 07/24/2025

5  the chief administrative officer, so I took

6  pieces of it.  I just didn't have operations

7  directly reporting to me.

8      Q.    Are you the CEO of the company at this

9  point?

10     A.    No.  We do not have a CEO at this point.

11     Q.    But you do have a president, and you're

12  it?

13     A.    And I'm it, yeah.

14     Q.    Do you recall a phone conversation that

15  you had with Gail on the topic of an office that

16  she held, that she was a -- see if I can find it

17  here -- let me see if I understand the timeline

18  here.

19            She was fired on, I think, June 23rd.

20  And she was fired by you, and that was the -- you

21  didn't know anything more about it than whatever

22  somebody had told you?

23     A.    It wasn't somebody.  So I was fully

24  briefed on it the day of the termination by Debra

25  Moore.  Debra Moore, the VP of HR, was handling

GAIL A. GRIFFIN,          *
                          *
    Plaintiff          *
                          *          NO.  1:24-cv-00248-TRM-MJD
Vs.                       *
                          *
MILLENNIA HOUSING MANAGEMENT *          JURY DEMANDED
LTD. And MILLENNIA HOUSING    *
DEVELOPMENT, LTD.             *
                          *
    Defendants          *

## DECLARATION OF KRISTI ADAMS

Comes Declarant, Kristi Adams, who makes the following declaration pursuant to 28

U.S.C. § 1746, and under penalty of perjury under the laws of the United States of America.

    1.    My name is Kristi Adams.  I live in Chattanooga, Tennessee.  I am above the age

of 21 years.

    2.    I was an employee of Millennia Housing Management LLC from October 5,

2020, until November 2023.

    3.    During most of my employment at Millennia, I worked under Gail Griffin.

    4.    I observed Gail Griffin performing her duties.  She was excellent as a leader.  She

worked very long hours, and she would answer my questions no matter what time of day or night

that I called.

    5.    Ms. Griffin began as my Regional Property Manager.  I initially worked in the

Knoxville area.  Later, I moved to Chattanooga where there was an opening at The Overlook.  I

also worked in Florida when there was a need.

1

6.     Frequently, various management employees of Millennia would set up calls with other employees. Sometimes, the calls were called "Zoom" and other times the calls were called "Teams."

7.     In late December of 2022 or early January of 2023, I was part of a call led by Mr. Zapf. He called us "Florida people." I was more a Tennessee person, but I helped in Florida when needed.

8.     Mr. Zapf stated that he knew employees were used to getting directions from Gail Griffin. He said, "You are no longer to be directed by Gail." Mr. Zapf stressed that he was in charge, and he would give us our directions. He said the same thing about any questions that we had. We were no longer to call Gail with any question. We were to call him with any questions. At one point, he said if we got a call from Ms. Griffin, we should let him know.

9.     The tone of the call from Mr. Zapf led me to wonder if Ms. Griffin was still employed by Millennia. It was very clear that Ms. Griffin was no longer in charge of the Jacksonville properties.

10.    After the call from Mr. Zapf, I learned Ms. Griffin was still employed but was to lead Tennessee and Kentucky as a Regional Director and would return to Tennessee. I was told that by Ms. Griffin and other management employees. I was glad I would still be supervised by Ms. Griffin.

11.    Prior to Ms. Griffin's return to Tennessee, I know Ms. Griffin was to help in Calloway Cove's preparations for a HUD inspection. At some point, Mr. Onix was assigned to lead the Jacksonville properties.

2

12.     During my employment, I was involved in many meetings.  One meeting was a short time before Ms. Griffin was terminated.  Ms. Griffin, Ms. Moore (head of Millennia's human resources), Mr. Weckerly (company vice president) and I were present at the meeting.

13.     Ms. Moore led the meeting.  In fact, she did almost all of the talking.  Mr. Weckerly did not seem to be paying any attention.  He was working on other matters.  He would only look up occasionally.  I recall he took a phone call.

14.     Ms. Moore was extremely aggressive.  She told Ms. Griffin that her certifications did not matter.  Ms. Moore kept saying to Ms. Griffin, "At your age, it is time to retire."  Ms. Moore said, "We all work for Mr. Sinito, and it is time to go."  Ms. Moore used "at your age" several times.

15.     Ms. Griffin responded two or three times.  Ms. Griffin said her certificates and education were important in her work.  Ms. Griffin said they had talked about her age and retirement several previous times.  She said her answer had not changed.  Ms. Griffin said she wanted to help people and wanted to help the company.  She wanted to work.

16.     I was surprised how blunt Ms. Moore was.  I saw Ms. Griffin fight not to cry.

17.     Ms. Moore kept pushing Gail Griffin to retire.

18.     Later, I was told that Gail Griffin was to be bumped  down to being the Property Manager at Overlook. I was the Property Manager at Overlook.  I knew there was no opening since it was my job.

19.     Another time I was supposed to meet with Ms. Griffin at the Overlook in Chattanooga. However, that day I was dealing with an illness, so I did not make the meeting.  I learned from Ms. Griffin that she was fired that day.

20.     Obviously, I was much younger and less experienced than Ms. Griffin.

3

21.    When I first talked to Ms. Alexandra Thpson, she said she had no idea Ms. Griffin would be fired.  She said she had never met Ms. Griffin until the day she was fired.  She said Ms. Griffin had great skills and she was sorry she was fired.  She said she had no input in the firing. A later conversation with her was different.  She said she wanted to find anything Ms. Griffin had ever done wrong.  I told her Ms. Griffin was the best boss I ever had. Ms. Thompson said others had told her the same thing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of September, 2025.

_____          _____
KRISTI ADAMS                                                    DATE
4 Sept. 2025

4

| | |
|---|---|
| **From:** | BJ Everson |
| **To:** | Gail Griffin |
| **Cc:** | Frank Sinito; Debra Moore; Angelica Sinito; Samuel Jablonski; Alan Weckerly; Elizabeth Gabor |
| **Subject:** | Stabilization Plan - Region C2 Update |
| **Date:** | Sunday, May 28, 2023 1:08:36 PM |
| **Attachments:** | Stablization Plan - Region C2 Effective 4.1.23.xlsx |

Hi Gail,

Please see the attached updated plan as of last week. This is an amazing amount of progress since the prior update in early May, great efforts by you and your team!

Please see below highlights/questions based on the plan:

**Collections:**

- Amazing efforts here across the board! Only one needed help this week is Maple Oak (91.4%), so please engage that site staff to push for more collections and May will be an amazing month for your portfolio.

**Move In:**

- Each property lost 1-5 tenants in May with a total of 7 move-ins for the portfolio in May. Please let us know what your largest move-in issue is per property, and we will get you the resources.

**Recertifications:**

- Again, amazing progress across all properties since last update. Very much appreciate this, but let's get the remaining Past Due's completed so we are not at risk of losing income. Are there additional resources you need in order to get all of these completed? I believe a number of the properties needed to be caught up before month-end; please focus your attention on those.

**Rent Rolls:**

- Thank you for the Levels for Morningside and Maple Oak. Please let us know what you need from a supplies perspective and if additional manpower is needed. Please start with the Level 1s and get them occupied. Once we have the supply lists we can engage Domenic and get them ordered.

**Delinquent & Prepaid:**

- This is the third area that showed massive improvement since our last update, thank you for these efforts!
- All properties are up to date with tenant follow ups other than a handful of tenants at Maple Oaks and one at Morningside. Please continue to follow up on delinquent tenants.

Please let me know if you have any questions.

Thanks!



BJ Everson

Director of Asset Management

Millennia Housing Management

4000 Key Tower, 127 Public Square

Cleveland, Ohio 44114-1309

C: (614)-946-4686

MILLENNIA00095

12 Bates No. M  95-96 Amazing Progress Email from BJ.pdf

beverson@mhmltd.com

MILLENNIA00096

To: Debra Moore
    Alan Weckerly

Re: Gail A. Griffin Response to PIP

I do appreciate that you recognized the facts that I inherited many challenges including lack of staff, no staff and staff discord which hindered the progression that was wanted to be achieved. Which was the "Millennia Way" and was accomplished.

The problems are the same, but many improvements have been made i.e., less complaints from residence getting to corporate and CGI, successful MORs, closing of an MOR that had been open over a year, passing of REACs, successfully appealing of a REAC, HUD visits with glowing reviews from the HUD Representative. Completing and satisfying four state audits and closing four state audits that were still from the previous year. Implementing the "No Smoking Policy" on all four properties in Jacksonville. Hiring of staff that were highly qualified; recommended and vetted by HR. The volume of issues that were presented to me were not just high and time consuming but extremely high. Remember no staff, no monies with an additional 768 units.

I do understand that there were some Money Orders/checks found that had not been processed of course the December money orders/checks would fall on me but beginning in January I was not at Valencia because James Zapf had me mostly working on the REAC for Calloway Cove and the issues at Morningside Gardens he assigned Pearl Gray, the ops specialist and himself to handle Valencia Way, he stated that he would take more control of VW and reassigned me to other duties that did not include VW. I was not part of the on-boarding of the PM or any day-to-day operations activities except the EQD at Valencia Way and The Weldon since last of December. That would be approximately $2936.00 that would have been under my watch that was not posted. Also, I noticed that some of payments should not have been accepted because they were partial payments, which is Millennia's policy. We do not accept partial payments except when approved by upper management.

When I accepted the role of RPD that included Jacksonville, the ledgers were horrendous Pearl Gray and myself work on straightening out the ledgers and also enlisted the help of William Worden who said that we can't fix the files unless you actually the property, we had 1 person at Valencia Way, 1 person at Calloway Cove and no staff at The Weldon, or Palmetto.

There were no payments being made to the attorneys in TN (Morningside, Maple Oak and Summit Towers) Therefore we could not go forward with any evictions.

2 Bates No. M 84-87 Response to PIP.pdf

MILLENNIA00084

Pearl Gray and I worked on the ledgers and in 1 week we recouped $39001.50, this was an ongoing trend that we worked on continuously.

I do understand that there were some Money Orders/checks found that had not been processed of course the December money orders/checks would fall on me but beginning in January I was not at Valencia because James Zapf had me mostly working on the REAC for Calloway Cove and the issues at Morningside Gardens he assigned Pearl Gray, the ops specialist and himself to handle Valencia Way, he stated that he would take more control of VW and reassigned me to other duties that did not include VW. I was not part of the on-boarding of the PM or any day-to-day operations activities except the EQD at Valencia Way and The Weldon since last of December. That would be approximately $2936.00 that would have been under my watch that was not posted. Also, I noticed that some payments should not have been accepted because they were partial payments, which is Millennia's policy. We do not accept partial payments except when approved by upper management.

With this statement you included $42000 which is misleading because you are including the total amount that was ran that particular day and $31000 had already been posted not $42000, There should have been more than that as we are to hold on to the check for at least 60 days.

Please see the Quarterly Inspections per Millennia's Policy "ii. Regional Managers shall complete 25% apartment home inspections quarterly, 100% annually."

I have never used Sabrina Noble as a District Manager; she has acted as my Sr. Property Manager including in Jacksonville until her transfer occurred in April. I also other property managers that assisted in Jacksonville and neither were considered a District Manager: Rose King, Kristi Adams and Theresa Caton.

I did not hire Antonio Blevins, he was LMT at Valencia Way when I arrived. FTS asked for him to be made Maintenance Supervisor at $60000+ because he was working too many hours, which was completed.

In the early part of 2022 Antonio came to assist with a REAC at Maple Oak, Kingsport, TN after completing a successful REAC at Valencia Way. He mentioned to the RMM Maurice Hampton and to the RMM Willie Crockett that he was interested in transferring to TN. When he came back from TN, he asked me about transferring and I let him know we did not have a position at that time. Several months later he came to TN to help with another REAC and there was a supervisor position open, he asked for the transfer it was granted because he had gotten VW up to 98% occupied, helped with 4 successful REACs within that year and had no complaints from either of the PMs the RMM that he worked for in Jacksonville,

2 Bates No. M 84-87 Response to PIP.pdf

MILLENNIA00085

I made the request to Alan and Debra that you would approve both the promotion to Maintenance Supervisor as well as the transfer to TN.

I don't see how you can hold me responsible for someone's personal lifestyle. He was not terminated because of his job performance.

Shawn Williams has done a great job in assisting with other properties in Jacksonville, Calloway Cove has a Satisfactory on the last MOR and passed the REAC. I have no documented performance issues while she has worked for me in Jacksonville. The concern you brought up to me, I had never heard, nor has she ever used anything to the nature around me. That matter should not be on me, it should be on Onix Sosa the new RM for Calloway Cove. I understand she is still employed with Millennia and in good standing as far as I know.

Donnie Davis is the Lead Maintenance Tech at Cherokee Hills 97 units, his qualifications to become an RMM are astounding, not only did William Mahaffey (HR) recommend him to be further interviewed by Rodney Weir, Facilities Director found that he met all the qualifications and felt that he would be great for the positions before I even spoke with someone. I presented the idea to Alan who agreed to have him interviewed, Alan has worked side by side with Donnie and knows his capabilities and knowledge. The position of an RMM no matter who is hired will still be traveling, needing lodging, meals paid for and any other incidental. This position has nothing to do with his current position, it is completed different realm. He qualifies and should not be penalized because he already works for us, actually he should be encouraged to continue his experience at Millennia.

I really don't understand about the issue about my dimples, I have had many conversations with my employees about their life, children, parents, clothes, death and sickness. That's what I believe Millennia is all about Respect, Performance, Service-Focused and collaboration.

I still don't remember about the PM's car, but I don't believe Alan made a mistake. But I do remember mentioning to Alan on 3 different occasions about Phyllis Bess, Pearl Gray and Yasmarie Pizzaro's car being keyed and was never informed that we would pay for anyone's' personal property. Each one asked me, and I asked my VP. Going forward I will definitely bring to your attention.

Sabrina Noble

On February 6, on a Teams call at 2:00pm with Frank Sinito, Alan Weckerly and Jim Zapf. I was assured by Frank 2x's during the meeting that my pay would stay the same. That I was being moved to work on the TN properties. On 04/12/2023, the day that the money orders were found, I was with Frank when this was discovered. After

our site visit Frank grabbed me by my shoulders in front of Onix Sosa and said to me that I had done a great job, and this was not a negative reflection on me in any way. That is just time to pass the baton and let Onix finish the course, Onix agreed with him, and Frank hugged me. There is more but I believe I have made my point.

I started with Millennia in 2016 as a Property Manager, I was promoted to Senior Property Manage in 2017, in 2018 I was promoted to Regional Manager and in 2021. I was promoted to Regional Property Director. All of my years in this industry (25). I have had Excellent Reviews even the last one that was completed by Alan Weckerly I received a 4.15 out of 5. I have received bonuses, raises and promotions since I have been with Millennia. Of course, this is very much of a shock when I am put on a PIP, never receiving a verbal or written warning actually the opposite has happened. I have gotten so many compliments on how well Jacksonville is turning around since the time I took over.

I will continue to do my job as best I can with honesty and integrity and will make Millennia as proud of our teamwork as ever. I will accomplish all goals set before because they come naturally to me.

I will do my cheerfully and with a smile.

*Gail A. Griffin*                                                 *05/05/2023*

_____

Gail Griffin                                                           Date

2 Bates No. M 84-87 Response to PIP.pdf

MILLENNIA00087

Office of General Counsel
Departmental Enforcement Center

March 13, 2024

**VIA EMAIL & FEDEX**

Frank T. Sinito
Millennia Housing Management Ltd ▬▬▬▬▬▬
Millennia Housing Management, Ltd. ▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬

Re: Notice of Final Determination

Dear Mr. Sinito:

By notice dated December 14, 2023 (Notice), you were notified of your proposed five-year debarment and that of your company, Millennia Housing Management Ltd. (Millennia). The Department of Housing and Urban Development (HUD or the Department) proposed your and Millennia's five-year debarment period to run from December 14, 2023, the date of both of your suspensions. You were both informed of your right to submit, within 30 days of your receipt of the Notice, a written argument and a request for a hearing in opposition to the proposed debarment action. The Notice also advised you that if you did not respond within 30 days, a final determination would be issued.

The Department agreed to several extensions of your time to request a hearing. The last such extension was provided on March 4, 2024, when HUD sent your counsel an email granting you one additional week, *i.e.*, until March 11, 2024, to either execute the latest draft settlement agreement to which HUD had agreed or request a hearing. Since you did neither, you have waived your right to contest, and your and Millennia's debarments have become final agency action. During the period of your and Millennia's debarments, both are excluded from procurement and nonprocurement transactions, as either a principal or participant, with HUD and throughout the Executive Branch of the Federal Government. The debarments are effective through December 13, 2028. The suspension actions previously imposed are hereby superseded by this debarment action.

These actions are separate and independent of any other enforcement actions that HUD has taken or may take in the future. Nothing herein waives HUD's or any other agency's right to investigate or take any action that they deem appropriate.

Sincerely,

3/13/2024

X  Mark G. Borum

Mark G. Borum

Signed by: MARK BORUM

Mark G. Borum
Director
Departmental Enforcement Center

CC: Monica Sussman, Esq.
    Rebecca Simon, Esq.
    Stephen Wallace, Esq.

cc:
CACB        Director, DEC (Borum, Mark G.)
CACBB      Director, Compliance Division (Trice, Carmen Y.)
CACBB      File
CACBB      Thompson

## VIA FEDERAL EXPRESS

Frank T. Sinito
Millennia Housing Management Ltd ██████████
Millennia Housing Management, Ltd. ██████████

██████████

Re:  Notice of Suspension and Proposed Debarment of Frank T. Sinito and Millennia Housing Management, Ltd.

Dear Mr. Sinito:

The Department of Housing and Urban Development (HUD) hereby suspends, and proposes the debarment of, you, Frank T. Sinito, and of two companies you own or control, Millennia Housing Management Ltd and Millennia Housing Management, Ltd. (collectively "Millennia Management") (you and these companies are herein, collectively, "you"), from future participation in procurement and nonprocurement transactions as participants or principals with HUD and throughout the Executive Branch of the Federal Government, for a five year period from the date of this letter.  This action is in accordance with the procedures set forth at Title 2, C.F.R., Parts 180 and 2424.  Copies of the regulatory provisions cited herein may be found on the U.S. Government Publishing Office's website at www.govinfo.gov.

The regulations governing suspension and debarment apply to you because you have been, are, and may reasonably be expected to be a participant or principal in a covered transaction, either with a Federal agency or with a participant in such a transaction.  *See* 2 C.F.R. §§ 180.120(a), 180.150, 180.200.  Specifically, Mr. Sinito has an ownership interest, directly or indirectly, in over two hundred multifamily properties insured and/or subsidized by the Federal Housing Administration (FHA) and subject to the HUD Regulatory Agreement for Multifamily Projects (Regulatory Agreement).[1]  Moreover, Mr. Sinito, based on his ownership interest in multifamily affordable housing properties, has entered into multiple Section 8 project-based housing assistance payment (HAP) subsidy contracts with HUD.  Millennia Management manages FHA-insured properties—and other properties regulated by HUD—for Mr. Sinito and for other owners.  Mr. Sinito is a "principal" of Millennia Management.  *See* § 180.995(a) ("principal" means, among other things, an "officer, director, owner, partner, principal investigator, or other person within a participant with management or supervisory responsibilities related to a covered transaction").  Millennia Management's improper conduct is imputed to Mr. Sinito because he participated in and

---

[1] The current version of this Regulatory Agreement is form HUD-92466M.  Some of the properties described in this Notice are subject to previous versions of HUD Regulatory Agreement, but the requirements described herein are substantially the same in all relevant versions of the Regulatory Agreement.

had knowledge of or reason to know of the improper conduct. Likewise, Mr. Sinito's improper conduct is imputed to Millenia Management because the entities participated in the improper conduct and had knowledge of or had reason to know of the improper conduct. *See* 2 C.F.R. § 180.630(b).

As noted above, you own, directly or indirectly control, and/or manage over two hundred multifamily housing properties around the country, many of which are subject to Regulatory Agreements, each of which is a "public agreement" for purposes of § 180.800(b). The requirements discussed below are not only terms of those public agreements; they are also regulatory requirements for purposes of § 180.800(b)(3). You have violated these requirements both with respect to unauthorized transfers and underfunded security deposit accounts. Nearly $4.9 million is missing or was improperly taken from 19 HUD-insured or HUD-subsidized properties.[2] Violations of these requirements jeopardize the financial health of the properties, jeopardize the housing stability of the tenant families, and increase the risk of a default to HUD. Your misconduct is so serious and compelling as to affect your present responsibility. *See* § 180.800(d).

First, under the terms of those Regulatory Agreements, any funds collected as security deposits "shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account." These requirements are based on HUD regulations. *See* 24 C.F.R. §§ 880.608, 881.601, 883.701, 884.115, 886.116, 886.315, 891.435, 891.635, 891.775. The HAP contracts applicable to some of these properties also expressly and specifically require compliance with these regulations.

The tenant security deposit accounts for fourteen (14) HUD-insured or HUD-subsidized properties were materially underfunded as of April 30, 2023, in the total amount of $405,229.16, as summarized in this table:

| IREMS Number | Property Name | Liability | Funded | Underfunded Amount |
|---|---|---|---|---|
| 800009975 | Canterbury Gardens | $32,379.00 | $3,548.45 | $28,830.55 |
| 800016382 | Cedar Woods | $20,637.00 | $7,490.07 | $13,146.93 |
| 800016456 | Covenant House | $11,327.00 | $1,521.44 | $9,805.56 |
| 800010084 | Elmcrest Village | $43,955.00 | $3,780.91 | $40,174.09 |
| 800017102 | Evergreen Estates | $12,421.00 | $11,716.46 | $704.54 |
| 800016691 | Highland Place | $24,705.00 | $11,874.97 | $12,830.03 |
| 800242177 | Hunters Run Apartments | $59,350.50 | $17,949.72 | $41,400.78 |
| 800016738 | International Towers | $30,868.00 | $11,815.89 | $19,052.11 |
| 800016654 | Morning Star Towers | $42,194.50 | $14,090.38 | $28,104.12 |
| 800010515 | Riverview Terrace | $23,946.50 | $11,502.38 | $12,444.12 |
| 800017255 | Sherman-Thompson Towers | $43,542.50 | $23,199.83 | $20,342.67 |

---

[2] The 19 identified properties represent a sample review of the Millenia portfolio. HUD has reason to suspect that the problems identified in this Notice exist in other properties. HUD is in the process of attempting to identify all HUD-insured and/or subsidized properties with missing funds.

2

| | | | | |
|---|---|---|---|---|
| 800009925 | St Antoine Gardens | $36,860.79 | $10,469.50 | $26,391.29 |
| 800017262 | Villages at Franklin Crossing | $157,990.68 | $13,363.07 | $144,627.61 |
| 800017491 | Whispering Hills | $10,746.00 | $3,371.24 | $7,374.76 |
| | | **Total Underfunding** | | **$405,229.16** |

Second, the Regulatory Agreements also prescribe the timing and amount of distributions to owners, limiting such distributions to either a percentage of initial equity or available surplus cash. Distributions, or advances, made when a property is not in a surplus cash position are not permitted. These requirements are also based on HUD regulations. *See* 24 C.F.R. §§ 880.205, 881.205, 883.306.

The following sixteen (16) properties had unauthorized distributions or loans from January 1, 2022, to April 30, 2023. There was a total of 147 improper distributions/loans in the amount of $4,578,671. The total amount of unauthorized distributions or loans for each of the properties is listed in the following table:

| IREMS Number | Property Name | Amount |
|---|---|---|
| 800016382 | Cedar Woods | $397,000 |
| 800016409 | Cherry Estates | $195,000 |
| 800016456 | Covenant House | $80,000 |
| 800010084 | Elmcrest Village | $857,787 |
| 800017102 | Evergreen Estates | $367,800 |
| 800016691 | Highland Place | $401,000 |
| 800242177 | Hunters Run Apartments | $243,384 |
| 800016738 | International Towers | $77,000 |
| 800016444 | Kingsbury Tower | $113,000 |
| 800016654 | Morning Star Towers | $930,700 |
| 800016516 | Oakdale Estates | $50,000 |
| 800016626 | Oakdale Estates Senior | $81,000 |
| 800010515 | Riverview Terrace | $280,000 |
| 800017255 | Sherman-Thompson Towers | $56,000 |
| 800009925 | St Antoine Gardens | $198,000 |
| 800016412 | Trail West Apartments | $251,000 |
| | **Total Potential Unauthorized Distributions** | **$4,578,671** |

The underfunding of security deposits and unauthorized distributions were, in each case,[3] a willful failure to perform in accordance with the terms of applicable Regulatory Agreements and/or

---

[3] In correspondence with HUD, you have acknowledged applicable distribution restrictions on 20 properties, including some of those identified here; you also acknowledged the present underfunded status of security deposit accounts on 23 properties, including some of those identified here. Some properties were subject to multiple contractual prohibitions.

3

HAP contracts and a willful violation of the regulatory provisions cited above that apply to those agreements.

Your misconduct affects the integrity of HUD's multifamily programs because it jeopardizes the financial viability of the projects. The mismanagement of your properties risks the housing stability, and housing quality, of those tenant families. For these reasons, you are not presently responsible to enter into public agreements or transactions and are subject to debarment.

You are also suspended because, as discussed above, there is adequate evidence to suspect that there exists cause for your debarment under §§ 180.800(b)(1), (b)(2), (b)(3), and (d). *See* § 180.700(b). Under § 180.800(b)(1), a federal agency may debar a person for the violation of the terms of a public agreement or transaction "so serious as to affect the integrity of an agency program," including a "willful failure to perform in accordance with the terms of one or more public agreements or transactions;" or a "willful violation of a statutory or regulatory provision or requirement applicable to a public agreement or transaction." § 180.800(b)(1), (b)(3). Pursuant to §180.800(b)(2), a federal agency may debar a person for a "history of failure to perform or of unsatisfactory performance of one or more public agreements or transactions." Debarment may also be based on "[a]ny other cause of so serious or compelling a nature that it affects your present responsibility." § 180.800(d). The ongoing nature and scale of your misconduct and the financial impact on the tenants that you serve requires HUD to suspend you immediately to protect the public interest. Moreover, HUD has on at least two occasions, most recently on November 28, 2023, demanding repayment of these funds to their respective accounts. You have failed to repay these accounts and you claimed that you currently lack the ability to repay the project funds, which further demonstrates your continuing risk to HUD and the immediate need for your suspension. Your suspension lasts until the conclusion of these debarment proceedings. *See* § 180.760(a).

If you decide to contest this Notice of Suspension and Proposed Debarment, you may submit a written argument and request a hearing. Pursuant to 2 C.F.R. §§ 180.730 and 180.825, your written submission must identify: 1) specific facts that contradict the statements contained in this Notice of Suspension and Proposed Debarment (a general denial is insufficient to raise a genuine dispute over facts material to the suspension); 2) all existing, proposed, or prior exclusions against you under regulations implementing Executive Order 12549 and all similar actions taken by Federal, State, or local agencies, including administrative agreements that affect only those agencies; 3) all criminal and civil proceedings against you not included in this Notice of Suspension and Proposed Debarment that grew out of the facts relevant to the cause(s) stated in this Notice; and 4) all of your affiliates as defined by 2 C.F.R. § 180.905. If you provide false information, the Department may seek further criminal, civil or administrative action against you as appropriate.

Please be advised that contesting a suspension does not stay the suspension. While contesting the suspension, you are prohibited from participating in any nonprocurement or procurement transaction with the Federal Government as identified above.

Your written opposition and hearing request must be submitted within 30 days of your receipt of this Notice. Your response **MUST** be in the form of an E-Mail directed to Camille

4

Campbell, Departmental Enforcement Center, U.S. Department of Housing and Urban Development at the following email address: DEC-Docket@HUD.gov.

The final decision regarding this Notice of Suspension and Proposed Debarment will be based upon evidence/information, including any written information and/or argument that both you and the Government may submit in this matter. If you fail to respond to this Notice within the 30-day period, your suspension and proposed debarment will become final. When this matter is referred to a Hearing Officer for a formal hearing, this notice of administrative action shall also serve as a complaint, in compliance with 24 C.F.R. § 26.13(a), (b) and (c).

Sincerely,

MARK BORUM

Digitally signed by MARK BORUM
DN: CN = MARK BORUM, C = US O = U.S. Government
OU = Department of Housing and Urban Development,
Office of General Counsel
Date: 2022.12.14 14:20:43 -05'00'

Mark G. Borum
Acting Director
Departmental Enforcement Center

5